1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3   UNITED STATES OF AMERICA,        )
                                     )  Case No. 3:16-CR-00051-BR
4            Plaintiff,              )
                                     )
5   v.                               )  October 14, 2016
                                     )
6   AMMON BUNDY (1),                 )
    RYAN BUNDY (5),                  )
7   SHAWNA COX (7),                  )
    DAVID LEE FRY (13),              )
8   JEFF WAYNE BANTA (14),           )
    KENNETH MEDENBACH (16),          )
9   NEIL WAMPLER (20),               )
                                     )
10           Defendants.             )
    _____)  Portland, Oregon
11

12              TRANSCRIPT OF PROCEEDINGS

13          (Day 22 - Jury Trial - Volume 1)

14      BEFORE THE HONORABLE ANNA J. BROWN, DISTRICT JUDGE

15

16

17

18

19

20

21
    COURT REPORTER:          AMANDA M. LeGORE
22                           ORCSR, RDR, CRR, FCRR, OCE
                             U.S. District Court
23                           333 West Broadway, Suite 420
                             San Diego, CA 92101
24                           amanda_legore@casd.uscourts.gov

25

```
 1    APPEARANCES:
      FOR THE PLAINTIFF:        GEOFFREY BARROW
 2                             CRAIG GABRIEL
                               ETHAN KNIGHT
 3                             Assistant U.S. Attorneys
                               U.S. Attorney's Office
 4                             1000 SW Third Avenue, Suite 600
                               Portland, OR  97204
 5                             (503)727-1000

 6

 7    FOR DEFENDANT AMMON
      BUNDY:                    J. MORGAN PHILPOT
 8                             JM Philpot Law
                               1063 E. Alpine Drive
 9                             Alpine, UT 84004
                               (801)810-8369
10
                               MARCUS MUMFORD
11                             Marcus R. Mumford, PC
                               405 S. Main Street, Suite 975
12                             Salt Lake City, UT 84111
                               (801)428-2000
13
      FOR DEFENDANT RYAN
14    BUNDY:                    RYAN BUNDY
                               Pro se
15                             79400-065

16                             LISA LUDWIG
                               Standby Counsel
17                             811 SW Naito Parkway, Suite 500
                               Portland, OR  97204
18                             (503)223-5570

19                             ROGER ROOTS

20    FOR DEFENDANT SHAWNA
      COX:                      TIFFANY HARRIS
21                             (Standby Counsel)
                               121 SW Salmon Street, Suite 1420
22                             Portland, OR  97204
                               (503)546-2927
23

24

25
```

```
 1   APPEARANCES:   (continuing)

 2   FOR DEFENDANT DAVID
     FRY:                    PER OLSON
 3                           Hoevet Olson Howes, PC
                             1000 SW Broadway, Suite 1500
 4                           Portland, OR  97205
                             (503)228-0497
 5
     FOR DEFENDANT JEFF
 6   BANTA:                  ROBERT SALISBURY
                             330 South 1st Street
 7                           PO Box 1272
                             St. Helens, OR  97051
 8                           (503)397-9000

 9

10   FOR DEFENDANT KENNETH
     MEDENBACH:              KENNETH MEDENBACH
11   (not present)           Pro Se
                             25795-086
12
                             MATTHEW SCHINDLER
13                           Standby Counsel
                             501 4th Street, #324
14                           Lake Oswego, OR  97034
                             (503)699-7333
15

16
     FOR DEFENDANT NEIL
17   WAMPLER:                LISA MAXFIELD
                             Pacific Northwest Law, LLP
18                           1420 World Trade Center
                             121 SW Salmon
19                           Portland, OR  97204
                             (503)222-2661
20

21   ALSO PRESENT:           DAVID McDONALD

22

23

24

25
```

1                                    INDEX

2

3                              Witness Index

4

FOR THE DEFENDANT:              <u>Direct</u>  <u>Cross</u>   <u>ReDirect</u>   <u>ReCross</u>
David Blanchard                    55     57
David Fry                          58    136       186        187
David Fry                                146                  192
David Fry                                154
David Fry                                156
David Fry                                157
David Fry                                171
Charles Snipes                    196
Duane Schrock                     201    229
Duane Schrock                            232
Duane Schrock                            233
Duane Schrock                            235
Timothy Puckett                   244    249       249

12

13

14                              -oOo-

15

16

17

18

19

20

21

22

23

24

25

1          (October 14, 2016; 8:03 a.m.)

2

3                    P R O C E E D I N G S

4

5          THE COURT:  So let's go on the record, everyone.

6          I want to note Mr. Mumford's timely presence today.

7          Mr. Olson, you're going to start with Mr. Fry?

8          MR. OLSON:  Yes, your Honor.

9          THE COURT:  What's the current estimate now of your

10  direct, please?

11          MR. OLSON:  15 minutes.

12          THE COURT:  Okay.  And do other defenders intend to

13  examine Mr. Fry at any length?

14          I'm only interested in timing here.

15          MR. SALISBURY:  I intend to, but not in any way --

16          THE COURT:  Sure.  Okay.  Are there any issues at all

17  I need to preview with respect to issues?

18          MR. OLSON:  No.  We resolved the one issue.

19          THE COURT:  Thank you.

20          And then, Ms. Maxfield.

21          MS. MAXFIELD:  Yes, your Honor.

22          THE COURT:  You filed a stipulation with respect to

23  Mr. Wampler's date of departure.  Tell me when you want it

24  read, and I'll read it.

25          Is Agent Blanchard now lined up or not?

1    MS. MAXFIELD:  I hope so.  I sent him an e-mail.  But

2    I -- is -- Agent Blanchard said he would be available at what

3    time?

4    MS. PHILIPS:  He's available in his office at 8:15

5    this morning.

6    THE COURT:  Do you want to see if Mr. Olson will

7    yield, and let you put him on quickly at 9:00?

8    MS. MAXFIELD:  Actually, I sent an e-mail, telling

9    him he would follow this witness but --

10   THE COURT:  Follow Mr. Fry, or not?

11   MS. MAXFIELD:  Yes.  I just don't want to be

12   embarrassed again and have --

13   THE COURT:  I know.  That's why I was thinking if we

14   started with him, you could hook him up, have him on the line

15   when the jurors walk in the room.

16   How long is -- how long is Blanchard?

17   MS. MAXFIELD:  Ten minutes, tops.

18   THE COURT:  Mr. Olson, how do you feel about

19   deferring to Blanchard?

20   MR. OLSON:  That's fine with me, your Honor.

21   THE COURT:  Okay.  So why don't you work with

22   Ms. Boyer, before we bring the jury in, to get Blanchard on the

23   line shortly before 9:00.  And then we'll know for sure we've

24   got a good connection, and all of that, while they come in the

25   room.  Okay?

1          Are there issues now, any more, with respect to

2    Blanchard?  No.

3          And then you'll want the stipulation read.

4          And then you have Mr. Snipes, too, or not?

5          MS. MAXFIELD:  I believe Mr. Snipes is on his way.

6          THE COURT:  Okay.  So what issues do I need -- what

7    are -- what is there remaining to resolve before we go forward?

8          Mr. Mumford?

9          MR. MUMFORD:  I believe -- your Honor, I believe

10   there are two issues that we had lingering yesterday and that

11   are still unresolved.

12          The one issue is Mr. Puckett.  See if we can't make

13   arrangements for him to testify remotely.

14          Let's talk about, first if we can, the issue of the

15   confidential informants.  We met, conferred, couldn't come to

16   anything.  We didn't get any information out of the Government

17   concerning who these folks are, or anything else.  So I think

18   we're coming back to your Honor for a resolution of that.  And

19   if your Honor wants me to, you know, go into that more, I can.

20          THE COURT:  Yes, in just a moment.

21          The other issue I had on my list was the stipulation

22   with respect to Mr. Brownscombe, or not.  Has that been

23   resolved?

24          MR. MUMFORD:  I believe it has, your Honor.  I don't

25   know if we've -- I don't know if we've finalized the language,

1  but we've agreed in concept to it.

2          MR. BARROW:  The witnesses have been released from

3  the subpoena, and we've agreed to stipulate as to the court --

4  as we've discussed in open court.  So I don't know the language

5  is really at issue, either.

6          THE COURT:  Write it out.  It should be filed, just

7  like everything else eventually.  But if you write it out, sign

8  off, I'll read it to the parties, and then you can make the

9  filing.

10          So with respect to Mr. Puckett, I thought where we

11  left it off was I - over the Government's objection, I was not

12  going to permit him to testify by telephone.

13          When the parties agree that a witness may testify by

14  telephone, I'm not stepping in the way of that, like with Agent

15  Blanchard.  So if Mr. Puckett can come personally, I've told

16  the defendants they can call him out of order, reserve resting

17  except as to him, and he can come Monday, if that's the issue.

18          MR. MUMFORD:  I would like that -- leave to do that.

19          Also, your Honor, I believe -- was it possible that

20  we could get him by Skype?  For example --

21          THE COURT:  No.

22          MR. MUMFORD:  Well, hold on for just a second.

23          THE COURT:  I thought I was talking about the IT

24  capacity, here.

25          MR. MUMFORD:  I think that your Honor said that if by

1    Skype, then it has to be with another courthouse, and it takes

2    time in advance.  The thought I had was maybe we could reach

3    out to the Pendleton courthouse today and see if he can go to

4    Pendleton on Monday.

5              THE COURT:  Here's our Pendleton courthouse

6    situation.  It's not staffed.  We have a part-time magistrate

7    judge who uses the chambers there as needed.  And when court is

8    scheduled, IT literally travels from Portland to Pendleton to

9    do that because it's not a full-time functioning courthouse.

10             It's possible that the Harney County courthouse might

11   have that, but it's on you to work with one of the IT people to

12   see if you can find a place for the witness to appear, wherever

13   he is, in a format that could be broadcast by video.

14             I assume the Government would accept the witness's

15   physical image in realtime by video with question and

16   answering, if that could be arranged.

17             MR. BARROW:  Your Honor, we are reluctant to agree to

18   that for the reasons we set forth before.

19             THE COURT:  Then let's just wait and see what

20   Mr. Mumford and his colleagues can work out.

21             And then I -- I don't want to take a record on that

22   which is speculative.

23             If there's a proposal, he's available at -- in a

24   manner in which he can -- his -- his realtime testimony can be

25   viewed by the jury, such that I can make an assessment about

1    whether the Government's objection has a basis or not, then --
2    then we'll talk about what real -- what's real.
3            But the defendants have leave to rest today, subject
4    only to calling Mr. Puckett in -- in a manner that addresses
5    allowing the jury to evaluate his credibility.
6            And am I right, Mr. Barrow?  Was he the witness who
7    had some convictions about which you were concerned or not?
8            MR. BARROW:  Yeah.  Unlike Agent Blanchard, for
9    example, which is pretty much uncontested, Mr. Puckett has
10   prior convictions which we have concerns with.  His testimony
11   is also directly contradicted by statements his father has
12   made, so that's why we think --
13           THE COURT:  So you can bring his father, you know, if
14   you need to do that.  If it comes down to that, this is what
15   disputed evidence comes down to.
16           MR. BARROW:  I understand.
17           THE COURT:  So Puckett will remain pending.
18           You've got a stipulation coming to me about
19   Brownscombe and Ms. Moawad.
20           And then let's go to this motion to compel issue.
21           What I would like you to do, Mr. Mumford, is to
22   restate concisely what it is you're seeking, the authority for
23   it.  Then I'll hear the Government's response.  I'll take a
24   look, if there are cases you need me to be refreshed on.  And
25   I'll get that resolved.

1          MR. MUMFORD:  Thank you, your Honor.

2          Hold on.

3          THE COURT:  If you need a few minutes, we can sit at

4   ease.  It looks like we have got time to do that.  So let me

5   know when you're ready.

6          (Pause.)

7          MR. MUMFORD:  I'm prepared, your Honor.

8          THE COURT:  Go ahead.

9          MR. MUMFORD:  Thank you.

10         The (pause referring) -- and just -- just -- your

11  Honor, in the meantime, it looks like Mr. Puckett -- there may

12  be a dispute that we have as to whether Mr. Puckett was

13  actually convicted.

14         THE COURT:  That's why I raised it.  I want you to be

15  able to work out, before he testifies, the legitimacy of these

16  conviction issues, so that -- the Government needs to be

17  prepared with respect to Mr. Puckett for the traditional

18  mechanism of proving a conviction, certified copies, and the

19  like.

20         MR. BARROW:  We will.

21         THE COURT:  So if it's contested, there's a basis on

22  which the Court can rule.

23         MR. MUMFORD:  So, your Honor, the -- the -- the issue

24  is -- is a disclosure of these confidential informants material

25  to our defense.  And it is, your Honor, *United States v.*

 1   *Barnes* -- this is an Eighth Circuit case, but I understand

 2   it's -- you know, it's stating a principle that general

 3   acceptance is -- the disclosure will almost always be material

 4   of a confidential informant involved here, holding that an

 5   informant who witnessed -- witnesses the crime or participated

 6   in it and the Government did not plan on using the informant as

 7   a witness at trial, the failure to disclose it, the whereabouts

 8   of the informant, who it is, and those kind of issues require a

 9   reversal and remand.  Your Honor, that's 486 F.2d 776.  I

10   believe the pinpoint on that was 779.

11        And so, your Honor -- so here's what we're facing.

12   We're facing a situation where the Indictment here, your Honor,

13   charges -- charges these defendants -- and Mr. Ammon in

14   particular -- with knowingly and willfully conspiring and

15   agreeing with each other and with persons known and unknown.

16        And so that's -- and where at least one

17   co-conspirator performed one of the following overt acts in

18   furtherance of the conspiracy, the November 5th meeting,

19   recruited and encouraged other individuals, known and unknown,

20   in person and through social media to participate and assist in

21   the above-described conspiracy.  Traveled to Harney County

22   between November and January 26th, 2016, to intimidate and

23   coerce the population of Harney.  To effectuate the goals of

24   the conspiracy beginning on December 15th.  Begin to brandish

25   and carry firearms throughout Harney County to effectuate the

1    goals of the conspiracy.  Occupy the refuge while using and

2    carrying firearms.  Beginning January 2nd, brandishing and

3    carrying firearms on the premises of the refuge.  And

4    preventing federal officials from performing their duties by

5    force, threat, and intimidation.  Beginning January 2nd,

6    refused to leave the refuge.  Beginning on January 22nd --

7    January 2nd, threatened violence against anyone who attempted

8    to remove them from the refuge.

9           So that's the broad outline of how the -- the -- the

10   this case was presented here.

11          THE COURT:  Well, let me -- let me just stop you,

12   first, to say that you're reading from the Superseding

13   Indictment.

14          MR. MUMFORD:  That's correct.

15          THE COURT:  So I think it's more accurate to say

16   that's how the Indictment was returned.

17          When -- when the Government narrows proof at trial,

18   especially in a situation like this, where the Indictment is

19   not going to the jury, the real issue is what evidence has the

20   Government proffered in support of the elements of the offense.

21          MR. MUMFORD:  That's right.  Thank you.  I was -- I

22   was just going there.

23          THE COURT:  And let me just make another legal point

24   for the record.  I apologize for interrupting.

25          But this overt act question needs to be noted as a

1    matter of law.  For the charged Indictment, no overt act has to

2    be proved.  It's -- this is one of those conspiracy statutes

3    that does not require proof of an overt act.

4          So the Government's -- the plain law, the

5    Government's alleging an overt act in the Indictment does not

6    require proof of one.  The conspiracy is the agreement and not

7    the actual object of being accomplished.

8          So thank you for the -- letting me make that point at

9    this part of the record.

10         Go on, please.

11         MR. MUMFORD:  Yeah.  And so -- and so what we have

12    here, in opening argument -- the Government -- how the

13    Government presented their case in opening argument, they said

14    it's an illegal armed occupation.  They said it was a

15    conspiracy of illegal activity that included setting armed

16    guards at entrances and a watchtower; converting employee

17    offices into personal residences; digging through government

18    records; using government computers, vehicles, and heavy

19    equipment; renaming the facility; possessing guns at the

20    refuge; possessing ammo at the refuge.  They blocked entrances,

21    controlled who came and when, held property.  Ultimately,

22    prevented the federal employees from carrying out their

23    official duties for 41 days.

24         They drove -- they drove out to remove a fence.  They

25    took down Government cameras.  And -- and they said -- they

1    conclude in their opening argument, we're not prosecuting the

2    defendants for what they believe but we're punishing the

3    defendant for what they did.

4              And so then their presentation of evidence was, well,

5    there are all of these weapons at the refuge.  And that your

6    Honor admitted all of that evidence as -- without knowledge of

7    where they came from, who brought them there, or -- or -- or

8    why.  But your Honor said, well, we'll admit it as

9    circumstantial evidence of the conspiracy.  And the intent that

10   Ammon Bundy and others, as manifest -- basically as manifest by

11   the collection -- collective actions of those coming to the

12   refuge.

13             So, your Honor -- and then they said the ammo -- the

14   ammo -- the refuge, the same thing.  It was admitted as

15   circumstantial evidence of the conspiracy and it was

16   circumstantial evidence of the intent of Mr. Bundy and others,

17   is what the Court said.  And by -- manifest by the collective

18   action of others.

19             So we're being prosecuted based on the collective

20   action here of others.  And it includes -- those others include

21   probably 15 -- at least 15 confidential informants that were

22   working with the Government, reporting to them, reporting back.

23             They were -- it looks like they were involved in some

24   of the quote/unquote administrative meetings at the refuge.

25             They were -- we have one who was reporting that -- we

1    don't know who it is, but it was a confidential informant who

2    was reporting on the removal of the -- of the -- of Government

3    cameras, here.

4            We've got -- and -- basically, we've got a situation

5    where -- as Ammon -- and Mr. Bundy testified that anyone could

6    attend the meetings and volunteer for things.  And -- and so

7    we've got a situation where these people who show up at these

8    administrative meetings, or otherwise -- and there's sometimes

9    up to 40 people there, is what these confidential informants

10   are saying.  All of those individuals are -- are,

11   quote/unquote, part of the collective action that is now being

12   imputed to these individuals as proof that they were entering

13   into a conspiracy.

14           Just yesterday, your Honor, one of the questions that

15   the Government asked our expert, Mr. Stephenson, was whether or

16   not it would make a difference in -- in how -- I mean, his

17   assessment of someone carrying a firearm was whether that

18   person was, quote, in a place he had no lawful right to be.

19           So I come back to, well, how do we know here -- the

20   jury's going to be asked this -- this question, right?  The

21   Government's going to say, hey, you know there was a conspiracy

22   because of all of these actions here.  We saw the photos, that

23   we see -- the guns that we see, and all of those things.

24           But, your Honor, in the middle of that there's a big

25   hole concerning Government -- the Government's confidential

1    informants, who -- who -- who -- we don't know what they did

2    and how they contributed to it.

3            And so how can we then -- how can the Government say,

4    well, ignore that issue, where we're saying, well, hold on.  We

5    should be allowed to use that and -- and -- and at least --

6    least figure out what that is so that we can then argue to the

7    jury, hey, that wasn't the action of Mr. Bundy.  That was the

8    actions of confidential informants that were working with the

9    Government there.

10           And -- and so because it's -- this conspiracy is so

11   undefined, I think that's -- that's the -- I think that's the

12   problem that we're having with it.  And I can see where the

13   Government's going to say, hey, it's undefined.  So Mr. Mumford

14   can't say what confidential informant he needs.  But -- but,

15   your Honor, they can't -- they can't create the problem and

16   then deprive me of -- of the solution there, is what I'm trying

17   to say.

18           Does that make sense?

19           THE COURT:  Don't ask me to answer that one.

20           MR. MUMFORD:  Okay.

21           THE COURT:  What I would like you to do is to tell me

22   specifically what is the factual basis for the assertions

23   you're making that there are 15 unidentified informants, and

24   all of that.  This is the first I've heard of this.

25           The -- and then I would like to address a timing

1   concern, in light of what Mr. Barrow noted yesterday about the

2   timing and the disclosures.  To the extent defendants were

3   concerned with getting and seeking an order to compel identity

4   of witnesses, this should have come long before today.  Should

5   have come before the beginning of jury selection, never mind at

6   the point defendants are about to rest.

7           So I want to know what the factual underpinnings are

8   of your assertions.

9           This addresses matters that not in the record, that

10  I've not been exposed to.  And you -- you should know I've made

11  a concerted effort not to be exposed to matter that isn't

12  presented by the parties here.

13          So I don't have any idea what you're talking about.

14          MR. MUMFORD:  Again, thank you.

15          THE COURT:  May he finish first, Mr.--

16          MR. MUMFORD:  I was talking --

17          THE COURT:  No, no.  Mr. Ryan Bundy is standing.  I'm

18  asking him.  Can you -- I want Mr. Mumford to finish, and then

19  you can address it.

20          Go ahead, Mr. Mumford.

21          MR. MUMFORD:  Yes, your Honor.

22          So there are -- I believe, your Honor -- in

23  discovery, there are files that are labeled CHS 01, 02, 03, and

24  so forth.

25          I will tell your Honor -- and these are the -- your

1    Honor may recall, yesterday there was some reference to an

2    unredacted or redacted confidential human source reports where

3    in the instance of Ms. Linnell, I believe Mr. Olson was -- was

4    examining her based on a redacted confidential source report

5    where it turned out that the Government stands up and starts

6    questioning her about -- cross-examining her based on an

7    unredacted one, based on the unredacted -- I mean, the redacted

8    portions of that, your Honor.  So that's a little bit different

9    problem, but it's a contributory problem to the one I'm having.

10            So, your Honor, there are 15 of these files.  Some of

11   them have as many as -- looks like, you know, 15 to 20 reports

12   from these sources.  Some of them have as few as one or two.

13            The -- some of them start, your Honor -- I'll just

14   tell you, I'm surprised.  One of them even starts before

15   November 2015, here.  And was -- appeared that they were aware

16   of that one -- for example, that one October video of

17   Mr. Finicum that your Honor wouldn't let us get into evidence

18   there.

19            And so these reports, your Honor, they generally

20   don't redact the date of the contact between the confidential

21   informant and their Government handwork, I guess.  But they're

22   redacted throughout.  And what the Government said is that they

23   didn't redact mentions -- anything that would mention our

24   clients, these defendants.

25            Now, I asked them last night, well, what if -- what

1  if they're just talking about an administrative meeting and

2  what went on there?  And I couldn't -- I don't know the answer

3  to that.  I don't know that they know the answer to that

4  because -- but that would be problematic because, as your Honor

5  knows, sometimes there will just be a meeting without

6  mentioning who was there, like my client or -- or other of the

7  defendants.  And -- and if they're redacting that portion of

8  that -- and, again, we don't know what we don't know there, so

9  it presents an issue.

10         I also point out, your Honor, we asked -- we have

11  raised these questions throughout the case.

12         During the Government's case, I asked Agent Ronnie

13  Walker about how many informants, and I was objecting to, at

14  the time, based on scope -- and that was a couple of weeks ago.

15  I asked Agent Lapp about it.  I asked Agent Luh about it.

16         THE COURT:  Mr. Mumford, examining a witness at trial

17  is not the way one gets to information for a motion to compel.

18         If you had 15 confidential human source documents

19  before trial and you -- that were redacted -- is that the case?

20  You had 15 confidential human source documents in a redacted

21  form before trial?  Is that what you're --

22         MR. MUMFORD:  I don't know when I got them, your

23  Honor.  And if your Honor is going to --

24         THE COURT:  No, I'm just -- I'm making the point that

25  the last day of a defendant's case is too late, generally, when

1    if you have the information and it's redacted and you -- you

2    have a need for it -- these are issues that I was working on

3    regularly with the parties up to the start of trial.

4              I'll hear from you in a minute, Mr. Bundy, I need to

5    finish with Mumford -- Mr. Mumford.

6              DEFENDANT RYAN BUNDY:  Has to do with this very

7    issue.

8              THE COURT:  Mr. Bundy, you need to let me finish with

9    one party, and then you get to speak.

10             What I'm saying, Mr. Mumford, is I'm concerned.  If

11   you thought there was information that was redacted that you

12   should have had access to, I don't know why it wasn't raised

13   until the motion was filed yesterday.  That's a concern to me.

14             But I think -- and Mr. Barrow can confirm -- that

15   these --

16             Well, let me just ask Mr. Barrow some factual

17   questions, so I can get a little more foundation.

18             Are there only 15 so-called CHS documents?

19             MR. BARROW:  There are 15 CHSs, more than one

20   document.  So --

21             THE COURT:  I'm sorry.  So there are 15 confidential

22   human sources.  You're representing that.  That's all there

23   are?

24             MR. BARROW:  Your Honor, let me be more detailed

25   about what happened.

1          THE COURT:  Okay.

2          MR. BARROW:  When this case came about, we reached

3     out to the FBI for all source reporting that is in any way

4     connected with the activities at Malheur.

5          We then reviewed all of that and identified 15

6     sources, and we identified those 15 sources as individuals that

7     had direct contact with the occupiers at the refuge.

8          THE COURT:  When you say "the occupiers," in light

9     Mr. Mumford's point as to who -- whose conduct might implicitly

10    being attributed to the defendant under a co-conspirator

11    statement or act theory, I want to know what you mean by 15 had

12    contact with the occupiers.  Who do you mean when you say, "the

13    occupiers."

14         MR. BARROW:  Anyone who was on the refuge during the

15    relevant time period.

16         THE COURT:  All right.  And how do you distinguish

17    these resources from being an occupier, in the first instance?

18    You're saying these are confidential human sources who had

19    contact with occupiers.  Why don't you consider them an

20    occupier in the first instance?

21         MR. BARROW:  The confidential source an occupier?

22    Why don't I consider that source an --

23         THE COURT:  Right.  I'm trying to figure out what is

24    a confidential human source who's present at the occupation or

25    not.  I need some definitional framework about the terms you're

1    using here in order to understand what you're talking about.

2             MR. BARROW:  So, your Honor, if someone had

3    approached the FBI and offered to provide information to the

4    FBI and was then at the Malheur occupation or had direct

5    contact, say, through the phone with someone at the Malheur

6    occupation, that's what I'm referring to.

7             THE COURT:  All right.

8             MR. BARROW:  And then, just by way of chronology --

9             THE COURT:  So these people, with whom your sources

10   had contact, include who, by name?  The defendants?  Or one or

11   more --

12            MR. BARROW:  Any defendant.  Any charged defendant.

13   That was an obvious one.  And anyone else that was -- if they

14   had contact with someone at the refuge who was engaged in

15   criminal activity, that had reported back, that was also --

16   would be counted.

17            THE COURT:  All right.  So you have these 15 sources.

18   And then you provided all of the reports but in a redacted

19   form?

20            MR. BARROW:  Correct.  And then, just in terms of

21   timing, this was something the Court alluded to, we discussed

22   extensively.  The parties sought the disclosure of this

23   information.  It was, again, the subject of a status report

24   that was filed on June 14th of 2016, in which the Government

25   announced that it would turn over this information on July 1st

1    of 2016.   We did turn over the information on July 1st of 2016.

2              THE COURT:   And when you say "the information," in

3    this context, you're -- you're saying the redacted CHS reports?

4              MR. BARROW:   Correct.

5              THE COURT:   All the records of which the Government

6    is aware that report what these 15 CHSs said, did, or whatever?

7              MR. BARROW:   Correct.

8              THE COURT:   Okay.   All right.   Go on.

9              In terms of redactions, these confidential human

10   sources, we now know -- from trial -- that some testifying

11   witnesses have been identified as, quote, informants.

12             Are -- are -- was Mr. McConnell a so-called

13   confidential human source in this context of discovery?

14             MR. BARROW:   He's been identified in this -- in this

15   trial as a source, and his reports were turned over.

16             THE COURT:   As part of the CHS?

17             MR. BARROW:   Yes.

18             THE COURT:   You're not being specific enough, and

19   that's why I'm asking.   I was trying to figure out if you

20   turned over McConnell just generally or was he one of the 15?

21             MR. BARROW:   As part of this process we're

22   discussing, yes.

23             THE COURT:   And when you did so -- and then what

24   about Ms. Linnell?   Is she one of the so-called confidential

25   human resources?

1          MR. BARROW:  Yes, your Honor.  And her reports were

2    turned over as part of the same process.

3          THE COURT:  All right.  So there are 13 other

4    individuals whose identities have not been disclosed.  Is that

5    right?

6          MR. BARROW:  Correct.

7          THE COURT:  Okay.  That's what I'm trying to get at.

8          And I take it, Mr. Mumford, you're seeking the

9    disclosure of their identities?

10         MR. MUMFORD:  Yes.  Their identities, how much they

11   were paid, and the unredacted versions of their reports, your

12   Honor.

13         THE COURT:  Okay.  So let me just see one -- I want

14   to make one more -- I need to look at one more thing.

15         (Pause referring.)

16         THE COURT:  Do you happen to have with you one of

17   these, just for illustration, for me to take a look at?  A CHS

18   redacted report?

19         MR. MUMFORD:  I just sent it to Mr. Breton.  I

20   believe he can pull it up.

21         THE COURT:  Okay.

22         MR. MUMFORD:  Your Honor.  This is one -- this is

23   probably the most extreme example.  But your Honor will see the

24   issue that we're dealing with here.

25         THE COURT:  So I'm looking at a page Bates marked

1    0059525 that is effectively all redacted.

2            I need to see that document in an unredacted form, so

3    I can understand the arguments here.

4            Do you have that with you, or not?

5            MR. BARROW:  I can go get it.  I don't have it right

6    now.

7            THE COURT:  So here's what I want to do on this

8    problem.

9            The defendant, to prevail on a motion to compel this

10   kind of information, has to make a showing of the need for the

11   identity.

12           If there hasn't been enough information provided in

13   discovery from which the defendant can make that showing, then

14   there's a duty on the part of the Court to make an in camera

15   review of the material.

16           And so I'm going to need to see all CHS documents for

17   the 13 sources who are -- who have been referenced here,

18   because the other two have been identified and examined, and

19   the like.  And I need that as soon as humanly possible, so that

20   I can review it, and we can take it up outside the presence of

21   the jury in an orderly way.

22           And then once I see that, Mr. Mumford, I'll take more

23   argument from you and Mr. Barrow.

24           I would like to hear from Mr. Bundy about the

25   concerns he wanted to add to this.

1          MR. MUMFORD:  Can I just make one more point?

2          THE COURT:  You may.

3          MR. MUMFORD:  Your Honor, on the point about when we

4    received it, there may be a dispute we have with Mr. Barrow on

5    that because I --

6          THE COURT:  I don't want to hear about that right

7    now.  You work it out with him.  And if there's an issue, we'll

8    take it up once I have more understanding of the substance of

9    what's going on.

10          Mr. Bundy.

11          MR. MUMFORD:  Thank you.

12          DEFENDANT RYAN BUNDY:  Yes, ma'am.  Concerning this

13    very same issue, it almost appears that my motions are not

14    being read or considered because I did, more than a month ago,

15    put forth a motion for discovery, including all of these

16    Government witnesses.

17          THE COURT:  Right.  But, Mr. Bundy, as I've denied

18    your motions repeatedly, you've never made a showing that

19    justifies going beyond the representations that have been made

20    here.  You can't just continue to cite rules.  You have to make

21    a factual showing for the basis for the Court to compel beyond

22    what's already been provided, and that's why your motions have

23    been denied.  They're largely legal rhetoric without factual

24    showings.

25          Right now, Mr. Mumford is making a factual argument.

1   That there is a need to know the identity of these confidential

2   human sources because that which has been redacted has

3   prevented the defendants from collectively -- including you --

4   from fairly challenging the Government's case or choosing to

5   put on what they want.

6          So I'm going to read those facts.  Then I'm going to

7   listen to the argument.  But your point about the prior motions

8   doesn't get us anywhere because you've not made factual

9   showings.

10         There is a -- an initial privilege on the part of the

11  Government to withhold identities.  So to go past that

12  privilege, you have to make a factual showing.

13         I'm going to read these materials.  So -- and now

14  that I've heard so much evidence, I have a very good

15  understanding of what the defendants' theories are and what the

16  Government's theories are.  And we'll take this up after I've

17  had an opportunity to read them all.

18         DEFENDANT RYAN BUNDY:  The point is it was asked for.

19  I did ask for this discovery.

20         THE COURT:  And the point is you haven't asked for it

21  in a way that shows, factually, the Government's privilege to

22  withhold identity should be overcome here, and that's what I'm

23  trying to explore here.

24         So that will table the discussion about informants

25  until I get all of that data.

1          MR. BARROW:  Can I be excused to --

2          THE COURT:  You may.

3          Yes, Mr. Mumford.

4          MR. MUMFORD:  And, your Honor, I was going to say I

5    really appreciate your Honor's point about -- coming down on

6    the issue of who is the occupiers that they're referring to.

7          Your Honor may recall that I asked one of the agents

8    on the stand whether any of the protestors were confidential

9    informants, and he said no.

10          And so -- and so -- and so I just -- and that was --

11    your Honor, that was Mr. Chad Lapp.  He testified he was not

12    aware of any informants within the protest group, is what he

13    had said.  So that --

14          THE COURT:  And that term "protest" is also --

15          MR. MUMFORD:  Exactly.

16          THE COURT:  -- subject to interpretation.  Your

17    definition of who a protestor is, without having defined it

18    with the witness, can give rise to other things.

19          So let me just say a couple of other points.

20          To the extent the defendants are concerned that the

21    jury would attribute to any one defendant, as a co-conspirator,

22    the conduct or statements of others -- you'll recall that in

23    the final instructions -- and we'll review these one more time

24    in detail -- the Court's proposal to instruct the jury is

25    consistent with law.  In order for any defendant to be charged

1    with the statement or conduct of another as a co-conspirator,

2    there has to be a basis for the jury to find, first, there was

3    in fact the alleged illegal conspiracy.

4         Secondly, the conduct or the statement that is being

5    argued as attributable to a defendant was made by a

6    co-conspirator in furtherance of a conspiracy.

7         And, third, the defendant was a member of the

8    conspiracy.

9         So that premise continues.  That is solid law.  And

10   the Government, when it argues its case, when it refers to an

11   act or a statement that the Government urges the jury to

12   attribute to one or more conspirators, the Government has to

13   identify who that person is.  It can't be an unknown person.

14   It can't be it's Mr. Wampler saying something or it's some

15   other person whose video we have seen; so there's some

16   opportunity to avoid this argument about some unknown person,

17   who is actually a Government agent, making statements.  I think

18   that's the defendants' theory here, that there is some agent

19   out there making statements that would be attributable to the

20   defendants.  And that's just wrong.  That can't happen.  And,

21   in fact, Mr. Mumford has asked for a modification to the

22   informant instruction to say that no one can conspire with an

23   informant.  That's true.

24        His problem, right now, is trying to identify by name

25   who those people are.  And I have to sort this out based upon

1    what I have seen in the trial versus what are in these

2    statements and the extent to which they make any difference.

3              I want to, again, go back to the primary point here.

4    There has been a lot of time extended by defendants in their

5    case in chief and in cross-examining the Government's witnesses

6    at length about their assertedly good faith belief about

7    propositions of law and that being a motivation or their

8    motivation for the conduct that the Government charges was

9    actually co-conspirator conduct.

10             The defendants have had a full rein to explore this.

11   And, in many respects, have made the trial about collateral

12   issues and not about the actual intentions.

13             I've deferred to the arguments of the defense --

14   defendants about their need to develop a factual basis for

15   their theory of the case.  But, in the end, the arguments have

16   to go back to whether there was in fact a conspiracy to prevent

17   officers of the United States from doing their duties.  The

18   charged officers are Fish & Wildlife workers and BLM workers.

19   And there need not be any proof that anyone was ever impeded or

20   that any Fish & Wildlife worker actually felt impeded or was

21   impeded.  The crime is the agreement to prevent them by force,

22   threat, or intimidation.

23             Because of the nature of the charge, it's really only

24   possible, potentially, to prove such a case circumstantially.

25   So the Government's been given leave to introduce evidence --

1    not directly or -- in the definition of direct evidence -- that

2    is, supportive of the charged conspiracy -- but circumstances

3    from which rational jurors could conclude that there was in

4    fact an illegal conspiracy.

5              The fact that defendants consistently assert that

6    their purpose was, quote, to protect the Hammonds or to protest

7    the Hammonds' treatment or to protest land use management

8    policies of the United States or to seek to acquire title to

9    federal land by means that, frankly, are not legally cognizable

10   but they think they are, are collateral points to whether they

11   actually had an intention to impede.

12             Rational jurors could conclude -- could but do not

13   need to conclude -- that the fact that ultimately there was a

14   conspiracy to occupy the refuge and to do it in an armed

15   fashion -- in the words, Mr. Bundy himself testified to under

16   oath that without the arms they wouldn't be taken seriously;

17   and if they left, then those workers would just come back.

18   That is very -- that is evidence the Government can point to,

19   to argue to the jury that they should draw the inference that

20   the illegal conspiracy existed and one or more of the

21   defendants were part of it, willingly, knowingly, and should be

22   found guilty.

23             On the other hand, the defendants have had a long run

24   here at producing each of their individual stories, their

25   personal backgrounds, their reasons for believing what they

1    believe about the law for the purpose of showing their state of

2    mind was not the charged conspiracy but something else.

3            So that is what this trial has been about; if, in

4    some respects, on the ends of potential relevance.  But it's

5    the Court's duty to permit the parties to develop their

6    theories.  Counsel are going to be free -- and Mr. Bundy, if he

7    chooses to argue his own case or, Ms. Cox, if you choose to

8    argue your own case, are going to be free to draw to the jury's

9    attention the facts they think prove the Government's theory is

10   wrong.  And that there wasn't any illegal purpose.  That the

11   jurors might not have agreed -- might not agree with their

12   purpose, but it wasn't a crime to do this.

13           On the other hand, the Government can say, "It is

14   too."  And that's really why we're here, is to give the jurors

15   a fair opportunity to understand the perspectives based on

16   admissible evidence, not a lot of other material.

17           So while I'm thinking about it, Ms. Harris and

18   Ms. Ludwig, I want both of you -- as standby counsel -- to the

19   extent Mr. Bundy is going to be making closing argument or

20   Ms. Harris is going to be making closing argument, I'm charging

21   each of you lawyers with the responsibility of reviewing with

22   them what the parameters are of a proper closing argument

23   because they don't know.  And they're not going to be permitted

24   to argue "I didn't know."  They can't make golden rule

25   arguments.  They can't ask the jury to put themselves -- the

1    jurors in their personal positions.  That's improper.

2            They can argue about what is reasonably inferable

3    from the evidence but never to appeal to the personal biases or

4    prejudices, and the like.  But you must do this, and go through

5    with these self-represented parties what you have learned

6    yourselves in terms of proper argument so that they're not

7    interrupted.  They need a fair opportunity to present their

8    case, and I don't want them in a situation where because of

9    their lack of experience they think they can argue something

10   and then they're found -- there's an objection sustained, and

11   they're not ready to proceed because they don't know.

12           So what is basically the rule is you're free to tell

13   the jury what you think they should conclude from the evidence.

14   You should not be using in your arguments words like "I

15   believe."  Because, (A), you're not on the witness stand when

16   you're arguing.  So you cannot personally vouch for anybody.

17           You can say to the jury:  They should believe witness

18   X, Y, Z because this person is inherently credible.  You saw

19   how the person testified.  You saw that when there was

20   cross-examination, they held fast to -- there -- there was

21   corroboration.  All of those things.  But you cannot stand

22   before the jury and say I believe this, that, or the other

23   thing because you can't.  It's not a proper -- proper time.

24           But, Ms. Ludwig and Ms. Harris, I trust you'll help

25   them outline what they can properly do, so they can channel

1   what they want the jury to get in a legal way.

2           And I'm assuming, Mr. Schindler, you're going to be

3   making the closing for Mr. Medenbach?

4           MR. SCHINDLER:  Yes, please.

5           THE COURT:  All right.  Okay.  So -- yes, Ms. Harris.

6           MS. HARRIS:  Good morning.

7           THE COURT:  What do you have for me?

8           MS. HARRIS:  I just -- I think -- want to supplement

9   Mr. Mumford's arguments, knowing that the Court will be

10  undertaking an in camera review.  And just in case it wasn't

11  emphasized in Mr. Mumford's argument -- it might have been -- I

12  just want to add one consideration.

13          I understand the Court's guidance this morning about

14  co-conspirator statements and the protection that that affords

15  in this case.  But I think one thing -- another consideration,

16  from our point of view, is the physical evidence in the case.

17  And the extent to which the physical evidence derives from the

18  conduct of people who are confidential human sources, then I

19  think that's another reason why, obviously, knowing who those

20  people are is important in defending the case.

21          We've had evidence presented in the form of firearms,

22  lots and lots of ammunition.  That the -- the people who were

23  proffered by the Government to introduce that physical

24  evidence, it seemed as if they were selected because they did

25  not know the source.  But certainly they --

1          THE COURT:  The -- that whole proffer had to do with

2    where the evidence was found --

3          MS. HARRIS:  Yes.

4          THE COURT:  -- and who found it.

5          And the premise that is associated with the

6    conspiracy has sufficient support to go to the jury, but these

7    are factual points about which I expect capable advocates will

8    be poking at the jury.

9          That if the Government wants the jury to attribute

10   16,000 live rounds of ammunition to a conspirator -- allegedly

11   Ms. Cox -- they need to know -- they need to be satisfied that

12   those rounds came from other co-conspirators and not from

13   people who were government agents.

14         This is why, I think, Mr. Mumford's asking for that

15   add-on to the informant instruction.

16         You don't need to know who the person is by identity

17   to rule this out, necessarily.  The point is they have the

18   burden to prove there was a conspiracy.  And every -- every

19   point they make about statements of the defendants or others

20   has to be tied back, again, to who made the statement and are

21   they a member of the conspiracy.

22         And if, by definition, you can't be a member of the

23   conspiracy if they're an informant and they haven't clarified,

24   that's a failure of proof, too.

25         So I'm not ruling.  What I'm saying is these issues

1    come up in a variety of contexts, and instructions are another

2    way to address the point, though.  So I -- thank you for what

3    you're saying.

4           I need to read what I -- what I don't know, so that I

5    understand whether there is a problem or it's merely a

6    hypothetical one.

7           So let me -- let me have the benefit of that, and

8    we'll take that up.

9           Now, other than Mr. Puckett and the potential of him

10   calling -- being called on Monday, I'm getting the sense

11   here -- and other than resolving this informant problem, I'm

12   getting the sense here that the defendants provisionally then

13   would rest today.  Is that right?  After the witnesses we've

14   talked about?

15          I need to make some plans around jury scheduling,

16   which is why I need to know this.  And another unrelated matter

17   I have to take up sometime today.  So I need to know, in

18   timing, what -- what you're planning.

19          (Pause.)

20          MR. MUMFORD:  Your Honor, there is one -- there is

21   one -- there's one additional issue that we may have.

22          I'm trying to get some more information about it

23   right now.  It concerns the identity of this Fish & Wildlife

24   employee.  It sounds like the Government may be presenting that

25   in their rebuttal case, anyway.  So maybe we don't even have to

1  provisionally rest.  But we're trying to get some more

2  information about who this individual is.

3          THE COURT:  Well, let me say this.  Can I ask the

4  question this way?  Other than the witnesses we've talked about

5  this morning, is there any other evidentiary presentation?

6          Mr. Bundy, yes.  Your video segment?

7          DEFENDANT RYAN BUNDY:  The video segment, and also

8  the notebook page.

9          THE COURT:  Yes.  What's your proffer there?

10 Updated?

11         DEFENDANT RYAN BUNDY:  Well, for the notebook page,

12 could call in Ms. Melissa Cooper to authenticate that notebook

13 page.

14         THE COURT:  Okay.  Bring her in, and I'll take it up

15 outside the presence of the jury.  I think that's the easiest

16 way to figure out what she says or doesn't say.

17         DEFENDANT RYAN BUNDY:  She's not available today.

18 She's not here in the state.  We would have to call her --

19         THE COURT:  Why don't you do -- well, tomorrow's

20 Saturday.  Why don't you see if the team can get her available

21 by telephone for a proffer over the phone to me so I can

22 evaluate what the issue is.  And then whether she needs to come

23 or not or whether she can appear by video, if it's admissible.

24 We can do that part.

25         Do you want to present the Mr. Finicum video evidence

1    one way or the other today?  Or do you want to wait until you

2    know that --

3              DEFENDANT RYAN BUNDY:  Well, I would still prefer

4    them to go together.

5              THE COURT:  Okay.  I'm just asking.

6              DEFENDANT RYAN BUNDY:  Sure.  Sure.  I'm not angry.

7              You know, unless, of course, the Government will

8    proffer that -- or concede that that notebook was found in that

9    vehicle and -- and accept -- accept that in.

10             THE COURT:  So you know by now how to pursue that.

11             Somebody needs to talk with the prosecutor, on your

12    behalf, and see if you can get a stipulation.

13             So I'm not going to compel any statement from

14    defendants that they're resting today.  I think it's fair to

15    just say there are a couple of loose ends that are still being

16    pursued, that have been identified, but none other than what's

17    going on.

18             Are you frowning at me, Mr. Knight?

19             MR. KNIGHT:  No, no.

20             THE COURT:  All right.  So I assume the Government's

21    ready to go with additional witnesses, even --

22             Just a minute, Mr. McDonald.

23              -- on a provisional process?

24             MR. KNIGHT:  We are, your Honor.

25             THE COURT:  So, Mr. McDonald, would you come on up to

1    the front, so I can see you.

2            MR. McDONALD:  Where would you like me, your Honor?

3            THE COURT:  Any old place.  How about right here?

4    There's a seat and a microphone there.

5            MR. McDONALD:  Sure.  Thank you.

6            THE COURT:  Why don't you state your appearance for

7    the record, for the benefit of all defendants.

8            Mr. Ryan Bundy is over here I don't know if you've

9    met him.

10            MR. McDONALD:  Not personally, but I'm familiar with

11    him.

12            THE COURT:  All right.  And you're here on behalf of

13    the friends of the Malheur refuge, to further seek quashing, or

14    something, of the subpoena Mr. Bundy served?  Is that correct?

15            MR. McDONALD:  Correct.  So, for the record, David

16    McDonald.  I'm here -- I was contacted yesterday by members of

17    the Friends of the Malheur Wildlife Refuge.  They asked me to

18    review the subpoena that was served on them by Mr. Bundy and

19    his defense team, and asked the Court to quash.

20            I understand that they have previously contacted the

21    Government.  The Government had filed a motion to quash.  The

22    Court heard that yesterday, but I -- I'm not privy to the exact

23    colloquy.

24            But I understand that you carried it for today

25    because you wanted to have live bodies.

1          So, yesterday I drafted a special appearance,

2   which -- and it's been filed.  I filed another motion to quash.

3   They are the appropriate party to move to quash because they

4   are the third party that's in receipt of the subpoena.  And I

5   stated grounds within that motion for the reasons why it should

6   be quashed.  I filed two additional affidavits.  One by the

7   person who was served, Mr. Jerry Moore.  He is the secretary of

8   the Friends of the Malheur Wildlife Refuge.

9          And he -- and as you can see, I have the records that

10  were subpoenaed.  And -- but we're asking the Court to just

11  quash the subpoena.

12         I would say, at the outset, that under 17(c),

13  normally, it's my experience that these subpoenas are pretrial

14  subpoenas.  So it was -- I was surprised to see these on the

15  last day of the defense case -- or next-to-the-last day of the

16  defense case.  But I also am not aware and I could not find in

17  the record any showing of a necessity of the subpoena under

18  17(b).

19         Generally, there is a requirement that the defendant

20  who is serving the subpoena make a showing that there is a

21  necessity of the witness present for an adequate defense, and I

22  have seen nothing by Mr. Bundy which states any necessity for

23  these documents in any way, shape, or form.

24         I can go through the other parts of the motion, if

25  the Court wishes.  I also put in there, in the alternative, if

1    he could tell us what he wants out of them, tell the Court what

2    he wants out of them.  I have the records, and the Court could

3    review them.  They're not that voluminous.

4              THE COURT:  Well, I appreciate your doing what you

5    have done.

6              Has there been any direct conferral with Mr. Bundy

7    on -- by you on behalf of the friends association?

8              MR. McDONALD:  No, I contacted standby counsel last

9    night.  But I was -- you know, Mr. Bundy remains in custody.

10   And --

11             THE COURT:  Sure.  So let me suggest this.

12             We have about three minutes before the jury has to

13   come in.  We're starting with the jury at nine o'clock.

14             MR. McDONALD:  Yes.

15             THE COURT:  What I would suggest -- and the marshals,

16   I'm sure, would permit for you to bring your chair around and

17   just go over here and talk with Mr. Bundy.  We'll -- we'll --

18   you and Ms. Ludwig and Mr. Bundy.  And see if something can be

19   narrowed by your discussion.

20             And then, after that, at the next recess, I'll take

21   up argument again.  We'll recess probably around 10:30.  I'm

22   sorry if you have to come and go, but right now the jury is the

23   priority.

24             MR. McDONALD:  I understand the Court's time

25   restrictions.

1          THE COURT:  Okay.  Would you please just bring your

2    chair around.  Come over here.

3          And turn your microphone off, Mr. Bundy, so that your

4    discussions are not broadcast to the room.

5          Everyone else who needs to take a restroom break, or

6    something, can.

7          And then, in a few minutes, I think Ms. Maxfield will

8    get Blanchard on the phone.  Right?  In just a few minutes.

9          So you guys -- you over here see if you can talk

10   through the friends issue.

11         MS. MAXFIELD:  I've got my fingers crossed.

12         MR. PHILPOT:  Your Honor, may I be permitted to step

13   out and talk to a witness while Mr. Mumford --

14         THE COURT:  As long as it's one you've told me about

15   and not a new one, because you've had disclosures now.  This is

16   not another new witness?

17         MR. PHILPOT:  It is likely not.  And we'll probably

18   be just releasing this witness.

19         THE COURT:  Go talk.

20         MR. PHILPOT:  Thank you, your Honor.

21         THE COURT:  You're limited to what has been

22   disclosed, though.

23         MR. PHILPOT:  Thank you.

24         THE COURT:  All right.  So while they're talking, I

25   need a projection of timing, so that I can get for the jury --

1    get a lunch break scheduled for the jury.

2              Nobody's here who can tell me anything.

3              (Pause, Court and clerk conferring.)

4              THE COURT:  Why don't we plan for the jury lunches to

5    come, Ms. Boyer, around 11:30.  And we'll take a break where we

6    are.  A short break.

7              The jurors have asked that they have a short lunch

8    break.  They are -- they're ready to hear what's to be heard

9    and to get their week over with so they start their journey.

10             So we'll plan for a lunch break about 11:30.

11   Wherever we are, it will be about as long as the jurors need,

12   and then we'll continue.

13             MS. MAXFIELD:  Your Honor, does it work to --

14             THE COURT:  And the jurors need to leave by 2:30

15   today.  And then, after that, we'll take up at some point.  I

16   have to do a three o'clock unrelated matter.

17             So about 3:30 we'll reconvene on jury instructions,

18   so that I can get those in a more final form.

19             So, gentlemen, while you were out -- we're off the

20   record.

21             (Off-the-record discussion.)

22             (Recess taken at 8:59 a.m.)

23             (Court resumes at 9:05 a.m.)

24             THE COURT:  All right.  I would like to go back on

25   the record and speak with Mr. Fry.

1          In fact, I'm going to suggest, since Mr. Blanchard's

2    testimony is relatively short, that Mr. Fry take the witness

3    stand so that we don't have to send the jury out for the

4    marshals to escort him, and I'll just explain he's going to be

5    there and wait during the witness's testimony.

6          Is that all right with you, Mr. Olson and Mr. Fry?

7          MR. OLSON:  Yeah.

8          THE COURT:  Mr. Fry, would you come on up here to the

9    witness chair.

10          MS. MAXFIELD:  Your Honor --

11          THE COURT REPORTER:  I need your microphone on,

12    please.

13          THE COURT:  We cannot hear you at all.

14          MS. MAXFIELD:  Oh, sorry.

15          Will it work for me to examine Agent Blanchard from

16    back here?  Will he be able to hear me from the phone system?

17          THE COURT:  I don't know.  I don't know the answer to

18    that.

19          Mr. Olson, why don't you come on up here.  And, if

20    necessary -- I'm guessing it will work, but you can -- we'll

21    have to figure something out.

22          Good morning, Mr. Fry.

23          DEFENDANT DAVID FRY:  Hey, good morning.

24          THE COURT:  As you've been participating in the

25    trial, you've seen several of the co-defendants have a similar

1    conversation with me about their right to remain silent and

2    their right to choose to testify or not to testify.

3              Do you remember those?

4              DEFENDANT DAVID FRY:  I do, yes.

5              THE COURT:  Have you talked with Mr. Olson about this

6    question, as to whether you should choose to testify or choose

7    to remain silent?  Have you talked with him about that?

8              DEFENDANT DAVID FRY:  I did.

9              THE COURT:  More than once?

10             DEFENDANT DAVID FRY:  Yes.

11             THE COURT:  Have you reviewed with him his

12   assessment, as a lawyer, about what risks you might face if you

13   choose to testify, as opposed to risks you might face if you

14   don't testify?  Have you gone through that weighing of the

15   risks and, maybe, benefits?

16             DEFENDANT DAVID FRY:  He's explained everything, yes.

17             THE COURT:  All right.  Have you considered his

18   advice?

19             DEFENDANT DAVID FRY:  I have.

20             THE COURT:  All right.  Of course, you do have the

21   right to remain silent and you have the right to choose to

22   testify.

23             If you do choose to testify, you're subject to

24   cross-examination, just as you've seen the others -- every

25   witness being cross-examined by the other side.

1           Do you understand that?

2           DEFENDANT DAVID FRY:  I do.

3           THE COURT:  And once you start testifying and waive

4    your right, you can't pick and choose which questions you're

5    going to answer.  You'll have to answer them all.  At least to

6    the extent I ruled they are relevant questions.  Yes?

7           DEFENDANT DAVID FRY:  I understand.

8           THE COURT:  Okay.  Has anyone put any pressure on you

9    to waive your right to remain silent when you don't want to?

10          DEFENDANT DAVID FRY:  No, they have not.

11          THE COURT:  Is the decision to do that your own

12   personal and voluntary decision?

13          DEFENDANT DAVID FRY:  It is.

14          THE COURT:  Because, in the end, it's your

15   constitutional right, not Mr. Olson's.

16          He's doing his best to help you and your case and to

17   point out legal issues along the way.  But he can't make the

18   decision.  It has to be your personal decision.

19          DEFENDANT DAVID FRY:  Right.

20          THE COURT:  And it is?

21          DEFENDANT DAVID FRY:  It is.

22          THE COURT:  All right.  Mr. Gabriel or Mr. Knight,

23   anything else in that colloquy you need me to address?

24          MR. KNIGHT:  No.  Thank you.

25          THE COURT:  All right.  I'm satisfied Mr. Fry is

1  making a knowing, intelligent, and voluntary waiver of his

2  right to remain silent.  And as soon as Ms. Boyer comes in --

3  can we see if we can get Mr. Blanchard on the line and see if

4  we can make connection with him?

5            MS. MAXFIELD:  Yeah, he is supposed to be waiting.

6            THE COURT:  Okay.

7            MR. OLSON:  Your Honor, Mr. Fry had a question about

8  the oath.

9            THE COURT:  Yes.  Yes, sir.

10           DEFENDANT DAVID FRY:  Yes, I was wondering would she

11 be willing to say -- you know, how normally they say in God --

12 like, "so help you God," can I -- can I ask if she would say,

13 "So help you Jehovah."

14           THE COURT:  We never say "so help you God" in the

15 administration of an oath because we respect all witnesses'

16 rights to choose whether they believe or they don't believe.

17           What is required is that you acknowledge that there

18 is an obligation to tell the truth and that you acknowledge

19 there are penalties if you don't.

20           And so the normal oath, as you've heard, is under

21 penalty of perjury, do you solemnly swear to tell the truth.

22           Now, you can say, "I do, so help me Jehovah," if

23 that's meaningful to you.  You may say that.

24           DEFENDANT DAVID FRY:  Okay.  Okay.  That's fine then.

25           THE COURT:  Would that work for you?

1            DEFENDANT DAVID FRY:  That would work.

2            THE COURT:  And you want to say it that way because

3    you believe in Jehovah?  And do you understand there are

4    consequences in your religious belief if you promise to tell

5    the truth and then you don't?

6            DEFENDANT DAVID FRY:  That's correct, yes.

7            THE COURT:  Okay.  That's fine.  It's perfectly

8    consistent with the oath.

9            Does that -- is that acceptable to you, Mr. Olson?

10           MR. OLSON:  Yes.

11           THE COURT:  And to the Government?

12           MR. KNIGHT:  Yes.  Thank you.

13           THE COURT:  Okay.  So let's -- let's see if we can --

14   Ms. Boyer's not here.

15           Can someone see if we can get the witness on the

16   telephone.

17           See if Liam can help you, Chris.

18           Mr. McDonald, have you been able to make some

19   progress?

20           MR. McDONALD:  Sort of, your Honor.  What I proposed

21   was that Mr. Bundy prepare a list of the people that he thinks

22   would -- if they were on that list, would be biased.  And then

23   I would review that list with his standby counsel.

24           THE COURT:  Okay.

25           MR. McDONALD:  And if the people that he names are on

1  there, I would disclose that to him and the donation amount.

2          THE COURT:  Okay.  So that -- you're looking for

3  whether any of the witnesses are members of the friends?

4          MR. McDONALD:  Well, not just witnesses.

5          THE COURT:  I was asking him.

6          MR. McDONALD:  I'm sorry.

7          DEFENDANT RYAN BUNDY:  Not only witnesses, Government

8  witnesses, other persons such as Lord Grasty, others --

9          THE COURT:  Well, it's, honestly, not relevant for

10  the jury unless his bias is somebody on whose testimony they're

11  going to need to rely.  So I'm going to focus you on that

12  point.  I'm not making rulings.  I'm just saying to be -- to

13  increase the chances you've got something here that might

14  require a court order, you need to make it relevant to what's

15  happening here, not just a general discovery inquiry.

16          DEFENDANT RYAN BUNDY:  And, of course, that is -- of

17  course, that is the reason for -- for the subpoena.  But, you

18  know, that would also include, you know, Governor Brown.

19          THE COURT:  Governor Brown's status is not relevant

20  in the case.  I've repeatedly ruled that the only issue about

21  the executive here is that you made a redress of grievances and

22  you did not get a response.

23          Her role, if any, in the manner in which the law

24  enforcement response was coordinated is not an issue in this

25  case.

1              To the extent any defendant who's acquitted, for

2    example, wants to bring a civil rights action saying rights

3    were violated, or something, that's a different case and a

4    different issue.  So, no, not that.  And I'm -- I'm really not

5    going to talk about this anymore because we now really do need

6    to move on.  It's 9:10.

7              Mr. McDonald will stay in touch with Ms. Ludwig.

8    We'll continue to discuss this issue.  I'm not ruling on

9    anything.  I'm just saying you've got an avenue to pursue.  It

10   might be worth pursuing it.

11             Ms. Boyer, would you --

12             Thank you, Mr. -- pardon me?

13             MR. McDONALD:  You would like me back here at 10:30?

14             THE COURT:  I would like you to -- I would like you

15   to work with Ms. Ludwig for timing.  We'll continue.  10:30

16   will be a short break.  But we've got plenty of witnesses for

17   the morning.

18             We're going to have a noon break, where I'm going to

19   be reading, now, 13 redacted documents that I didn't know I

20   needed to read.  And then we're going to resume again.  And

21   we'll be recessing at 2:30, and we'll come back at 3:30.  So --

22             MR. McDONALD:  You're asking me to remain available?

23             THE COURT:  I'm asking you to work with Ms. Ludwig,

24   because she works with Mr. Bundy, to try to get to a place

25   where your conferral is complete.  And at that point I'll take

1    argument.  Not now.

2                MR. McDONALD:  Okay.  Thank you, your Honor.

3                THE COURT:  Ms. Boyer, please get Agent Blanchard on

4    the phone.

5                (Clerk placing telephone call.)

6                THE WITNESS:  David Blanchard.

7                THE COURT:  Mr. Blanchard, this is Judge Anna Brown.

8                Good morning, your Honor.

9                THE COURT:  We are on the record, outside the jury's

10   presence and in our trial, United States versus Ammon Bundy,

11   and others.

12               You're being called as a witness remotely because of

13   your unavailability to be here in person.

14               So the first point in my speaking with you is to

15   ensure that I can hear you and your voice is coming across the

16   broadcast.

17               I'm going to ask Ms. Lisa Maxfield -- she's counsel

18   for Mr. Wampler -- to just converse with you a little bit to

19   see if her microphone is working and broadcasting to you and

20   here.  And then, based on your responses, we'll figure out if

21   we need to make technical adjustments before we bring the jury

22   in.

23               Once we do bring the jury in and after they're

24   seated, I'll ask you to please raise your right hand to be

25   sworn, and then the clerk will administer the oath.  And we'll

1   go through a process, as I assume you're familiar with from

2   other kinds of testimony.  Understand?

3                THE WITNESS:  Yes, ma'am.

4                THE COURT:  Very good.  Ms. Wampler -- I'm sorry.

5   Ms. Maxfield, would you see if you can communicate from your

6   place there with that microphone.

7                MS. MAXFIELD:  Good morning, Agent Blanchard.  Can

8   you hear me?

9                THE WITNESS:  Yes, I can.  Good morning.

10               MS. MAXFIELD:  All right.  Great.

11               THE COURT:  All right.  Who else expects to be

12  speaking with Agent Blanchard?  I want to test microphones.

13               Anybody else?

14               MR. GABRIEL:  I do, your Honor.

15               THE COURT:  Okay.

16               MR. GABRIEL:  Mr. Blanchard, this is Craig Gabriel.

17  Can you hear me?

18               THE WITNESS:  Yes, I can.  Good morning.

19               THE COURT:  Okay.  So just stand by there.

20               Are you still an agent?

21               THE WITNESS:  Yes, I am.

22               THE COURT:  So we'll refer to you as Agent David

23  Blanchard then, yes?

24               THE WITNESS:  Yes, ma'am.

25               THE COURT:  Okay.  We're going to bring the jury in.

1    Just stand by there.

2            Let's all stand for the jurors.

3            (Jurors enter at 9:15 a.m.)

4            THE COURT:  Everyone, please be seated.

5            And good morning, ladies and gentlemen of the jury.

6            THE JURORS:  Good morning.

7            THE COURT:  Has anything come across your -- your

8    world?  Any exposure at all about the case since we adjourned

9    yesterday?

10           Everybody's saying no.

11           All right.  So you'll see Mr. David Fry is seated

12   here.  He is going to testify.  But before he's sworn, another

13   witness is testifying by telephone.

14           So you're only going to hear this witness's voice.

15   He is an FBI agent, David Blanchard, being called by

16   Ms. Maxfield.

17           So let's begin.

18           Agent, would you please raise your right hand to be

19   sworn.

20           THE WITNESS:  I'm ready.

21           (Witness sworn.)

22           THE WITNESS:  I do.

23           THE COURT:  Sir, would you state your full name,

24   please, and spell all of it.

25           THE WITNESS:  David L. Blanchard.  D-A-V-I-D, L.,

Blanchard - D - By Ms. Maxfield                    55

1    Blanchard, B-L-A-N-C-H-A-R-D.

2              THE COURT:  Thank you, sir.

3              Ms. Maxfield.

4              MS. MAXFIELD:  Thank you, your Honor.

5                         DIRECT EXAMINATION

6    BY MS. MAXFIELD:

7    Q.  Good morning, Agent Blanchard.  How are you employed?

8    A.  The Federal Bureau of Investigation.

9    Q.  And where are -- where do you work?

10   A.  I'm assigned to the Los Angeles division, the Santa Maria

11   resident agency, which is located in Northern Santa Barbara

12   County.

13   Q.  In February of this year, did you arrest Neil Wampler?

14   A.  I did.

15   Q.  And was that on February 10th?

16   A.  Yes.

17   Q.  The next day, did you drive Mr. Wampler to a court in Los

18   Angeles?

19   A.  Yes.

20   Q.  And during that drive, did you have a tape recorder that

21   was recording everything that was said?

22   A.  Yes.

23   Q.  At about 8:18, did Mr. Wampler make a spontaneous statement

24   to you?

25   A.  Yes.

Blanchard - D - By Ms. Maxfield                56

1   Q.   And what was that?

2   A.   Based something to the effect that he could not resist the

3   temptations to try to proselytize a bit.

4   Q.   And what else did he say?

5   A.   "I don't know if I really want to talk about it all that

6   much, but I might be able to give you a few educational sources

7   that if you ever got around to it, you could kind of look at it

8   and see where our heads are at, and stuff like that."

9   Q.   Was he provided a piece of -- a piece of paper and a pen?

10  A.   Yes.

11  Q.   And did he give you and the other agent who was with you a

12  list of resources that he thought would be helpful in

13  understanding where our heads are at?

14  A.   Yes.

15  Q.   And what were those sources?

16  A.   The first source was on YouTube.  And he listed some names:

17  Chris Anne Hall, Lisa Tulca (phonetic), Sheriff Mack, and the

18  final resource was the Yale Freeman lectures.

19  Q.   Did he then describe to you what each of those sources --

20  basically, give you a summary of what -- what they said?

21  A.   He went on to say that these sources -- if -- if we wanted

22  to get a clue into their thinking -- of the liberty activists

23  and their thinking, he further stated that it was his idea to

24  invite Chris Anne Hall to come to Burns, Oregon.

25  Q.   Did he also -- after he gave you the four names, did he

Blanchard - X - By Mr. Gabriel                    57

1  also give you the significance of each one of those people?

2  A.  He did give further explanations, yes.

3  Q.  And those explanations were recorded?

4  A.  Yes, they were.

5  Q.  And did he tell you that the Yale Freeman professor had a

6  specialty in Colonial America and the American Revolution?

7  A.  Yes, he said that.

8  Q.  And did he tell you that Sheriff Mack had won a -- excuse

9  me, a landmark Supreme Court case?

10 A.  Yes, he did.

11 Q.  Is that basically the substance of what he shared?

12 A.  Yes.

13         MS. MAXFIELD:  Okay.  No further questions, thank

14 you.

15         THE COURT:  All right.  Any questions?

16         Mr. Gabriel.

17         MR. GABRIEL:  Thank you, your Honor.  Briefly.

18                    CROSS-EXAMINATION

19 BY MR. GABRIEL:

20 Q.  Good morning, Agent Blanchard.  Craig Gabriel here.

21         I want to refer you to your 302, on the first page,

22 the second to last paragraph, and then the last sentence.

23         Did Mr. Wampler make a spontaneous statement to you

24 about where he had been previously?

25 A.  Yes.

Fry - D - By Mr. Olson

1    Q.    What did he say?

2    A.    He stated I was at Bunker [sic], Nevada, Sugar Pine Mines

3    and the wildlife refuge in Oregon.

4              MR. GABRIEL:    Thank you, your Honor.    I have nothing

5    further.

6              THE COURT:    All right.    Anything else, Ms. Maxfield?

7              MS. MAXFIELD:    No, your Honor.    Thank you.

8              THE COURT:    All right.    Thank you, Agent.    We're

9    going to terminate the telephone call now.

10             All right.    So, jurors, the next witness is Mr. Fry.

11             Sir, would you stand, please.    Face the jury and the

12    deputy there.    Raise your right hand to be sworn.

13             (Witness sworn.)

14             THE WITNESS:    I do, so help me Jehovah.

15             THE CLERK:    Please take a seat.

16             THE COURT:    Please formally introduce yourself to the

17    jurors by telling us your full name and spelling all of it,

18    sir.

19             THE WITNESS:    Yes.    My name is David Lee Fry.    It's

20    D-A-V-I-D, L-E-E, F-R-Y.

21             THE COURT:    Thank you.

22             Mr. Olson.

23             MR. OLSON:    Thank you, your Honor.

24                           DIRECT EXAMINATION

25    BY MR. OLSON:

Fry - D - By Mr. Olson                     59

1   Q.  Good morning, Mr. Fry.

2   A.  Good morning.

3   Q.  Your father, last week, gave a -- a bit of a summary of

4   your early years, your childhood.  Is that a fair summary?

5   A.  Yes, it's correct.

6   Q.  All right.  We don't need to relive all of that.  But one

7   thing that I think was missed is do you have any other prior

8   employment other than working for your father's dental

9   practice?

10  A.  Yes.  I've worked, also, at this -- it was called Blackhawk

11  Industries.  It was a plastic making for automobiles.  And I

12  worked there.  And it actually collapsed when the auto industry

13  thing happened in 2008, 2009.

14  Q.  Okay.  Did you like that job?

15  A.  It was pretty good paying, yes.

16  Q.  Okay.  And then were you employed at your dad's dental

17  office, all the way up until the time you decided to come out

18  to the refuge?

19  A.  That's correct.

20  Q.  And what -- he described it.  But why don't you just

21  describe it, in your own terms, what sort of activities or job

22  responsibilities you had there?

23  A.  I'm basically like the little handyman there.  I do

24  everything.  I -- I help with the front reception.  You know,

25  booking in patients.  I help repair equipment, hand pieces.

Fry - D - By Mr. Olson

1   You know, little levers, and stuff like that.

2           I also pour models.  Make ortho retainers.  Help the

3   doctors assist, you know, doing all of their stuff.  So

4   basically everything that doesn't require, you know, a degree

5   and, like, ATP stuff, for doctors.

6   Q.  Okay.  And back in December of 2015, before you came out to

7   the refuge, did you know any of the individuals in this room?

8   The defendants?

9   A.  No.

10  Q.  Did you know any of the people that were charged in this

11  case, who aren't on trial right now?

12  A.  I do not.  I never met these people ever, never.  Facebook,

13  communications, or anything.  It's -- this is the first time

14  with them.

15  Q.  Now, did you know -- did you know or know of LaVoy Finicum?

16  A.  Yes.  That's the only person I was -- I -- I knew, in a

17  sense.  I was following his YouTube page.  He has his own

18  YouTube channel.  And I subscribe to that, and he put out a

19  couple of videos.  And I actually made some comments, you know,

20  in his videos.  You know, I purchased one of his books.

21          And it was -- it's kind of funny, because we were

22  talking about the Jewish festival, Feast of Tabernacles, which

23  is actually happening now.  So --

24  Q.  So what -- what was it about Mr. Finicum that drew you to

25  his website?  Did you guys have some common interests?

Fry - D - By Mr. Olson                    61

1   A.   I believe I was just browsing through and one of his videos

2   popped up in some -- some constitutional thing, you know.   And

3   I guess I liked the way he portrayed himself.   He was a great

4   speaker.   And he said a lot of valid -- you know, had a lot of

5   valid points.   And so I just, hit the little "subscribe"

6   button.   So then you would see all of the videos that they, you

7   know, come up with next.   And so you just watch them.

8   Q.   Did you ever communicate with him, either through the web

9   page or some other means, before you came out to the refuge?

10   A.   Yes.   It was -- it was like -- so when someone has a

11   YouTube channel, when they post a video, there's a little

12   comment section.   And I posted some comments and he responded.

13   And, you know, that was -- I was talking about his book and --

14   and the Jewish feast.

15   Q.   Okay.   And so -- now, what day did you come out to the

16   Malheur National Wildlife Refuge?   What day did you leave from

17   your home in Ohio?

18   A.   I left on the -- January 4th.

19   Q.   And can you tell us what -- what led up to that?   You know,

20   what had you heard about this particular protest going on here

21   in Oregon?

22   A.   Well, I heard that it was -- you know, it was an armed

23   protest and that they started occupying this bird refuge.   And,

24   you know, at the time, they were saying it was -- it was an

25   unoccupied building.   And so I really didn't know what was

Fry - D - By Mr. Olson

1   going on.  And I had a strange premonition, you know, feeling,

2   you know, while I was watching these videos that, you know,

3   something would happen to LaVoy.  You know, that he probably

4   would be killed.  And so I was concerned with that.

5   Q.  Let me interrupt you for a second.

6          Did you know that -- did you -- did you know that

7   Mr. Finicum was at the refuge?

8   A.  Yes.  It was -- it was in his videos.  Yes.

9   Q.  Okay.

10  A.  And so I -- you know, I was really interested in meeting

11  him.  And so I decided that this was a great opportunity for me

12  to get out of the house to go check out this protest and see

13  for myself what was going on.

14  Q.  What did you understand that this protest was all about?

15  A.  Well, they were complaining about, you know, federal

16  government's corruption within the Bureau of Land Management.

17  I guess they're doing things that are beyond the -- their legal

18  authority, I suppose.

19  Q.  Had you ever done much protesting yourself, in your life,

20  before this?

21  A.  No, I haven't.  This is actually the very first protest

22  I've ever joined.  And one thing about this is that, you know,

23  most other protests I've seen lately, you know, involve burning

24  down buildings and rioting, straight up.  And I didn't want to

25  be a part of anything like that.  And this one was portrayed as

1   a very peaceful protest, and so I felt comfortable in checking

2   this one out.

3   Q.  Do you have a lot of strong political and spiritual

4   beliefs, Mr. Fry?

5   A.  Yes, I do.  I have a lot of religious beliefs that conflict

6   with a lot of the -- you know, federal policies that are in

7   place.  I -- I am strongly against a lot of the wars that are

8   going on; in arming all of these moderate rebels over there in

9   the Middle East, who topple their own governments over there.

10  I'm not a fan of abortion.  I don't fairly agree with the way

11  the government has been managing anything lately.  It seems

12  like they have kind of fallen apart in providing their support

13  of us, the we, the people.  And so I feel like they've failed

14  in a lot of aspects.

15  Q.  So, in the past, how would you have expressed those

16  opinions of yours?

17  A.  In the past, I would just, you know -- I actually have a

18  web page, before, that I would run.  And it was just like a

19  news blog.

20          And I called it -- it was actually called "Dead

21  America."  And just kind of signaling that America is a dying

22  country.  And so I had that.  And I was posting all sorts of

23  political views on there.  And I've tried, you know, alternate

24  things like that.  Talked on the forums.  Expressed my views on

25  there.  I've signed petitions.  But I've never -- I've never

Fry - D - By Mr. Olson

1    joined a protest, so this was something fun for me, I guess.

2    Q.  So what was your understanding -- you know, before you got

3    out here, or as you were coming out here, what was your

4    understanding about this refuge, as far as, you know, who

5    controlled it or what agency, if any, controlled this -- this

6    refuge?

7    A.  I actually did not even know what agency controlled the

8    refuge.  I just assumed, you know, everything was BLM, because

9    that was the name that was thrown out so much.

10           And then also it said -- you know, the articles and

11   stuff I read was saying it was unoccupied building, and I

12   didn't know that -- at the time that people were actually

13   working there.  I thought unoccupied was -- it was just kind of

14   abandoned -- one of these federal abandoned buildings, and

15   stuff.  But -- so that's what I knew at the time.

16   Q.  Okay.  So do you have -- among the issues that you're

17   interested in -- well, let me ask it -- the question this way.

18           Do you have public lands in Ohio?

19   A.  Actually, I've never heard of any kind of public lands in

20   Ohio.

21   Q.  Are you familiar with, you know, some of the issues that

22   have been talked about in this case?  Public lands, issues of

23   ranchers' access to public land, and so on, were those issues

24   ones that drove you or ones that you thought about much before

25   you came out here?

1   A.  At the time I really had no knowledge of this whole public

2   land issue.  Like -- again, public land in Ohio, it's unheard

3   of.  It seems to be more of a Western kind of problem, and so I

4   wasn't really into that -- that -- that isn't what drew me out

5   here.  I was more -- just concerned to see, you know, what it

6   was that they were talking about.  And so that's -- I learned

7   most of that when I actually got here.

8   Q.  And were you also hoping to come out here to speak about

9   some of the other things that -- that you are concerned about?

10  A.  Right.  And I -- basically, you know, they're complaining

11  about the -- the Bureau of Land Management and -- you know, I

12  actually wanted to talk about Fukushima because I thought it

13  would be somewhat relevant because I -- I disagree that the

14  government was able to manage anything at this point.  And

15  so -- I don't think they could manage land.

16          So I was trying to draw attention towards how our

17  government has failed in managing our protection about

18  Fukushima, because they essentially just swept that under the

19  rug, leaving us exposed to countless amounts of radiation.

20  Q.  And your dad touched on it but -- radiation.  So just tell

21  us, if you would, just briefly.  What is Fukushima, and what is

22  your concern about that?

23  A.  So Fukushima is a nuclear meltdown that happened in Japan

24  back in 2011, after the tsunami, caused by the earthquake, hit

25  the Dai-ichi reactors.

66

Fry - D - By Mr. Olson

1          And one of the reactors exploded and threw out, you

2    know, radiation all up in the atmosphere.  And it's -- some of

3    the reactor cores melted through to the crust.  And now they're

4    filling it with water.  But that water is actually leaking out

5    into the Pacific Ocean by like 300,000 gallons a day.  And

6    it's -- it's -- it's a catastrophic event that's been covered

7    up, essentially, because, you know, they claim that nothing

8    could be done.  Yet the only way that they --

9          MR. KNIGHT:  Your Honor, I'm sorry.  I'm going to

10   object to the narrative form.  To the extent it forms his state

11   of mind, that's fine.  But now we've heard quite a bit about

12   this.

13         THE COURT:  A little too much detail at this point,

14   Mr. Olson.  So let's stop it there.

15         Please go on.

16         MR. OLSON:  Sure.  Yes, your Honor.  Thank you.

17   BY MR. OLSON:

18   Q.  Well, let me ask you this question.

19         When you came out to the refuge, did you know

20   anything about adverse possession?

21   A.  I was not aware of that, no.

22   Q.  When you came out to the refuge, was it your intent to be

23   part of a group to lay claim to this property?

24   A.  I -- I actually -- I wasn't even aware that that was

25   happening.  I thought that it was just a sit-in, basically.

Fry - D - By Mr. Olson

1   Q.   A sit-in?

2   A.   Yes, like a Martin Luther King style sit-in.

3   Q.   How many days did it take you to drive out?

4   A.   It took me four days, due to the weather.  It was supposed

5   to take, I think it was -- 32 hours, it said on the GPS.

6   Q.   You drove out.  Is that right?

7   A.   That's correct.

8   Q.   In your vehicle?

9   A.   Yes.

10  Q.   And where did you sleep on the way?

11  A.   I slept mostly in my vehicle, and then I spent one day at a

12  hotel.

13  Q.   And how much money did you bring with you?

14  A.   I brought 700 bucks.

15  Q.   And when you came out to the refuge, what was your intent,

16  as far as how long you thought you would stay, what you might

17  do next, that sort of thing?  Did you think you would stay very

18  long?  Or -- or how did you think that was going to go?

19  A.   Well, I didn't think the protest was going to last that

20  incredibly long.

21          Again, I was planning to stay until the point was

22  made, and I thought everybody was just going to pack up and go.

23  And I was going to head down to California where my brother was

24  actually staying, just down south a little bit.

25  Q.   Okay.  Where did your brother live, at the time?

1    A.   He was over in -- I think it was Sacramento.

2    Q.   Okay.   Was he -- was he in the military?

3    A.   Yes.   He's -- he's a marine.

4    Q.   All right.   Now, did you bring a gun with you from your --

5    A.   I did not.

6    Q.   Okay.   And why not?

7    A.   Because I -- I personally don't believe in -- in -- like

8    I -- I believe in the existence of reason to have a firearm,

9    but I personally never got involved in that.   I -- generally

10   speaking, I'm not much of a firearm fan, just due to my, I

11   guess, mental history.   I -- I saw myself using the gun on

12   myself more than actually ever needing it, so I just never --

13   never got involved in that.

14   Q.   There was a bumper sticker on your car that said something

15   about Second Amendment rights?

16   A.   Right.

17   Q.   Where did you get that bumper sticker?

18   A.   I found that at the refuge in a box, and so I just put it

19   on there.

20   Q.   All right.   Did you bring your laptop with you to the

21   refuge?

22   A.   I did.

23   Q.   And your smartphone?

24   A.   I did.

25   Q.   And other accessories relating to recording and

Fry - D - By Mr. Olson

1    distributing of videos and such?

2    A.   Yes.   I brought all of my -- I brought all of my computer

3    equipment that's portable.

4              I brought, you know, cables, some little cards,

5    little flash drives, and stuff like that.

6    Q.   Now, you mentioned Mr. Finicum's YouTube channel.

7              Did you have your own YouTube channel?

8    A.   I did.   I had a YouTube channel called Defend Your Base.

9    Q.   And what was the origin of that?   Why did you originally

10   set that up?

11   A.   Well, I'm actually a video gamer as well.   And so when

12   you're, you know, video gaming, some people like to, you know,

13   record certain events that happened on there.   So I would post

14   those on my channel.   And it was basically just -- Defend Your

15   Base is my online gaming name.   And so, like, you know, you

16   have got to Defend Your Base in your game.   So that's where it

17   came from.

18   Q.   Okay.   And -- and later you would use that phrase -- well,

19   we'll get to that later.

20             So the Government has introduced some evidence of

21   your Facebook communications with a person named Mindy on

22   January 7th, and we've heard some of that.

23             Who is Mindy?

24   A.   Mindy is my coworker at the dental office.

25   Q.   All right.   And is she somebody you know well, or how long

Fry - D - By Mr. Olson

1   have you known Mindy?

2   A.   Well, I've known her for (pause) probably nine, eight --

3   nine, ten years.

4   Q.   Okay.  And on January 7th, the date of those -- those

5   communications, are you en route to the refuge, when you made

6   those communications with Mindy?

7   A.   Yes.

8   Q.   And you said along the lines of, you know, I might be

9   murdered.  Don't tell mom and dad.

10  A.   Correct.

11  Q.   Why did you say that?

12  A.   Well, you know, hearing that it's an armed protest -- you

13  know, one of the things besides playing games is I research a

14  lot of things on the Internet.  You know, history, stuff like

15  that.

16          And, you know, in the past, a lot of unarmed

17  protests, the government has actually come in and, you know,

18  killed protestors and brought in the tanks -- you know, this

19  was known as the Bonus Army March, you know.

20          And so I figured if they were killing people at an

21  unarmed one, that they would probably be killing people at an

22  armed one.

23  Q.   Did you -- as you were driving out here, did you think this

24  was an illegal protest?

25  A.   I did not think it was illegal.  And a lot of things that

1    led me to believe that -- you know, first, I thought it was

2    this abandoned federal facility.

3              Actually -- and it's happened in the past, I think.

4    It was Eric Holder.  He's taken over abandoned -- an abandoned

5    federal -- it was a ROTC, R-O-T-C building.  And he was never

6    charged with that.  So it's happened before.  But there was

7    also no warnings of anybody to not go out there.  I didn't see

8    any media saying that it was illegal, the FBI -- no one -- no

9    one was trying to stop anybody from going in, so I thought this

10   was just another protest.

11   Q.  As you approached the refuge, was there any kind of

12   perimeter of law enforcement or any law enforcement presence

13   that deterred you from moving forward into the refuge?

14   A.  There was not.

15   Q.  And you're coming over from the southeast.  Is that right?

16   A.  Yes.  I came up from -- it was Winnemucca, Arizona [sic].

17   Q.  Did you stop in Winnemucca to pick up some supplies for the

18   refuge?

19   A.  I did.  I stopped at the Walmart down there, and I just

20   grabbed a whole bunch of hygiene -- some hygiene stuff.  And --

21   it was canned goods and just basic -- basic necessities, I

22   guess.

23   Q.  For yourself or for -- to donate to the refuge?

24   A.  Well, I figured if I'm going there, I'm going to need the

25   supply for myself, too.  And so I brought as much as I could.

Fry - D - By Mr. Olson

1    And if people needed some, they had some there.

2            You know, I bought like -- I think it was like ten

3    toothbrushes, and stuff. A bunch of shampoo bottles. So if

4    people needed, I had some extras.

5    Q.  So what time of day was it -- what day was it when you

6    arrived?

7    A.  It was January 8th, at probably -- I would say around 11

8    o'clock in the evening.  It was pretty dark.

9    Q.  And did you arrive at that front entrance?

10   A.  Yes.

11   Q.  Were you greeted by anyone?

12   A.  Yes.  I was greeted -- I don't know who they were, since

13   they were actually wearing their little beanies and -- they had

14   flashlights out, and they were just pointing them, asking me

15   who I was.  And I said, "I'm here to, you know, check out

16   what's going on.  Help you guys out, if I can.  You know, just

17   kind of see what's going on."

18   Q.  Did they have firearms, that you could see?

19   A.  I couldn't see any -- any firearms.  It was really -- it

20   was really dark, so --

21   Q.  Okay.  So how did you get in?  Did somebody escort you,

22   then, onto the premises?

23   A.  He radioed in, saying that there is some -- some guy here,

24   you know, who's here to help.

25           They backed a little truck away, and then -- and he

Fry - D - By Mr. Olson

1    told me to pull in.  And when I pulled in, he said to wait here

2    for a second.  And then another truck came.  And they said all

3    right.  Go ahead and follow him.  So I followed him all the way

4    to the bunkhouse.

5    Q.  All right.  And did you spend that first night at the

6    bunkhouse?

7    A.  I did.  I slept on the couch in there.

8    Q.  What happened the next day?

9    A.  The next day, LaVoy Finicum came in, in the morning, and I

10   noticed him.  And I said, "Well, hey, good morning,

11   Mr. Finicum."

12          And he says, "Well, hello, you know."  And I said,

13   "It's me, David Fry."

14          And he seemed to have recognized, you know, who I was

15   because of our previous conversations on -- throughout his

16   YouTube channel.

17          And so, at that point, he asked me if I was good at

18   computers by any chance.  And I told him as a matter of fact I

19   was, you know, pretty decent with them.  And so he asked me if

20   I would help him with some of these computer problems he had.

21   Q.  Okay.  So did he tell you to -- to sleep somewhere?

22   A.  Yeah.  He says that he's going to want me to go to this --

23   I guess what we know now as the firehouse building.

24          He called it the media center because that's where

25   they were doing a lot of -- it was supposed to be the media

1    team was coming -- that promised to come for him, but they

2    didn't.  And so he had me sleep in that building, the

3    firehouse.

4    Q.  Okay.  That's the one where Ryan Curtis, who testified a

5    couple weeks ago, testified that was his office?

6    A.  That's right.

7    Q.  All right.  And did Mr. Finicum supply you with a sleeping

8    bag?

9    A.  Yes.  He gave me a sleeping bag and these little foam

10   mattresses.

11   Q.  So you had not brought out those sleeping pads -- a

12   sleeping bag for yourself?

13   A.  I didn't have a sleeping bag, but I did bring my blankets.

14   Q.  Okay.  So after some time there, did you talk to people and

15   get to know some other folks there that were present?

16   A.  I -- generally speaking, in that firehouse building, there

17   wasn't much people at that place.  Most people were actually

18   not allowed to be in there just because there was artifacts in

19   the basement and they didn't want people being down there

20   without --

21   Q.  Right.

22   A.  So when I had -- when I arrived I did talk to people, it

23   was over at, I guess, the bunkhouse, near the fire pit.

24   Q.  Okay.

25   A.  That's --

Fry - D - By Mr. Olson                         75

1   Q.  All right.  So in that first -- you know, let's say 24 or

2   48 hours that you were there, did you -- did you form an

3   impression or an understanding as to how the initial occupation

4   of the refuge happened?

5   A.  How it --

6   Q.  As far as --

7   A.  Okay.  So when I was down there -- you know, I did hear

8   about the Hammonds.  Like when I was on my way driving, you

9   know, they were complaining about the Hammonds.  You know,

10  through another videos they were producing and stuff.

11          And so there was this whole thing about the Hammond

12  issue that was going on.  And, at the time, I wasn't aware of

13  what that was.  But it seems like that was the driving factor

14  of what caused the people to be out there.

15  Q.  Okay.  And my question wasn't a good one.

16          What I meant was -- okay.  So you said as you're

17  coming out there, you had this idea that it was an abandoned

18  property.  When you got there, did you come to understand that

19  there were actually people that worked there?

20  A.  Oh, yeah.  So -- so, yeah, I noticed that there was

21  definitely people working there, you know.

22  Q.  And when you first got there and noticed that, what was

23  your understanding as to where those people were at that time?

24  Those employees?

25  A.  So -- so I did ask where the people were.  And they had

Fry - D - By Mr. Olson

1    said that they were on --

2              MR. KNIGHT:  I'm going to object to hearsay, your

3    Honor.

4              THE COURT:  The objection is sustained.

5              Mr. Olson, rephrase the question in a way that goes

6    to the witness's state of mind and not proof for truth --

7              MR. OLSON:  Sure.

8              THE COURT:  -- unless you've got another ground to do

9    so.

10             MR. OLSON:  Sure.

11   BY MR. OLSON:

12   Q.   Just leaving out, you know, what people actually told you,

13   just what was your understanding, then, in that first day or so

14   as to where those employees were?

15   A.   My understanding was that they were on vacation.

16   Q.   Okay.  But it was apparent to you that there were people

17   there that did work there, and that were just simply on

18   vacation?  Like New Year's vacation?

19   A.   That's correct, yes.

20   Q.   And did that understanding change over a period of time?

21   A.   Yes.  After -- obviously, they're not going to be on

22   vacation that long.  I was told -- objection.

23             MR. KNIGHT:  Object.

24             THE WITNESS:  I'm sorry.  My understanding is that

25   they couldn't -- they weren't at work anymore because they were

1    told --

2              MR. KNIGHT:  I'm going to object on the basis --

3              THE COURT:  The objection is sustained.

4              Please listen.  Mr. Olson will ask you a question in

5    a form that will give you an admissible basis to answer what's

6    appropriate.

7    BY MR. OLSON:

8    Q.  Just -- what was your understanding, as for as, you know,

9    why the employees weren't coming back to work?

10   A.  My understanding was that the management team of that BLM

11   or Fish & Wildlife were told not to go to work.

12   Q.  Okay.

13   A.  Because there was an ongoing protest.

14   Q.  Okay.  Now, Ryan Curtis's computer.

15             The -- there's a video that the Government has

16   introduced, Government Exhibit 623, that shows you sitting at

17   that computer and saying that you're -- you know, you're

18   displaying your Defend Your Base website.

19             Did you attempt to hack into that computer?

20   A.  I did not.  I actually turned on the computer, at first,

21   and, you know, it's saying there is a log in, and all of that

22   stuff.

23             And so I just left it at that.  And I had this --

24   it's called Linux, and it's a little flash drive operating

25   system.  That when you plug it in -- how a computer works is it

78

1    boots from a hard drive.  And whatever is on that hard drive is

2    the operating system that operates the computer.  So that would

3    be the government's operating system.  And so when I plugged

4    that -- my flash drive in, that's my hard drive.

5                And so the computer I tell it to boot from that, and

6    it actually pops up as my own computer.

7                And so their hard drive, and all of that, is not

8    being accessed, and so it's not hacked or anything.

9                It's no -- no data breaching, or anything like that.

10   And so I'm just using the hardware of the computer.

11   Q.   Okay.  And why did you do that?

12   A.   Well, I had this little laptop.  It was a -- one of those

13   little net books.  And it's a very slow computer compared to

14   this other computer that was there, that was, like, ten times

15   faster.  And so I was using that one to compress videos and

16   work on a web page that I had, because it would run much

17   smoother.

18   Q.   Now, did you -- did you also use that computer to access --

19   I may have made a mistake in my opening about this.

20               Did you access the Internet through that computer?

21   A.   Yes.  I had my own cell phone service, Verizon.  That's --

22   you got the mobile hotspots that they have now.  And so you can

23   use the Internet through your own cellular service.  And so I

24   was able to access the Internet through that.

25   Q.   And that's the building, also, you slept in.  Is that

Fry - D - By Mr. Olson

1  correct?

2  A.  That's correct.

3  Q.  And we showed the video earlier during Mr. Curtis's

4  testimony that you took of your sleeping spot there.  Right?

5  A.  Well, originally, I was sleeping right there where Ryan

6  Curtis's desk area was.  I slept on the floor there.  And I

7  noticed that there was mice running around.  And so I went over

8  to the next room over, and it had actually a door where --

9  where I could close it and the mice wouldn't be able to come

10 in.  So I ended up sleeping there, after that.

11 Q.  Okay.  Now, as time went on, did you begin to create some

12 of your own videos and upload it into your YouTube channel?

13 A.  Yeah.  I start creating my own videos because when I was at

14 the refuge -- and, you know, before going there -- I noticed

15 that a lot of the media coverage wasn't accurate, and they were

16 kind of making a lot of stuff up.

17      And so I decided that I was going to try to get, you

18 know, firsthand experience and show people what actually -- or

19 what exactly is going on out there.

20      And so I started making my own videos to kind of show

21 people what -- what it's like out there and, you know, who --

22 what kind of people they are out there, and stuff like that.

23 Q.  Okay.  And -- and you shot some videos that didn't involve

24 any other people.  Is that right?  Do you remember those?

25 A.  I've shot some video of the wildlife.

Fry - D - By Mr. Olson

1   Q.  All right.  Let's bring up one of those.  2608.

2           MR. OLSON:  Don't publish it just yet.

3   BY MR. OLSON:

4   Q.  Mr. Fry, can you tell us what Exhibit 2608 is.

5   A.  Okay.  So this is -- this is the video of some sort of

6   rodent, I guess.  I didn't know what it was, if it was a

7   squirrel or a groundhog.  Over in Ohio we have squirrels that

8   run on trees.  And so here, they had them on the ground, I

9   guess.

10  Q.  So this is some animal that you hadn't seen before?  You

11  didn't recognize?

12  A.  Yeah.  I had no idea what it was.  It just -- it had the

13  face of a squirrel but the body of a groundhog.  So I called it

14  the squirrel or mini-groundhog.

15  Q.  So this is a video that you shot at the refuge?

16  A.  Yes.

17  Q.  And approximate date that you shot it?

18  A.  Ah, this would be probably on the 8th, 9th, or 10th, or

19  something.  It was very early on.

20  Q.  Okay.  And --

21          MR. OLSON:  Your Honor, I would ask to publish.  This

22  is a matter that we brought up pretrial.  I would ask that we

23  publish this and play it for the jury.

24          MR. KNIGHT:  No objection.

25          THE COURT:  Thank you.

Fry - D - By Mr. Olson

1          Go ahead, Mr. Breton.  It's received.

2          (Video playing with sound.)

3          MR. OLSON:  Can you stop it there.

4    BY MR. OLSON:

5    Q.   So, Mr. Fry, do you have an interest in wildlife and

6    animals?

7    A.   I do.  I love animals a lot.  We've got three dogs and two

8    rabbits and --

9    Q.   Did you take some other videos, similar in nature, of some

10   other wildlife out there?

11   A.   I did.  I took a video of the pack of quails that were

12   running around.

13   Q.   Okay.  And did you take another video of yourself

14   reading -- or -- were there multiple videos that you took of

15   yourself that -- where you're -- strike that question.

16          Did people send books to you folks at the refuge?

17   A.   They did.  People sent all kinds of books.  People sent

18   *Quran*s in retaliation against Jon Ritzheimer.  He was -- he was

19   one of the guys who were there.  And they know of his

20   anti-Muslim kind of stance.  And so they bought a bunch of --

21   hundreds -- hundreds of *Quran*s, I guess, just to antagonize him

22   there.  And then they --

23   Q.   Were there some other books -- other types of books people

24   sent?

25   A.   There were all kinds of books.  *Souls of the Black Folks*

1  was one that run into my head really well for some weird --

2  it's a weird name.

3  Q.  And did you shoot a video of yourself reading a passage or

4  making some comments regarding the *Quran*?

5  A.  Yes, I did read a passage.  I was just trying to show

6  people -- I was trying to point out the fact that a lot of

7  people have a belief that Muslims are like all terrorists, and

8  stuff like that.

9  Q.  Let me just interrupt you.

10          MR. OLSON:  And let's show the video.  Can you bring

11  up 2606.  Don't publish it yet.

12  BY MR. OLSON:

13  Q.  All right.  Again, Mr. Fry, was this video taken at the

14  refuge?

15  A.  It was, yes.

16  Q.  And approximately when was it taken at the refuge?

17  A.  This one would be a little bit -- a little bit later on, in

18  the mid -- mid -- mid time.

19  Q.  Okay.

20  A.  Mid-month.

21          MR. OLSON:  Again, your Honor, this is a matter of

22  pretrial, and I would ask that we go ahead and play this.

23          MR. KNIGHT:  No objection.

24          THE COURT:  Thank you.  It may be received and

25  published.

1              (Video playing with audio.)

2              (Video stopped.)

3    BY MR. OLSON:

4    Q.   And so, Mr. Fry, just briefly, again, what was the purpose

5    of creating -- and did you also put this onto your website?

6    A.   I did, yes.

7    Q.   What was the purpose of that?

8    A.   I was just trying to show people, you know -- I'm not too

9    big a fan of the divide-and-conquer tactics that's been

10   happening lately, and so I was just trying to get people --

11   more people just to, you know, unite and work towards a cause

12   of fighting against corruption.

13   Q.   Are you Muslim yourself?

14   A.   I'm actually not.  I -- I -- I'm a Judeo-Christian.

15   Q.   And that *Quran* that was there, did you have that with you

16   at the end, at camp -- at the western encampment?

17   A.   I did.  I just put it in my backpack and kept it with me.

18   Q.   So in the Government's case, there was also Government

19   Exhibit 640, which was a video that was shot by somebody else,

20   but it showed you and Mr. Finicum and a couple of other people

21   down in the basement, going through some -- or pointing out

22   some artifacts down there.

23              Do you remember that video?

24   A.   Yes, I do.

25   Q.   Was that in the basement of the building that you were

Fry - D - By Mr. Olson

1  staying in?

2  A.   That's correct.

3  Q.   And was there in fact rat feces and rat nests, and whatnot,

4  in, amongst those artifacts?

5  A.   There was, yes.

6  Q.   And -- now, that was with Mr. Finicum.

7        When you were there with Mr. Finicum, did you get to

8  know him a little better?

9  A.   I did.   I got to know him a little bit better.

10       Prior to me being out there, I didn't know he was --

11  he was bald.   He always had a hat on in all of those videos.

12       And so I did get to spend a little bit of time -- not

13  too much because he was always out and about doing his things.

14  But I got a general sense about who he was.

15  Q.   Okay.   And, you know, did you come to like him as a person?

16  A.   I did.   I thought he was -- he was a very great guy.   He

17  was a -- very passionate about trying to, you know, fight

18  against corruption.   And he loves this -- his country a lot,

19  and he was upset about how it's going.

20  Q.   Just briefly, about Fukushima.

21       Did you actually ever get a chance to talk about that

22  when you were out there?

23  A.   I did.   I had an interview with *The Oregonian*, I think it

24  was.   And I briefly got to talk about it.   But it didn't come

25  out as well as I had hoped.   They weren't interested in

1  Fukushima.   They were more interested in trying to ridicule me.

2  Q.   Okay.   Now, we heard testimony from a young man by the name

3  of Nick Bleuler or Buler (phonetic) -- I can't remember how he

4  pronounced his name.   But, among other things, he testified

5  that he saw you with a Mossberg shotgun.

6              Did you carry such a gun?

7  A.   I did not.

8  Q.   Did you carry any kind of shotgun?

9  A.   I ended up picking up a shotgun after LaVoy was killed.

10 And I found this shotgun in the bunkhouse, in one of the

11 abandoned rooms.

12 Q.   Okay.   But just to get back to that question, that was

13 after Mr. Finicum got shot.

14             Before Mr. Finicum got shot, did you ever carry

15 around with you a shotgun or a rifle?

16 A.   I did not.   No.

17 Q.   Any kind of -- something that Mr. Bleuler might have

18 mistaken you for, as having a shotgun or a rifle of some kind?

19 A.   Absolutely not.

20 Q.   Did you come out to the refuge to prevent U.S. Fish &

21 Wildlife employees from doing their job?

22 A.   No.   They -- they -- employees never was brought up as a

23 discussion.   It was just about policies, in general.

24 Q.   Now, in that -- that video -- that was, again, Government

25 623, where you're sitting at Mr. Curtis's computer, you refer

Fry - D - By Mr. Olson

1   to that as being a BLM computer.  Do you remember that?

2   A.   (Nods head.)

3   Q.   Yes?

4   A.   I did.

5   Q.   Okay.  And have you heard evidence in this case that it was

6   actually the U.S. Fish & Wildlife that maintained that refuge?

7   A.   I just assumed everything was BLM.  I wasn't even aware

8   that U.S. Fish & Wildlife was involved until after we were

9   charged.

10  Q.   Did you have an understanding that whoever's desk that was,

11  that that person would be coming back to work someday?

12  A.   I did.  I -- you know, after -- after, obviously, being

13  there, you know that there's someone working there.  You know,

14  got a picture of his daughter in the little lady bug uniform.

15  And so I kept the place as really nice and tidy, as I could, as

16  possible.

17          And as far as the computer, I made sure, you know,

18  that I wasn't damaging it.  So when he did come back, he would

19  have a computer to use and with nothing being damaged.

20  Q.   You said you thought this was all the BLM.  Did you have

21  the intention of preventing any BLM employees from -- from

22  coming to do their work through force, threats, or

23  intimidation?

24  A.   I did not.

25  Q.   Was it your conscious desire to do that?

Fry - D - By Mr. Olson

1   A.   It was not.   I was just there as part of a protest.

2   Q.   Did you ever have any conversations with anyone about

3   preventing U.S. Fish & Wildlife or BLM employees from doing

4   their job?

5   A.   Again, the employees -- just -- that conversation never

6   occurred, that people were there to keep people from -- from

7   working.

8   Q.   So, generally speaking, before January 26, what kind of

9   stuff would you be doing through the course of a day?   A normal

10  day?

11  A.   Well, besides -- you know, at the end of the day, people

12  would bring to me, you know, their little flash drives, and

13  whatnot, that had the videos and pictures that they needed to

14  upload.

15        And so I would have to compress them.   Because

16  normally a raw video is -- is a very, very large file.   And so

17  you have to compress it to a smaller size to upload it.   And so

18  I would be up, you know, running those.

19        And while those computers were running -- because

20  sometimes they take an hour or more to compress -- I would be

21  over at the bunkhouse, and I would be chopping wood.   I helped

22  wash some dishes.   And that's all I can think of at the moment.

23  Q.   Okay.   The Government has -- again, going back to those

24  Facebook posts, there was a message in Government Exhibit 59, a

25  summary of your Facebook posts.   A message that you sent to a

88
Fry - D - By Mr. Olson

1   Derrick Fry.  Looks like maybe the early hours of January 26.
2           Who is Derrick Fry?
3   A.  Derrick Fry is my -- my uncle.
4   Q.  Okay.  Where does he live?
5   A.  He lives in Ohio, as well.
6   Q.  Okay.  And the message reads:  "No man, I'm here at the
7           wildlife refuge, armed protest, took over this
8           wildlife refuge."
9           Do you remember what he had sent to you that -- were
10  you responding to a message that he had sent to you?
11  A.  Yeah, he asked what I was doing.  I guess he must have
12  heard something from a family member.  But I told him I was
13  here over in Oregon.
14  Q.  Okay.
15  A.  And he says, "What are you doing over there?  Are you
16          chopping trees?
17          And I said, "No.  I'm just here at this armed
18          protest, and at this -- this wildlife refuge."
19          You know, "We're occupying it."
20  Q.  You said, "Armed protest"?
21  A.  I did.
22  Q.  Were you yourself armed?
23  A.  I was not.
24  Q.  But were others having their firearms?
25  A.  There was other people with their arms, yes.

Fry - D - By Mr. Olson

1  Q.  And you said, "took over this wildlife refuge."

2          Did you yourself take over this wildlife refuge?

3  A.  No, I -- I don't -- I didn't take it over.  I was occupying

4  it.

5  Q.  Okay.  I have another document I want to show you.

6          Again, this is not for the jury.  But it's Exhibit

7  2615.

8          Mr. Fry, without reading this, could you please tell

9  the jury -- well, read it if you need to to refresh what your

10  recollection is.  But can you tell us what this is?

11  A.  Yes.  So with all of these *Qurans* that were being sent over

12  there.  There was one -- you know, there was a couple of

13  discussions about, you know, the Muslim faith --

14  Q.  Mr. Fry, I'm going to interrupt you.  Just -- is this your

15  handwriting in this note?

16  A.  It's my scratch -- scratch -- scratch writing.  Yes, it is.

17  Q.  Okay.  So you wrote this note?

18  A.  I did.

19  Q.  When did you write it?

20  A.  This would be on the -- it would probably be around the

21  23rd.

22  Q.  Okay.  And did you write it at the refuge?

23  A.  I did.

24          MR. OLSON:  And, your Honor, I would ask that this be

25  published now, Exhibit 2615.

1    MR. KNIGHT:  For the limited purpose of demonstrating

2    the witness's state of mind, we don't object.

3    THE COURT:  The objection is sustained.  It's in for

4    that limited purpose, Members of the Jury.

5    Go ahead.

6    MR. OLSON:  All right.  Thank you.

7    BY MR. OLSON:

8    Q.  Mr. Fry, could you just go ahead and read this letter to

9    us.  And then I'm going to ask you to explain the circumstances

10   that lead to this.  Okay?  So go ahead and read it to us first.

11   A.  So it says, "Hello, everyone.  I'm sorry I couldn't

12   stick around as long as I wanted.  I just feel

13   like there isn't much for me to do.  I never

14   should have cared.  Caring is my weakness, and

15   with it I will go."  And I said, "bye," and "you

16   can have all of my stuff."

17   Q.  What led to the circumstances that led to you writing this

18   letter?

19   A.  Well, I was very upset, you know, again, with the, Muslim

20   conversation that came up.  There was this -- at the fire pit,

21   there was a conversation with this guy.

22   He -- I was trying to explain to him that not all

23   Muslims are evil terrorist people.

24   And he was like, no, the only good Muslim is a dead

25   Muslim.  And I absolutely -- I really hated that comment, and I

Fry - D - By Mr. Olson

1    didn't want to be around this person anymore.  And I found it

2    hypocritical that this guy's trying to talk about preserving

3    the Constitution and be so against the First Amendment right to

4    have everybody believe what they want.

5              And so I just was thinking about leaving, but I

6    wasn't really -- this was more of a stress relief, where I was

7    just like -- ah -- and I crumpled it up and threw it in the

8    trash.  But I didn't leave.

9    Q.   Okay.  Was there a moment that you were thinking about

10   leaving?

11   A.   It crossed my mind, you know, because I really didn't want

12   to be -- I -- I didn't want to be involved in any kind of

13   crusade.  But, you know, it wasn't -- there was no defendant

14   here who's anti-Muslim, or anything like that.  It was just

15   like two or three people that -- that were like that, and I

16   didn't want to be around that really.  But I realized, you

17   know, I overreacted, because it's not like the majority of the

18   people there were like that.  It was just a few.

19   Q.   Mr. Fry, did you attend any meetings at the refuge?

20   A.   I did not attend them.

21   Q.   I was going to say, you know, any meetings where it was

22   discussed about plans or organization around the refuge?

23   A.   No.  There was -- I didn't attend any meetings.

24   Q.   Were you invited to any such meetings?

25   A.   The only one I was invited to was the one that LaVoy

Fry - D - By Mr. Olson

1    went -- was going to.

2    Q.  Okay.  Well, we'll get to that in a second.

3            But there was -- we saw the video, somewhere along

4    the lines here, of a church service, where there was music

5    played and so on.  Were you at that?

6    A.  I was at the church service, yes.

7    Q.  Okay.  So you socialized some with the folks that were

8    there?

9    A.  Correct.

10   Q.  But as far as can you recall, you don't recall any meetings

11   where future plans were discussed or tasks were delegated, or

12   anything like that?

13   A.  Yeah, I wasn't at any -- anything that I would hear about

14   what their plans was.  I wasn't aware of any -- the cameras

15   being taken down until after they were taken down.  You know,

16   the fence thing, I didn't even know about that until the media

17   was playing it.

18           And so I wasn't -- I wasn't invited to anything

19   that -- where they showed plans, yes.

20   Q.  Okay.  Now, January 26, did Mr. Finicum send you a text

21   message that day, asking you to attend a meeting?

22   A.  Yes.  I did get his text message.  It was -- I think -- I

23   think my phone was set still to three hours because -- from

24   Ohio.  And I think it said 12 o'clock, or one o'clock, but it

25   would have been sent three hours before that, if it was here.

Fry - D - By Mr. Olson                  93

1   But he asked me if I wanted to come to this meeting with --

2   with the sheriff, I think it said, so I could record it.

3         And I missed that message because I was helping Lee

4   Rice fix his cell phone and his computer.

5   Q.   And Mr. Rice touched on that in his testimony a couple of

6   weeks ago.  Is that right?

7   A.   Yes.

8   Q.   So if you had gotten that text message and if you had seen

9   it, would you have gone along with Mr. Finicum to that meeting?

10  A.   Yes.  I would have been in that truck.

11  Q.   So what time was it that day when you first heard something

12  had happened?

13  A.   This would be more towards the evening because -- when I

14  did see that text message, I responded, like four hours later.

15  And I said was it too late to join that -- you know, go with

16  you guys?  And I never got a response back.

17        And it was probably around 6:30 -- 6:00, 6:30 that we

18  found out that they were fired upon and -- and he was killed.

19  Q.   Okay.  And, initially, what did you hear?  Did you know

20  that he was killed?

21  A.   Well, actually, I didn't know he was killed, but we just

22  heard that two people were shot.  And this was coming through

23  Pete Santilli's live feed.  And he was saying, You know,

24  there's -- two people were shot.  One -- they're in the

25  hospital.  And, you know, they're preparing their vehicles, and

Fry - D - By Mr. Olson

1    they're coming to raid the refuge.   Along --

2    Q.   That was Mr. Santilli that said that?

3    A.   Mr. Santilli, yes.

4    Q.   Okay.   And then, as time went on, did you learn that it was

5    actually Mr. Finicum that had been shot?

6    A.   Yes.   This came in probably -- maybe an hour later.   Hour

7    or two later.

8    Q.   Did you learn that he had been killed?

9    A.   Yes.

10   Q.   And do you recall how you heard that?   Was that just kind

11   of the general talk, or do you recall specifically somebody

12   telling you that?

13   A.   It was -- I'm trying to figure out where it came from.   I

14   don't recall exactly.

15        I'm thinking -- because I know Pete was arrested

16   shortly after, so it wasn't from him.

17   Q.   But, nevertheless, you -- you learned this.

18        And did you also learn that the FBI -- or did you

19   believe -- that the FBI was -- was coming to the refuge?

20   A.   Yeah.   We were told they were coming to the refuge to

21   assault us, in a sense.

22        MR. KNIGHT:   I'm going to object to hearsay on

23   that --

24        THE COURT:   The objection is sustained.   Jurors,

25   disregard the answer.

1           Ask another question, please.

2    BY MR. OLSON:

3    Q.   Did you specifically talk to Mr. Banta?  Did he tell you

4    anything about the presence of FBI people?

5    A.   Mr. Banta and -- I came to --

6    Q.   Let me ask you this question.

7    A.   -- an understanding -- okay.

8    Q.   Based on your conversation with Mr. Banta, what was your

9    understanding, as far as the presence of FBI people?

10   A.   My understanding is that Mr. Banta spotted like 20 -- 20 or

11   more vehicles heading our direction.

12   Q.   Okay.  And were you aware that the FBI was -- was calling

13   in to try to get people to get out of there?

14   A.   Blaine Cooper had spoken with the FBI and --

15           MR. KNIGHT:  Object to hearsay, your Honor.

16           THE COURT:  The objection is sustained.  Please

17   phrase your questions carefully to call for this witness's

18   state of mind and not hearsay.

19           MR. OLSON:  Sure.

20   BY MR. OLSON:

21   Q.   What was your understanding as far as the FBI's desire to

22   have folks get out of there?

23   A.   The FBI had said that everybody was allowed to leave, but

24   rumor was that people were being arrested as they were leaving.

25   And so --

Fry - D - By Mr. Olson

96

1   Q.   Okay.  And was there actually -- do you recall an FBI

2   agent, Agent Luh, actually calling your phone?

3   A.   That's correct.  This -- Agent Luh called my phone and

4   asked me to hand the phone to Blaine Cooper.

5   Q.   Okay.  Now, he's testified that you made a statement along

6   the lines of, well, we're waiting for to you come in and murder

7   us, or something like that.  Do you remember saying that?

8   A.   That's correct, yes.

9   Q.   So he had your phone number.  Had -- had any FBI agent,

10  before January 26, called you to tell you to -- you should

11  leave the refuge?

12  A.   No.

13  Q.   So the FBI -- you learned that the FBI was -- was asking

14  people to leave, telling people to leave.

15           Why didn't you leave?

16  A.   I was -- generally speaking, I was -- I was very upset

17  about what had happened.  All of the other camera people were

18  either arrested or -- or left.  And so I was the last one there

19  that had any kind of camera skills.  And so I felt it more of a

20  duty, also, to stay behind because there was a whole bunch of

21  people that were still there.  Like 20, maybe.  Something like

22  that.

23  Q.   And as things kind of shook out through the night, people

24  were leaving.

25           How many people ended up staying that whole night?

Fry - D - By Mr. Olson

1    A.    That whole night, it -- it dwindled down to about 15

2    people, though.    So there was still 15 people, or so, all

3    scattered about.    And so I was just trying to record basically

4    what was happening.

5    Q.    And, of course, we've seen some of that in the government

6    exhibits.

7              But you said cameraman, and I think you also used the

8    term "live streaming."    We've heard about that.

9    A.    Mmmm.

10   Q.    What was your goal in live streaming that night?

11   A.    My goal was -- you know, there was two reasons that I

12   wanted to live stream that event.    Was because if the FBI or

13   the government -- whatever you want to call them -- if they're

14   watching that they're being watched -- you know, if they know

15   that all of these Americans are watching, that they would be

16   less likely to go in and do something that they would feel

17   humiliated by.    And if they did attack, you know, then at least

18   people would understand -- get to -- probably see a different

19   perspective than -- than what would be told by, you know, the

20   winning force.

21   Q.    Okay.    So if everyone else had left that night, would you

22   also have left?    Or would you have remained as the only person

23   staying there?

24   A.    Well, I would have left if everybody left, yes.

25   Q.    And did you continue to do that, into the next -- that

1  night and into the next day?  This live streaming stuff?

2  A.  Yes.  I kept that live stream running because we really

3  thought they were coming in to -- just come in and kill us.

4          Delt -- understanding was Delta force team was

5  coming, you know, and -- going to come and slaughter us and

6  stuff.

7  Q.  So, Mr. Fry, you're very calm today.  Right?

8  A.  Yes.

9  Q.  January 26th, you weren't so calm.  Right?

10  A.  I was -- I was -- I was a little bit losing my mind, in a

11  sense (laughing) because I -- I thought -- I don't know.

12  Maybe -- I guess everybody reacts differently when they feel

13  like their life is about to be extinguished.  I mean, I don't

14  think I was being crazy but maybe not completely sane.

15  Q.  So you've seen Government Exhibit 673, which is the one

16  where you're kind of walking around the buildings.  You have

17  got a shotgun over your shoulder.  Correct?

18  A.  Mmmm.

19  Q.  And you're -- you said something along the lines of you're

20  going to watch me die live on Defend Your Base.

21  A.  Right.

22  Q.  That was nine months ago, basically?

23          With the benefit of time and reflection, what's your

24  reaction now, in seeing that?

25  A.  Well, now, looking back at all of that stuff, it -- it's

Fry - D - By Mr. Olson

1   actually quite embarrassing, to be honest.

2           You know, reading some of the -- actually, if you

3   caught on, I was screaming -- I screamed one time, allupbar

4   (phonetic), as a joke, because there's this guy who made a

5   comment, and I just thought it was funny at the moment.

6           You know, at the time I just thought we were going to

7   die.  And I really didn't think what people were going to think

8   of me in the future, and so I was just being loony.

9   Q.  What do you think of this diagnosis that Dr. Guyton has

10  given you of schizotypal personality?  What's your -- what do

11  you make of that?

12  A.  Well, I -- I feel more comfortable with that than -- I've

13  previously been diagnosed with schizophrenia, which was a

14  misdiagnosis.  And it makes more sense because I'm not

15  constantly delusional.  You know, I'm quite sane almost all of

16  the time.  It seems to be a pattern that, when under extreme

17  situations, that I might act funny.  But -- but that's -- I

18  don't see it as -- as -- as anything bad, I guess.  I don't

19  know.

20  Q.  Okay.  Has it provided some insight to you as to

21  understand, you know, a little bit about yourself and your

22  life?

23  A.  Yes.  I -- I tend to -- it's hard to say because a lot of

24  the things that I've experienced in my life -- you know, I

25  don't want to consider it a mental illness.  I'm a spiritual

Fry - D - By Mr. Olson

1   person.  And you can't quite explain those things in any

2   medical fashion.  And so I think it kinda gets -- tends to be

3   classified as a mental illness.  You know, I sometimes like to

4   believe what I hear is -- is an angel, you know.  I don't want

5   to believe is as a disease.

6   Q.  Okay.  That rifle that you were carrying around with you

7   that night --

8   A.  Mmmm.

9   Q.  -- did you carry it with the intent to prevent employees or

10  officers of the U.S. Fish & Wildlife or the BLM from doing

11  their jobs?

12  A.  No.  I think it should be quite obvious that, you know, it

13  was a response to being attacked -- or thought to be attacked

14  by the FBI.

15          The Fish & Wildlife and BLM were not even on my mind

16  at -- when I was holding that gun.

17  Q.  Okay.  And you touched on earlier -- I interrupted you.

18  But where did you get that gun?  Where did that come from?

19  A.  Okay.  So when everybody had started fleeing on the 26th, I

20  walked into one of the abandoned rooms and I found this shotgun

21  on the ground there by the bed post.  And so I picked that up

22  and found the little shotgun carrier thing, belt (indicating

23  with fingers).  So I grabbed that too.

24  Q.  Okay.  Did you sleep at all that night?

25  A.  I did not.

Fry - D - By Mr. Olson

1    Q.   Where did you spend the night?

2    A.   We had left -- a lot of us had left that -- I guess the

3    refuge, in a sense.  And we went over to what was called the --

4    what we called it as the west encampment.

5         And so this would be like the parking lot of the

6    refuge, I guess.

7    Q.   Sure.

8    A.   And we stayed there, the whole night and waited to be

9    killed.  We didn't even go to bed.

10   Q.   And is that where you stayed all subsequent nights, all the

11   way up to the end?

12   A.   Yes.

13   Q.   In that little corner of the parking lot?

14   A.   That's correct.

15   Q.   And why did you do that?

16        Why didn't you continue to just stay where it was

17   nice and warm in the buildings?

18   A.   Well, we felt that it would be better to, you know, leave

19   the refuge.  You know, we actually had packed all of our

20   things, our belongings.  And we were -- we were ready to go,

21   but we didn't feel safe to go.  So we just kind of --

22   Q.   But as time went on, you know, why did you -- I mean, this

23   is the middle of winter, freezing cold --

24   A.   Um-hmm.

25   Q.   -- why didn't you just go back into those buildings and

Fry - D - By Mr. Olson

1    stay there?

2    A.  We just didn't feel like it was -- we felt like whatever

3    they were coming after us for was because obviously we were

4    occupying the buildings.  And so we wanted to show we were no

5    longer part of this protest, and that we weren't trying to

6    occupy anything anymore.

7               So we -- we left and we had all of our things ready

8    to go.

9    Q.  And you knew that -- that first night, you knew that the

10   Bundys had been arrested.  Correct?

11   A.  That's correct, yes.

12   Q.  And Ms. Cox?

13   A.  Yes.

14   Q.  And so -- okay.  Did you know why they had been arrested?

15   Or what specifically they had been charged with that first

16   night?

17   A.  I -- I would like to believe that we did know what they

18   were charged with, which caused us to get away from those

19   buildings.  But I'm not 100 percent sure.

20   Q.  Okay.  All right.  Now, into the next day, January 27th, I

21   want to ask you some questions about some -- some -- some

22   people that have been mentioned here in the course of this

23   trial.

24              Were there some individuals who showed up in the

25   immediate time period before you had heard about Mr. Finicum's

1  death?

2  A.   Yes.   There was these -- what we now call them as the Navy

3  SEALs guys.

4         They had shown up, I think, just -- maybe half a day

5  before LaVoy -- the whole LaVoy thing came on the 26th.

6  Q.   How did they show -- what kind of vehicle were they driving

7  when they showed up?

8  A.   They showed up in an old -- really, one of those older RV

9  campers.   The little -- where you -- it has a little -- you can

10  sleep inside of them.

11  Q.   Okay.   Did you know why they showed up?   Or did they seem

12  out of place at the time that they showed up?

13  A.   They did.   They seemed very out of place.

14  Q.   All right.   And in the Government's case we've heard

15  some -- some -- some evidence of some damage, and so forth.

16         Based on your observations of -- of these

17  individuals, do you have an opinion as to how that damage --

18         MR. KNIGHT:   I'm going to object to the form of the

19  question.   He can testify to what he saw but not an opinion

20  about what they did.

21         THE COURT:   (Nods head.)   All right.

22         MR. OLSON:   I'll rephrase that, your Honor.

23  BY MR. OLSON:

24  Q.   We've heard about some damage done to the door of Carla

25  Burnside's office.

Fry - D - By Mr. Olson

1    A.   Correct.

2    Q.   That night, on January 26th, did you see that door when it

3    was intact and not damaged?

4    A.   I did.  I was driving on a four-wheeler.  And when I was

5    driving towards the west encampment -- and this would be on

6    the -- mid-morning of the 27th, or so, they were still there.

7              And on my way back from the bunkhouse, collecting

8    drinks and stuff, I drove past them.  And he was walking

9    towards --

10   Q.   You say "he."  What do you mean?

11   A.   The --

12   Q.   One of these guys?

13   A.   The navy -- the big bearded Navy SEAL guy.

14   Q.   Okay.

15   A.   And so I drove past Burnside's building because -- like --

16   there's a little sidewalk there.  So you cut in through that

17   and take a left.

18             And I drove past that door, and it was intact.  There

19   was nothing wrong with it.  And later in the day, coming back,

20   that door was kicked in.  And he was still around in that area.

21   Q.   When you say "kicked in," how -- how do you know it was

22   kicked in, versus just open or something?

23   A.   Well, you can see how there was the wood splints -- so the

24   wood has splintered.  And so there was wood particles all over

25   the place and it's broken.  And there was nobody else down

1    there except for him.

2    Q.   Okay.  All right.  Did those people leave that day, on the

3    27th?

4    A.   They did.  Like towards the afternoon.

5    Q.   All right.  There's a trench that was built by your

6    encampment there.

7         Did you build that trench?

8    A.   I didn't build it.  There was two other people who were --

9    Q.   Was that your idea to build that trench?

10   A.   It was not.

11   Q.   Did you come to understand what the purpose of that trench

12   was?

13   A.   At the time, I didn't know what they were doing, why -- I

14   mean, I guess I'm just assuming that it was for some sort of a

15   defensive position in response to thinking they're going to be

16   killed.

17   Q.   Okay.  Did you continue to live stream throughout that day,

18   the 27th?

19   A.   Yes.

20   Q.   And one of the Government's exhibits shows you holding a

21   different gun.  This time a gun with some stickers at the end.

22   Do you remember that one?  I believe it was Government 670?

23   A.   Yes.

24   Q.   Was that your gun?

25   A.   It was not.

1    Q.   Where did you find that gun?

2    A.   That -- that was actually handed to me because --

3    Q.   Okay.

4    A.   I was using the shotgun, and he told me, "It's not good at

5    long distance," and so he was like, "Here, use this."

6    Q.   Who's "he"?

7    A.   I think it was Sean.

8    Q.   Okay.  Did you ever carry a round -- a rifle referred to as

9    a Mossberg shotgun?

10   A.   I -- I never carried any gun called a Mossberg.

11   Q.   And -- and so, as far as you know, you're not depicted in

12   any of the live-streaming videos you shot, holding a Mossberg?

13   A.   That's correct.

14   Q.   In that same exhibit, 6 -- 670, there's a moment where you

15   kind after approach the screen and you say, "Free the

16   Hammonds."

17   A.   Mmmm.

18   Q.   Where did that come from?  Why did you say that at that

19   point in time?

20   A.   And so -- I said that because -- in a lot of my videos,

21   you'll see that I was reading from the comments.  And so one of

22   the comments made was "free the Hammonds" and "free the

23   Bundys."

24        And so I just kind of parroted what he said.

25   Q.   So you were reading a comment, basically?

Fry - D - By Mr. Olson

1    A.   Reading it, yeah.

2    Q.   Okay.   Now, do you remember talking to Agent Maxwell that

3    night?

4    A.   Yes.

5    Q.   And this was Government Exhibit -- excuse me -- 15.   Where

6    were you basically -- he was trying to get you to come out.

7    Right?

8    A.   Mmmm.

9    Q.   And you and the others were expressing some suspicion over

10   that because of the manner in which Mr. Finicum was killed.

11   Right?

12   A.   Right.

13   Q.   You had mentioned before that you had actually packed up

14   and you were ready to go.

15        Were you -- were you all packed up and -- and ready

16   to go at that -- at that -- during that day?

17   A.   Yes.   Yes.   We were all -- we had all packed our things and

18   we were ready to go.   But, again, nobody -- I think it was --

19   the Andersons who -- they never even got the word that they

20   were able to leave.

21   Q.   Well, you don't need to get into that right now.

22        But through the course of that day, did everyone else

23   leave?   All of the other 15 or 20 people that you were talking

24   about?

25   A.   Through the course of the day --

Fry - D - By Mr. Olson

1    Q.  Or maybe the next day?  I don't --

2    A.  There was.  There was people who have left.  I think it

3    was -- Duane Ehmer left fairly -- maybe 1:00 or 2:00 in the

4    afternoon.

5            He -- he actually came back, and he told everybody,

6    "Hey, you guys are okay to leave."  So -- he's like, I'm -- if

7    anybody wants to come, you know, come on along.

8            And he actually left, and we actually saw in the news

9    that he was arrested when -- when he left the second time.

10   Q.  Okay.  So -- but was there -- you say that you were all

11   packed up and ready to leave.  Why didn't you just leave?  What

12   happened?  Was there something that happened with respect to

13   Mr. Anderson?

14   A.  Right.

15   Q.  Or his situation?

16   A.  Mr. Anderson was told that he wasn't allowed to leave.

17           MR. KNIGHT:  Your Honor, I'm going to object to the

18   hearsay there, your Honor.

19           THE COURT:  The objection is sustained.  Please

20   rephrase.

21           MR. OLSON:  Okay.

22   BY MR. OLSON:

23   Q.  Well, did it become apparent that -- that Mr. Anderson was

24   going to be charged and arrested with -- for an offense?

25   A.  Yes.

1    MR. KNIGHT:  I'm going to object to the basis.

2 Saying the witness has an understanding of something that's

3 based on hearsay is no different than hearsay.

4    THE COURT:  The objection is sustained.

5    THE WITNESS:  Well --

6 BY MR. OLSON:

7 Q.  Did you have an understanding that Mr. Anderson came to

8 be --

9 A.  I talked on the -- on the phone with the FBI agent about

10 that.

11 Q.  Okay.  All right.  So what was Mr. -- initially, was anyone

12 else told that they were going to be charged or arrested?

13 A.  No.  It was just Sean Anderson at that time.

14    And they said -- the FBI said that you guys are all

15 free to leave except for Sean.

16 Q.  Okay.  So what was -- was Mr. Andersen willing to just go

17 ahead and be arrested?

18 A.  No, Mr. Andersen -- he was very upset by that.  He felt it

19 was --

20    MR. KNIGHT:  I'm going to object to the speculation

21 on the --

22    THE COURT:  The objection is sustained.

23    Disregard the question and the answer.  Please

24 rephrase.

25 BY MR. OLSON:

1   Q.  Okay.  Mr. Anderson did not turn himself in to be arrested.

2   Is that right?

3   A.  That's correct.

4   Q.  And what was Sandy Anderson's position?

5   A.  Sandy would not leave as well because it was her husband.

6   And she wasn't willing to leave him to be arrested.

7   Q.  So, given that your situation, what was your position?

8   Were you ready to leave with -- with these people not willing

9   to leave?

10  A.  I was not willing to leave unless everybody was going to

11  leave because, again, I was the only person with this camera.

12  And I was worried that if people were to stay behind without

13  any monitoring of what -- what's going on, that the Government

14  would come in and -- and kill them and try to cover it up, or

15  something.

16  Q.  So in staying, at that point, was it your intent to prevent

17  U.S. Fish & Wildlife or BLM employees from coming back to work?

18  A.  It was not.

19  Q.  Did Mr. Banta ever say that he wanted to prevent U.S. Fish

20  & Wildlife employees or BLM employees from doing their job?

21         MR. KNIGHT:  Object to the hearsay of Mr. Banta on

22  this point.

23         THE COURT:  The objection is sustained.

24  BY MR. OLSON:

25  Q.  Did Mr. Banta also have a distrust of what the FBI might

Fry - D - By Mr. Olson

1   do?

2   A.  Mr. Banta did have a distrust.  Everybody had a very strong

3   distrust with the FBI.

4   Q.  Now, eventually, you are told that you're -- you're going

5   to be charged and arrested as well?

6   A.  Yes.  Later, they ended up charging all of us, yes.

7   Q.  All right.  And did you guys have a conversation about --

8   what was your idea about, you know, whether you should all

9   continue to stick together versus people make their own

10  individual choices?

11  A.  Well, originally, you know, we all wanted just to leave

12  together.  We didn't want to leave anybody out there by

13  themselves.  So we decided that it was safer to stick together

14  and -- and kind of see what happens that way, because --

15  because then it's -- you know, if you're in a group, you're

16  less likely to be just killed, I guess.

17  Q.  Now, obviously, they didn't come in and kill you the first

18  night or the next day.  Right?

19  A.  No, they didn't.  They did not.

20  Q.  And you -- you didn't necessarily continue to do all of

21  that live streaming.  Right?

22  A.  Eventually, my -- my phone got cut off.  The FBI had cut my

23  phone service.

24  Q.  All right.

25  A.  And --

Fry - D - By Mr. Olson

1   Q.   Were there drones flying around?

2   A.   There was.   There was this little remote controlled little

3   airplane thing that they would fly over our heads at night, and

4   it would scare the crap out of us.   Be making lots of noise.

5           And so I ran out there with a spotlight and spotted

6   it.   And -- and I guess that's what it was.

7   Q.   Did the presence of those drones contribute to your

8   suspiciousness?

9   A.   Yeah, I was -- I didn't know what kind of -- what those

10  things would do.   You hear about predator drones, and stuff

11  like that.   So we don't know if it's got -- built bombs on it,

12  or anything.   We didn't know.

13  Q.   So you mentioned at some point they took away your cell

14  phone service.   Is that right?

15  A.   They did.

16  Q.   And did they provide you with a separate phone or a new

17  phone that you could communicate with them?

18  A.   Yeah, the -- the excuse that they gave to cut my phone off

19  was that they heard my charger wasn't working.

20          And so they cut my phone off and provided me with

21  this little FBI flip phone, Verizon.

22  Q.   How did they get that to you?

23  A.   They -- they put it inside the cab -- like the seat area of

24  the excavator that was at the front gate.

25  Q.   Okay.

Fry - D - By Mr. Olson

1    A.   And before they cut my phone off, they called my phone and

2    says -- and said, you know, that we have this other phone over

3    at the front gate.  And, you know, we want you to go over there

4    and grab it.  And it looks like a little cocaine package.  And

5    so they -- that's what they said.

6    Q.   Okay.  And after they gave that to you, did they -- did one

7    of the FBI agents make a statement to you that -- that kind of

8    increased your -- your sense of suspicion or paranoia or fear?

9    A.   Yeah.

10   Q.   Do you recall that?

11   A.   The FBI was telling me, you know, that -- something along

12   the lines -- like -- well, she said -- she said you saw how

13   close we were to you.  You saw how close we were to get -- to

14   be able to get to you.  You know.  And so she -- she was

15   implying that there's these FBI people, you know, sneaking

16   around at nighttime, and stuff, around us.

17   Q.   Okay.  So were there a few days there where you didn't have

18   access to social media and then the Internet, and so forth?

19   A.   That's correct.

20   Q.   Were you ultimately able to work around that?

21   A.   Yes.  I was able to find someone's mobile hotspot that they

22   had left behind.

23   Q.   And so did you go back to live streaming or -- or -- or

24   shooting videos, and so forth, and posting that on your YouTube

25   channel?

Fry - D - By Mr. Olson

1  A.   That's correct.

2  Q.   Now, during this time that you were at the refuge, were you

3  receiving a lot of negative comments from people about you

4  potentially getting raped in prison?

5  A.   Yes.  I -- ever since I released the very first video of me

6  being there, I was being bombarded with these comments of how I

7  was going to be raped in prison, and -- and all kinds of really

8  horrible things that they were going to do to me there.

9  Q.   Did you take those seriously early on?

10  A.   Early on, I did not.  At the time, I really didn't think we

11  were -- it was really a crime.  I thought it was just a

12  protest.  But as the event unfolded, and now we're being told

13  we're going to be charged, that threat, that idea of going to

14  prison became more of a reality.  And so I started really

15  taking that serious.

16  Q.   And so were those threats kind of getting worse as time

17  went on, especially after you know that you're going to be

18  charged?

19  A.   I wouldn't say they got worse.  I mean, they were always

20  really bad.

21        But just towards the end, I started taking more

22  notice, I guess, up -- to that stuff.

23  Q.   And we've created an exhibit.

24        MR. OLSON:  Can you bring up 2616.

25        Yes.  Don't publish yet.

1  BY MR. OLSON:

2  Q.  Mr. Fry, would you look at 2616, and tell us what we're

3  looking at here on the first page.

4  A.  So this is one -- this is just some of the comments that

5  you would see in this -- the comments section of my videos I

6  would post.

7  Q.  So -- at the top there is -- what is that?  Is that a

8  screenshot?

9          MR. SCHINDLER:  Your Honor, I apologize.  I'm sorry

10  to interrupt the proceedings, but we've lost screens here.

11  This whole section of the room --

12          THE COURT:  When did that happen?

13          MS. MAXFIELD:  Just now.

14          THE COURT:  Just now?

15          How much longer on direct?  Mr. Olson, just give me a

16  sense --

17          MR. OLSON:  15 minutes.

18          THE COURT:  Then I think we might as well take the

19  morning recess.

20          We can take up this technical issue, and we'll

21  continue after the break.  With the same instruction, ladies

22  and gentlemen.  Please do not discuss the case.  Leave your

23  notes here.  Enjoy 15 minutes, and we'll be back to you.

24          My plan is for the lunch break to be around 11:30, or

25  so, and a logical break in the evidence for as long as you

Fry - D - By Mr. Olson

1   need.  And then we'll come back.  And then the plan to adjourn

2   at the end of date is around 2:30-ish.  Okay?

3           Very good.  Watch your step.

4           Let's all stand for the jurors.

5           See you in a bit.

6           (Jurors exit at 10:38 a.m.)

7           THE COURT:  So let's be seated, please.  While we're

8   in recess, I trust our IT specialist will work on the screen

9   issue.

10          Mr. McDonald, I can get an update from you and

11  Mr. Bundy in ten minutes, after the recess -- short recess.

12  Unless you have something on which you need direction right

13  now.

14          MR. McDONALD:  I have no progress report for the

15  Court.

16          THE COURT:  Okay.  Well, then I'll check in with you

17  after recess.

18          Everybody stay seated, please, as Mr. Bundy,

19  Mr. Bundy, and Mr. Fry leave.

20          Mr. Fry, you can step down, obviously.

21          (Pause.)

22          THE COURT:  Okay.  We're in recess.  We will be back

23  in session in 10 to 15 minutes, as soon as everybody's ready.

24          (Recess taken at 10:40 a.m.)

25          THE COURT:  So, I would like to just note

Fry - D - By Mr. Olson                                117

```
 1   Mr. McDonald and Mr. Bundy and Ms. Ludwig have been conferring.
 2   Is there anything I need to be addressing before I bring the
 3   jury in?  Are you still talking?
 4           DEFENDANT RYAN BUNDY:  We're just about finished
 5   here.  But we've gone over a list of names, and I think we're
 6   going to be okay.
 7           THE COURT:  Okay.  Mr. Mumford?
 8           MR. MUMFORD:  I think the next witness, your Honor,
 9   after Mr. Fry, is Mr. Duane Schrock.
10           THE COURT:  Okay.
11           MR. MUMFORD:  I expanded my proffer to the Government
12   this morning and just explained that I do anticipate getting
13   into -- if your Honor will remember, there's exhibits --
14   Government Exhibit 50 and 51.
15           Those were the videos of the -- of Ms. Shawna Cox and
16   Mr. -- Mr. Bundy were in there, in the office.  And I think
17   they were showing it to talk about what they were -- was in the
18   office.  And Mr. Schrock is actually one of the participants in
19   that meeting.  He's the voice off-camera, and just
20   explaining -- I'm going to have him explain what the meeting
21   is.
22           If your Honor will recall, I tried to get additional
23   clips played --
24           THE COURT:  Let me just see if there's an issue from
25   the Government, without you having to tell me.  Unless there's
```

1    an issue, I don't need to know this.  I'll just hear all of

2    this out.

3                 Is there an issue?

4                 MR. GABRIEL:  Your Honor, we don't have any issue

5    with Mr. Schrock explaining the meeting briefly.  But it is,

6    generally -- in terms of the proffer -- being offered so that

7    it could reflect on Mr. Ammon Bundy's state of mind that he had

8    support from the community.  And I think that's been --

9                 THE COURT:  So we'll just take Mr. Schrock, and we'll

10   take any objections as they come.

11                MR. MUMFORD:  All right.  Thank you.

12                MR. GABRIEL:  But we're not playing the videos, as I

13   understand it.

14                THE COURT:  Just to show -- long enough to get the

15   voice in the background to establish his -- his basis of

16   knowledge --

17                MR. GABRIEL:  (Nods head.)

18                THE COURT:  -- without replaying the content.

19                MR. MUMFORD:  That's right.

20                THE COURT:  So you think about 15 more minutes, yeah?

21                MR. OLSON:  Maybe a little more, just because -- if

22   I'm judging right --

23                THE COURT:  And other defendants with Mr. Fry?  Give

24   me an idea.  I need a case management assessment here.

25                MS. MAXFIELD:  (Shakes head.)

```
1              THE COURT:  Anybody?

2              MR. MUMFORD:  Minimal, your Honor.

3              THE COURT:  So we should be able to conclude Mr. Fry

4    right around the lunch break.

5              I was going to raise it just because normally I

6    wouldn't want the defendant moving with marshals walking next

7    to him in the jury's presence.  But it looks like we'll -- we

8    can just avoid that and take a break when it's finished.

9              We're assuming the lunches will be here around 11:30.

10   Is that right?

11             So let's just plan on taking a lunch break when

12   Mr. Fry is finished, and then we'll reorganize for what comes

13   next, after a short lunch break.

14             So everybody here?

15             Yes, let's all stand, then, for the jurors.

16             (Jurors enter at 10:55 a.m.)

17             THE COURT:  I'm sorry.  Did we get the monitor issue

18   fixed?

19             DEFENDANT SHAWNA COX:  (Nods head.)

20             THE COURT:  Thank you.

21             All right.  Everyone, please be seated.

22             All set, jurors?

23             THE JURORS:  Yes, ma'am.

24             THE COURT:  Mr. Olson, you may continue.

25             MR. OLSON:  Thank you, your Honor.
```

Fry - D - By Mr. Olson

1          Mr. Fry, I skipped over something that I want to go

2     back to, on the 27th.

3     BY MR. OLSON:

4     Q.   Do you know who Victoria Sharp was?

5     A.   Yes, that was the lady that was with -- with the people in

6     the van -- or the truck that LaVoy was killed --

7     Q.   And on January 27th, did you hear an audio recording of an

8     interview that Ms. Sharp gave?

9     A.   Yes.

10    Q.   And let me just -- was there anything that she said that

11    affected your mindset, in terms of contributing to your sense

12    of fear or suspicion towards the FBI?

13    A.   Yes.  What she said really actually freaked us out quite a

14    bit.  You know, she was saying --

15    Q.   Did she describe what happened?

16    A.   She described what happened.  That, you know, Mr. LaVoy was

17    shot multiple times, even while he was on the ground.

18          MR. KNIGHT:  Your Honor, I'm going to object to

19    further characterization of this, even as to state of mind.  He

20    said it freaked him out.

21          THE COURT:  The objection is sustained.

22          He may talk about his state of mind without

23    recounting matters that go beyond the scope of what the jurors

24    have already heard.  I'll simply remind the jurors that the

25    circumstances surrounding Mr. Finicum's shooting are not the

Fry - D - By Mr. Olson

1   subject of this case.  Just the fact of the date of and its

2   impact on the state of mind of others.

3           Go ahead.

4   BY MR. OLSON:

5   Q.  Okay.  So you were freaked out by it.  You were concerned

6   by this?  What she said?

7   A.  Yeah, we were -- we were -- it sounded barbaric, from the

8   way she was explaining it, yes.

9   Q.  Okay.  Now, let's go back to 2616.

10          MR. OLSON:  And, your Honor, during the break, I

11  think the Government said we can go ahead and publish this.  So

12  I would offer Exhibit 2616 at this time, and ask that it be

13  published.

14          MR. KNIGHT:  Just for the limited purpose we

15  discussed, yes.

16          THE COURT:  I don't know what that means.

17          MR. KNIGHT:  Sorry.  Not to admit but to refresh the

18  witness's state of mind --

19          THE COURT:  So it's for the witness only?

20          MR. KNIGHT:  No.  I'm sorry.  Not to be admitted but

21  to be published for the purpose of corroborating the witness's

22  state of mind.

23          MR. OLSON:  Well, I guess I had a different

24  understanding, your Honor, as to whether this would actually go

25  back to the jury, which was my intent.

Fry - D - By Mr. Olson

1      So let me just lay a foundation with Mr. Fry.

2           THE COURT:  Go ahead.

3   BY MR. OLSON:

4   Q.  Mr. Fry, again, what is -- what is this?  Page 1, here, of

5   this 2616?

6   A.  This would be some of the comments that I would see on my

7   YouTube channel.

8   Q.  Okay.  And at the top of the screen there is what?  That

9   picture?

10  A.  That's -- that's us inside what we later deemed as our

11  little camp called Camp Finicum.

12  Q.  I didn't mean what the actual picture was but is that a

13  screenshot of something there at the top?

14  A.  Yeah.  That's a screenshot of -- of video from my YouTube

15  channel.

16  Q.  All right.  And what do we see underneath that?

17  A.  And underneath is the comment section.

18  Q.  All right.  And from the subsequent pages that follow this,

19  why don't we --

20           MR. OLSON:  Why don't we go ahead and go to the next

21  page.  And then the next page.  And then the next page.

22  BY MR. OLSON:

23  Q.  Does it follow the same kind of pattern of showing a

24  screenshot of a video, and then comments underneath it?

25  A.  Yes.

Fry - D - By Mr. Olson

1   Q.   And are these comments related to the issue of threats of

2   being sexually assaulted?

3   A.   Yes, they do.

4   Q.   And were these comments that you saw, when you were at the

5   refuge, in response to these videos that you posted?

6   A.   Could you repeat that one more time.

7   Q.   Yes.  Were these comments, ones that you saw at the refuge,

8   in response to the videos that you had posted?

9   A.   That's correct, yes.

10          MR. OLSON:  All right.  Your Honor, I would offer

11  this 2616 as an exhibit.

12          MR. KNIGHT:   The Government objects, your Honor.

13  It's cumulative to what the witness has offered unrefuted

14  testimony to, and that is his state of mind as it relates to

15  people telling him that there may be a reaction to his

16  behavior.

17          THE COURT:  The objection is sustained.  Please

18  proceed.

19          MR. OLSON:  Okay.  May I be heard about that, your

20  Honor, at the next break?

21          THE COURT:  You may, but the witness has already

22  talked about his fears.  He may also testify that they are what

23  they are.  The jurors do not need to see the explicit texts.

24          So please move on.

25          MR. OLSON:  Okay.  All right.

1    BY MR. OLSON:

2    Q.  Mr. Fry, is there a -- you can take that down.

3            Is there something about you that you believe made

4    you particularly vulnerable to these types of threats?

5    A.  Yes.  You know, just looking at me, you know, long hair,

6    short, you know, small body, whatnot, and just -- just -- I --

7    I -- I definitely see myself becoming an easy victim, if I was

8    put in a -- in an environment like that.

9    Q.  Okay.  And was that concern a contributing factor for your

10   decision to not, you know, turn yourself in or -- or give up

11   your spot there at the refuge?

12   A.  Yes, I -- I -- at that point, you know, I was thinking it's

13   probably better just to die than to be raped for the next 11

14   years or something.

15   Q.  Now, we've heard from a rancher by the name of Mr. Dunbar.

16   And we don't need to dwell on this.  But you heard testimony

17   about he needing to get onto the refuge to do some work.

18           Do you remember those phone calls or conversations

19   that you had with him and the FBI at that time?

20   A.  I do remember.

21   Q.  Did you have any problem with him coming onto the refuge,

22   and other government people coming onto the refuge to assist

23   him?

24   A.  I did not.

25   Q.  And did you communicate to that -- that to them?

1   A.   Yes.   I told Mr. Andy Dunbar that he was more than welcome

2   to come to the refuge to do what they were calling irrigation.

3   And -- and we told them that they had nothing to fear from us.

4   That we would allow him and the FBI agents to escort him as

5   bodyguards, to come to the refuge to do their work.

6   Q.   Okay.   All right.   So then the Government played a couple

7   of videos that were shot -- it looks like -- on -- at least the

8   date of them was February 7th.

9        Two of those videos, you refer to something about

10  fortifying.

11  A.   Mmmm.

12  Q.   Do you recall those videos?

13  A.   I do.

14  Q.   Can you tell us what happened that day, that -- that caused

15  you to create those videos?

16  A.   Well, in -- in response to, you know, hearing about -- you

17  know, not hearing.   But the -- the -- the indirect kind of

18  threat that there was FBI agents, you know, sneaking around,

19  I -- me and Jeff decided it was probably better to kind of put

20  up a little security perimeter around us.   And so we put up

21  little log -- wood logs around our tent, all the way around, as

22  much as we could.

23        And I started putting like string, like, up around

24  the area.   And tied bottles and cans to the string, so if

25  people were to hit those strings, you know, you would hear them

1    coming.

2            And so when we did that, the FBI agent said that we

3    could be charged possibly with another charge, and my

4    understanding was the charge of fortifying.  And so --

5    Q.  Did the FBI agent tell you that directly, or did you hear

6    that some other way?

7    A.  It came in from Sandy Anderson.

8    Q.  Okay.

9            MR. KNIGHT:  I'm going to object to -- based on the

10   that, your Honor, I'll object to hearsay, even as to state of

11   mind, if it's coming through another person.

12           THE COURT:  The objection is sustained as to the form

13   of the question.

14           The witness may testify, without identifying why,

15   that he had a concern at some point -- based on the line you're

16   pursuing -- that conduct could be perceived as fortifying and

17   might make his situation worse.

18           Go ahead.

19   BY MR. OLSON:

20   Q.  Was --

21           MR. OLSON:  Thank you, your Honor.

22   BY MR. OLSON:

23   Q.  Was it your understanding that you faced a whole new charge

24   of fortifying?

25   A.  That's correct.

Fry - D - By Mr. Olson

1  Q.  And is that what you were -- and did you become upset about

2  that?

3  A.  I did.  I got -- I got upset because it sounded like a

4  completely baloney crime.  And so I created a video, and I --

5  basically implying -- it was the video of my driving their

6  truck.  And I was trying to basically tell them, if you want to

7  charge me with these crimes, go ahead and charge me with

8  driving this truck, too.  And so that was my -- my response to

9  that.

10 Q.  And you also -- there was another video where you talked

11 about somebody desecrating Mr. Finicum's memorial.

12          How had you heard about that?

13 A.  We had access to the Internet through the -- that MiFi

14 hotspot.  And we were browsing through the Internet and came

15 acrossed articles where at the site LaVoy was killed, you know

16 they put up the little crosses and stuff.  And people were

17 going there and ripping them out and breaking them, and all of

18 that.  And it was -- it was very disturbing.

19 Q.  So was that another thing that you were upset about?

20 A.  Yes.

21 Q.  Were you still grieving the loss of Mr. Finicum?

22 A.  I was definitely -- I don't know if you want to -- I mean,

23 grieving -- I wasn't weeping, or anything like that.

24          But I was extremely disgruntled by that because I

25 felt we definitely lost a good guy there.

1   Q.   So -- and then the next day you're -- you spoke to an FBI

2   agent by the name of Ginda.   You knew him as Vinnie Ginda.   Do

3   you remember that?

4   A.   Yeah, Vinnie Ginda.

5   Q.   And there's a Government exhibit that has been played a

6   couple of weeks ago where you made a statement to Agent Ginda

7   to the effect of, Maybe I shouldn't let you guys come in here.

8   Maybe I should just take out as many of you as I can.

9            Do you remember that?

10  A.   I do.

11  Q.   Were you still upset when you had that phone call with

12  Mr. Ginda or Agent Ginda?

13  A.   Yes.   When I had that conversation, I -- I had told them

14  many times, like, you guys have no right to come in and just

15  start killing us.

16           And I thought I had mentioned that in that

17  conversation but I was explaining to him, you know -- that I

18  was trying to explain that we had a right to self-defense.   And

19  you know that if he came in, trying to killing us or what not,

20  that we would -- that I would kill as many of those people as I

21  could, as possible.   Or perhaps just -- maybe just kill myself

22  instead because I didn't really want blood on my hands.

23           And so I was telling him I was contemplating between

24  either going -- you know, becoming -- you know, kill them, or

25  suicide by cop, or just shoot myself.

1    Q.  Would you have shot at them if they had -- if it were

2    something other than self-defense?

3    A.  You know, honestly, I -- I don't think I would have at all.

4    I just don't feel comfortable -- the idea of -- of killing

5    people, really.  That's something that goes against my

6    religious belief.

7               And I actually told the FBI agents, you know, earlier

8    that I don't consider them my enemies at all.  It's just

9    everybody wants to go home at the end of the day.

10   Q.  So in making that statement and making similar statements,

11   was it your conscious desire to prevent U.S. Fish & Wildlife

12   and BLM employees from coming back onto the refuge to do their

13   job?

14   A.  It never even crossed my mind.

15   Q.  So January 10th -- February 10th arrives.

16   A.  Mmmm.

17   Q.  And the FBI arrive.

18   A.  Mmmm.

19   Q.  What are they driving?

20   A.  They were driving -- well, what we now know as BearCats,

21   which is an armored personnel carrier.

22   Q.  And how many of those vehicles appear -- were -- let me

23   strike that question.

24               Where were you when you first saw them?

25   A.  I was actually -- I had this gut feeling to go out there --

Fry - D - By Mr. Olson

1   on the four wheeler to just go ahead and check out what's

2   coming.  And here they were.  So there was a bunch of these

3   BearCats heading our direction.  And so I took back off on my

4   four-wheeler to come back to the -- to the camp.  And warn the

5   others that they were coming.

6   Q.  So how many of these vehicles were there?

7   A.  Oh, there was (pause) at least eight.

8   Q.  And were these vehicles -- are they bigger than a big

9   S.U.V.?

10  A.  Much bigger, yes.

11  Q.  Are they bigger than a Humvee?

12  A.  Yes.

13  Q.  And so you got back into the -- the encampment.

14          Where did they position themselves?

15  A.  There was -- in the -- in the RV turnaround spot, they had

16  put two at the lower end of the turnaround.  And then they put

17  two more in front of us.  I'm thinking maybe there was three,

18  but -- but I think it was two.

19          But then they had one also up on the ridge, just a

20  little bit above us.  And then they had, like, a couple of them

21  by the front gate.

22  Q.  When you say "up on the ridge," you mean the road that's

23  kind of adjacent to the --

24  A.  Yeah, well, the Sodhouse Lane.

25  Q.  Okay.  All right.  And so when they arrived, did you think

Fry - D - By Mr. Olson

1  this was an assault?

2  A.  I did.  And I believed it to be an assault because when

3  they called about doing the irrigation work with the ranchers,

4  I told them, you know, it was okay that the FBI people come.

5  But just don't use this as a sneak attack, you know, to attack

6  us.  And the FBI agent said, "If we were planning to assault

7  you, we would not letting now know we were coming."

8  Q.  Okay.  So when they arrived on the 10th, did they tell you

9  they were coming?

10  A.  They did not.

11  Q.  Okay.  So did you draw the conclusion that this -- from

12  that that this was an assault?

13  A.  That's correct.

14  Q.  Did you grab a gun and start firing at them?

15  A.  No.  I grabbed a bullhorn.  And I told them that this was

16  wrong and that they needed to go home.

17  Q.  Okay.  Were you yelling at them?

18  A.  Yes.

19  Q.  Did they also have a loudspeaker, where they were speaking

20  at you?

21  A.  Yeah.  They were telling us, it's time to come out, that

22  they weren't going to assault us.  And basically saying,

23  it's -- it's time to go.

24  Q.  Okay.  Were you ready to go?

25  A.  I was not.

1  Q.  Okay.  Why not?

2  A.  Just due to the many fears that we still had -- well, I

3  guess, I had.  And just the nature of the circumstance, it

4  didn't feel like it was justice, really.

5  Q.  So approximately what time of day was it when they arrived?

6  A.  This would be about 4:30 in the evening.

7  Q.  And did they -- did this kind of just back-and-forth

8  yelling at each other kind of continue into the evening?

9  A.  It did.  And I was able to actually -- there was -- there

10  was a broken phone that we had found.  And I pulled the sim

11  card out of that one and put it in one of the Anderson's phones

12  to -- and -- and loaded that one up, to get it working.

13          And so when the FBI agents came, I called out to a

14  guy named Gavin Simes.  And he set up a live stream.  And so

15  that was my attempt to let everybody know what was going on,

16  from the outside world.

17  Q.  And is Gavin Sime, the person who has his own kind of

18  YouTube channel and YouTube show?

19  A.  That is correct, yes.

20  Q.  Okay.  Now, did some among you negotiate for Reverend

21  Graham and Ms. Fiore to come and be present when you guys

22  surrendered?

23  A.  Yes.  So as this phone call with Gavin Sime was going

24  through, he was doing third-party routes, you know, calls.  And

25  Gavin -- or not Gavin.  Michele Fiore, I think it was.  And,

Fry - D - By Mr. Olson

1  yeah -- and then Franklin Graham -- like, we were wanting them

2  to come to the refuge to witness our -- our surrender, in a

3  sense.

4        And, at first, the FBI were like, no, you guys have

5  to come out now, and we weren't comfortable with that.  And

6  eventually they did agree to allow those two to appear.

7  Q.  Okay.

8  A.  To see.

9  Q.  And when did they get there?

10 A.  This was -- the surrender was supposed to be scheduled at

11 eight o'clock in the morning.  So they were there at least by

12 then.

13 Q.  And -- well, did you -- did you surrender when they got

14 there?

15       Let me ask you this.  Did Mr. Banta go ahead and turn

16 himself in?

17 A.  Everybody else did turn themselves in at that time.

18 Q.  And did you, immediately?

19 A.  Immediately not.  I did not.  I was still worried, you

20 know, about these rape things.  You know, I was actually

21 becoming very suicidal.  I told them -- I went back into the

22 tent, and I told them, you know, none of our grievances have

23 been addressed.  You know, doesn't -- there -- there's all of

24 these issues that still have to be resolved and that I wasn't

25 comfortable going to prison so I could be raped for the next

Fry - D - By Mr. Olson

1    who knows how long?  And so I -- I told them I had a gun

2    pointed at my head.

3    Q.  Did you in fact have a gun pointed at your head?

4    A.  I did.

5    Q.  And were you live streaming still -- or again, I should

6    say, with Gavin Sime at that time --

7    A.  Yes, there was --

8    Q.  -- on the phone?

9    A.  Yes, Gavin Sime was on the phone.  I had two phones in my

10   hand.  There was Gavin Sime, Chris Anne Hall.  And, on the

11   other end, there was Marc, the FBI agent, and some other FBI

12   agent.  And I'm trying to talk to these two at the same time.

13          And, eventually, Marc was able to convince me -- he

14   explained how the prison thing works, and he was, like, you

15   know, most of that big bubba stuff is -- is Hollywood kind of.

16   And that they actually segregate the really bad people from

17   kind of lesser -- lesser crime people.

18          And so that comment -- that reassured me more that,

19   you know, there wasn't really anything to worry about.

20   Q.  Is it ironic that it was an FBI agent that ultimately

21   talked you out of there?

22   A.  You know, I actually like Marc a lot.  He was -- he seemed

23   like a really great guy.  I probably had a better connection

24   with him than most.  I actually believed him for -- for -- I

25   did.

Fry - D - By Mr. Olson

1  Q.  Why did you make him say "hallelujah," before you came out?

2  A.  It was just -- I don't know why that came out like that.

3  But it was something that just popped in my mind.  You know, to

4  ask them if they would say "hallelujah."  That -- you know,

5  that -- but if they were willing to say it, they would be like

6  less evil people in my mind, and I felt more comfortable, you

7  know, surrendering.  And they agreed.

8  Q.  Okay.  Okay.  So you turned yourself in?

9  A.  So I turned myself in.  And as soon as I came out, they all

10  started screaming "hallelujah."  Yeah.

11  Q.  Mr. Fry, at any time when you were at the refuge, did you

12  have consciously a desire to prevent officers from the U.S.

13  Fish & Wildlife --

14          MR. KNIGHT:  Your Honor, I'm going to object.  This

15  has been asked and answered four times by my count.

16          THE COURT:  Yes, it has.

17  BY MR. OLSON:

18  Q.  Did you ever threaten or intimidate any officers?

19  A.  I never did.  Not -- not fish -- I mean, I guess,

20  apparently, the one comment, you know, about the FBI.  But I

21  never threatened or intimidated, you know, Fish & Wildlife or

22  BLM.

23          MR. OLSON:  No further questions, your Honor.

24          THE COURT:  All right.  Any other defense questions

25  of Mr. Fry?

Fry - X - By Mr. Salisbury

1        MR. SALISBURY:  Yes.

2        THE COURT:  Yes.  Mr. Salisbury, please.

3                         CROSS-EXAMINATION

4    BY MR. SALISBURY:

5    Q.  Good morning, Mr. Fry.

6    A.  Good morning.

7    Q.  I wanted to first ask you about -- just a few minutes ago,

8    in your testimony, you said that when you heard about the

9    killing of LaVoy Finicum, that it sounded barbaric to you.

10       Now, I don't want to talk about the circumstances of

11   the killing of LaVoy Finicum.  I want to ask you about -- you

12   used the word "barbaric."

13       What does that word mean to you?

14       MR. KNIGHT:  I'm going to object, your Honor.  He's

15   already testified as to his state of mind, how it was --

16       THE COURT:  The objection is sustained.

17       MR. SALISBURY:  Your Honor, he hasn't testified about

18   that word.

19       THE COURT:  Sir, he has used the word, and it is a

20   normal word in the English language.  The objection is

21   sustained.

22   BY MR. SALISBURY:

23   Q.  So after you found -- you thought it was barbaric.  What

24   was the link between the phone call with Victoria Sharp and

25   when you saw Mr. Banta?  You said that -- what I'm referring to

Fry - X - By Mr. Salisbury

1    you is when Mr. Banta told you that the FBI was coming and you

2    testified about the cars.

3    A.   Okay.

4    Q.   Did that happen around the same time, or can you explain

5    that?

6    A.   No, the -- the video of Victoria Sharp came later.   That

7    would be -- it was -- it was Jeff Banta reported seeing the --

8    the convoy of trucks, or whatever, coming at 10 o'clock, 10:30

9    on the 26th.   And Victoria Sharp video came out sometime after

10   midnight on the 20 -- it would be the 27th.

11   Q.   So was the Victoria Sharp video very close in time to the

12   video that you made that night?   That we've seen in evidence?

13   A.   The 673?   That video actually would be around 10:30, or so.

14   Q.   Okay.   Now, back to -- when you talked to Mr. Banta about

15   the convoy of cars, what did you learn after you talked to him?

16   What were you aware of about the convoy of FBI -- FBI vehicles?

17   A.   I was aware -- I became aware that they were heading our

18   direction and that there -- there was quite a bit of -- of them

19   and that they were coming to surround us.

20   Q.   And how did that make you feel at that point?

21   A.   Well, I felt -- I felt we would all be killed.

22   Q.   And I think you said at some point in your testimony you

23   said you thought we were going to die.   Was that your

24   testimony?

25   A.   Yes.

Fry - X - By Mr. Salisbury

1    Q.   So why not surrender?

2    A.   Well, at that point there was also so many other people

3    that were staying behind.  And just my -- I didn't feel

4    comfortable leaving them by themselves like that.  And,

5    generally speaking, you know, death -- and it's a scary thing.

6    But if it has to happen, it has to happen.  But I wanted to be

7    able to document and show how -- you know, to the outside

8    people how it went down.

9    Q.   Okay.  And I think you had said that -- were you aware at

10   that time that any of the other camera people -- that was the

11   word you used -- that they were all gone by that point?

12   A.   That's correct.

13   Q.   And who were the camera people?  And what did they -- I

14   don't need the names of the specific people.

15   A.   Well, they were all of the people that had a base of --

16   they had their own YouTube channels.  Some of them had actually

17   their own websites and stuff.

18           But they had a certain amount of followers.  So it's

19   not like, you know, if you just had no followers whatsoever and

20   you created it, no one's going to be watching or know what's

21   going on.

22           So I was the only one who actually had a certain

23   amount of, you know, followers that would be able to see what's

24   going on live.

25   Q.   And that duty to stay behind, to document, that you talked

Fry - X - By Mr. Salisbury

1    about, did that prove to be true to you?  Did that help what

2    you were doing?  Your documenting this?

3    A.   I believe it -- it -- in the end, I believe it did save the

4    last four -- of us four.  I think it saved our lives.

5    Q.   And why was that?

6    A.   Well, at nighttime -- when I did surrender on the 20 -- or

7    not the 20 -- the 11th, they actually had a whole bunch of

8    these people out in the bushes with their night visions.  And,

9    you know, all of these little fancy goggles and -- they were

10   out there, coming up out of the bushes when I finally came out.

11   So they -- they were out there the whole night, and I think

12   they were going to come in.

13   Q.   And how did your -- how did your live stream protect the

14   four of you?

15        MR. KNIGHT:  Your Honor, I'm going to object at this

16   point to highly cumulative.  We've talked about the role of he

17   live stream both with Mr. Olson's direct and now with

18   Mr. Salisbury.

19        THE COURT:  The objection is sustained.  This is an

20   argument inferential from the underlying facts.

21        Go on.

22   BY MR. SALISBURY:

23   Q.   Do you think that the live stream protected you when you

24   testified about the BearCats?

25        MR. KNIGHT:  I'm going to object.  The same reason.

Fry - X - By Mr. Salisbury

1          THE COURT:  The objection is sustained.

2   BY MR. SALISBURY:

3   Q.  Now, you just mentioned in your testimony about the -- that

4   you saw government agents out there in the -- at nighttime.

5          Is that what your testimony was just now?  That you

6   saw them out there watching you?

7   A.  No, no, no.  When I turned myself in on the 11th, they

8   actually were coming up -- out from the bushes.

9   Q.  Okay.

10  A.  So -- so they were out there, I guess, watching us at

11  nighttime, and -- and stuff.

12  Q.  Did you suspect that that was happening while you were

13  there with the final four?

14         MR. KNIGHT:  I'm going to object to the relevance,

15  and it's actually cumulative.  He talked about his perceptions

16  during that period extensively, with Mr. Olson.

17         THE COURT:  Objection is sustained.

18  BY MR. SALISBURY:

19  Q.  Did that make you nervous that they were out there watching

20  you?

21         MR. KNIGHT:  Same objection.  He's asking a follow-up

22  question based on the -- a ruling that's been sustained.

23         THE COURT:  The objection is sustained.

24  BY MR. SALISBURY:

25  Q.  Did you and Mr. Banta ever talk about the fact that the

1  government was out there watching you?

2  A.   Yes.  When -- when Jeff actually drove out there with that

3  four-wheeler, we were at the main camp, and we saw them driving

4  out and doing something.  And he came back and brought this

5  camera.  And we were all creeped out that -- that they had this

6  camera out there.  And we didn't, at that time, know it was an

7  FBI camera.  But he -- it was pointed in our direction.

8          And -- and we -- were all worried about, you know,

9  what are these things out there.  You know, how many more out

10  there watching us?  You know, there's all of these things out

11  there.

12 Q.   And how did that affect your state of mind?

13 A.   It was -- it was -- we felt -- we felt paranoid.  Yeah.

14 Q.   During the time you were there with Mr. Banta -- we've seen

15 some videos of, you know, around the campfire at night.

16          Did you ever talk about any agreement with Mr. Banta

17 to prevent employees from going to work at the refuge?

18 A.   No.  They -- again, the -- the topic of employees had never

19 came about.

20 Q.   Did you ever talk about ways that you could use fear,

21 threats, or intimidation --

22          MR. KNIGHT:  I'm going to object.  This has been

23 asked.

24          THE COURT REPORTER:  One person.

25          MR. KNIGHT:  This is highly cumulative.

Fry - X - By Mr. Salisbury                           142

1          He's been asked a number of times about whether or

2    not he committed the crime as alleged.

3          THE COURT:  The objection is sustained.  These are

4    arguments and phrases for argument.

5          Mr. Salisbury, please go to something new.

6    BY MR. SALISBURY:

7    Q.  What was the focus of your concern in talking to Mr. Banta

8    during that final four portion?

9    A.  Well, we were really hoping that -- the Government kept

10   saying, you know, Oh, it's not that big of a deal charge.  And,

11   you know --

12         MR. KNIGHT:  I'm going to object to hearsay, your

13   Honor.

14         THE COURT:  Overruled.  Go ahead.

15         THE WITNESS:  And so we kept asking them, "Well, if

16   it's not that big of a deal, then why don't you just drop the

17   charges and let us all go?  Because we're all already -- we're

18   all packed and ready.  And we're all willing to leave, if

19   you'll all just let us all go."  And they wouldn't let us.

20   BY MR. SALISBURY:

21   Q.  So were you trying to find a way out?

22   A.  Yes.

23   Q.  Now, we heard some testimony earlier, but I didn't hear it

24   from you.

25         Could you just describe -- I think you were -- were

1    the main point of contact on the phone calls with the FBI

2    negotiators?

3    A.   I was.   Everybody -- everybody else really didn't want to

4    be part of talking with the FBI.   And I felt that -- I was

5    scared that if we didn't talk to them, that they would take

6    that as a sign of not cooperating, and they would just attack

7    us.   And so I kept talking and talking and just -- I was the

8    only one talking to them, almost all the time, just to keep the

9    conversation going.

10   Q.   Can you describe, you know, how often you would talk to

11   them on a normal day?

12          MR. KNIGHT:   Your Honor, I'm going to object.   This

13   is cumulative.   The FBI folks actually talked about their

14   contacts with Mr. Fry and the Mr. Banta and everybody else

15   there.

16          THE COURT:   The witness may talk about his

17   perspective, which may or may not align with the direct

18   testimony on this point.   The objection is overruled.

19          Go ahead and answer.

20          THE WITNESS:   And so he -- they would call three

21   times a day, and I would probably talk one to two hours.   A lot

22   of times two hours, or so, each time.

23   BY MR. SALISBURY:

24   Q.   And then you had said that the first call was around the

25   26th or 27th of January?

1    A.   The first call was the 26th.   This would be -- this would

2    be probably about six o'clock, or so.

3    Q.   And then you -- that continued every day until the 11th of

4    February?

5    A.   That's correct.

6    Q.   And just three phone calls per day?   Or more than that,

7    sometimes?

8    A.   Well, it would be three because they would -- they would

9    always say, you know, we're going to call tomorrow again at --

10   I think it was nine o'clock in the morning.   And then 12

11   o'clock in the afternoon.   And then I'm thinking maybe six

12   o'clock in the evening.   So they would -- it would always be

13   the same every day.   The same times.

14   Q.   And did you trust the FBI during those phone calls that you

15   had with them?

16   A.   I didn't.

17   Q.   Why was that?

18   A.   There was a lot of, like -- I -- I would throw out little

19   tests, you know, asking if they knew about this or if they knew

20   about that.   And they would always say, Oh, no, we -- for

21   example, we -- we asked -- I was talking about Mark Rich, who

22   was pardoned by Bill Clinton, you know, after his last day on

23   presidency.

24        And I was asking them, you know, why can't the

25   President just pardon us?   And they were like, well, you first

Fry - X - By Mr. Salisbury                                    145

1   have to go to court to be pardoned.  And that's not true

2   because Mark Rich fled to Switzerland, and he was pardoned and

3   he never stepped foot in court.  And so I would throw out

4   things like that.  And I would catch them -- I presumed they

5   were lying.  Maybe they were just ignorant, I don't know.

6   Q.  And did that -- your lack of trust for the FBI, did that

7   delay -- or put it this way.

8           Did it make you stay at the refuge longer during the

9   final four period?

10          MR. KNIGHT:  I object.  We've covered this at length.

11          THE COURT:  Sustained.  Ask a new question, please.

12  BY MR. SALISBURY:

13  Q.  Now, who had the idea for Franklin Graham?

14  A.  That was Jeff Banta's idea.

15  Q.  Did you think that was a good idea?

16  A.  I did.

17  Q.  Was it helpful?

18  A.  I think it was.  I believe he brought a more uplifting, you

19  know, attitude to the area.  You know, we -- we knew he wasn't

20  going -- he's not plotting to seek really to destroy us, or

21  anything.  He is this Christian guy.  So we felt comfortable.

22  Q.  How often did you talk to the Reverend Graham?

23  A.  I can't say exactly when that started.  But from -- from --

24  after the day it started, it was almost an every day basis.

25  Q.  And did you participate in those calls?

Fry - X - By Defendant Ryan Bundy

1  A.  I did.

2  Q.  Did you talk to Reverend Graham by yourself or with -- with

3  the other final four?

4  A.  We talked to him -- since we couldn't figure out how to get

5  the speakerphone working on that flip phone, we all just took

6  turns talking.  Sometimes we were just all huddled up in the

7  tent together.  Sometimes we would just be walking about,

8  talking on the phone.  So it was both.

9  Q.  And do you think that that contributed to resolving this?

10 Having Reverend Graham talk to you guys?

11 A.  I think so.  I think he definitely calmed the attitude

12 between both parties.  And, you know, it was ultimately his

13 presence -- you know, allowing him to come witness our

14 surrender, we felt absolutely 100 percent sure that, you know,

15 there wasn't going to be no sneaky killings.

16            MR. SALISBURY:  No further questions, your Honor.

17            THE COURT:  All right.  Other defense questions?

18            DEFENDANT RYAN BUNDY:  Yeah.

19            THE COURT:  Yes, Mr. Bundy.

20                        CROSS-EXAMINATION

21 BY DEFENDANT RYAN BUNDY:

22 Q.  Dave Fry, how are you today?

23 A.  I've been better.

24 Q.  Been better, huh?  Been a rough go.

25            You mentioned that there was quite a few calls you

Fry - X - By Defendant Ryan Bundy

1   had with the FBI.

2            Did they speak about wanting to bring a peaceful

3   resolution to this during those calls?

4   A.  You know, that -- that -- that word popped up more times

5   than I can count on my fingers.  It was -- it was a very

6   commonly used word.

7   Q.  They said it all the time, huh?

8   A.  They did.

9   Q.  Peaceful resolution.

10           Did -- to your understanding, is arresting you and

11  throwing you in jail for months on end a peaceful resolution?

12           MR. KNIGHT:  I object to the relevance of that

13  question.

14           THE COURT:  The objection is sustained.

15  BY DEFENDANT RYAN BUNDY:

16  Q.  What -- you mentioned that letting you go would have -- you

17  wanted to go.  You wanted to go home.

18           Would letting you go, in your mind, have been a

19  peaceful resolution?

20  A.  It would have.  But, again, I was -- I was worried about

21  what would happen to the others.

22           So I wanted everybody to go home together, instead

23  of, you know, being separated and one at a time.

24  Q.  You wanted it peaceful for everybody?

25  A.  I wanted it to be peaceful for everybody, yes.

Fry - X - By Defendant Ryan Bundy

1  Q.  And during those phone discussions, did you discuss with

2  them for -- the reason for which you were there?

3  A.  I did.  I said, you know, we were here protesting.  And

4  eventually, of course, they -- they brought out the charges

5  against us, over the phone, and told us what's going on.

6           And we had -- I believe we had explained that, you

7  know, that wasn't what we were there to do.  We were

8  protesting, you know, the Hammonds.  And just the federal

9  corruption.  Not -- not there to prevent workers.

10 Q.  So as far as a peaceful resolution, did they ever try to

11 resolve those issues?

12 A.  No.  And that was one of the things that I said just before

13 I left.  I -- I was telling them, you know, it doesn't feel

14 like there was justice here because none of our grievances ever

15 have been addressed.  It's just, you know, we're going to come

16 here and -- and the government just goes there and squashes

17 the -- the protest and never -- never answers to any grievance.

18 Yeah.

19 Q.  So you said you didn't have trust for them.  Is that in

20 part because they claimed to want a peaceful resolution and yet

21 would not work with you to resolve anything?

22 A.  Could you repeat that one more time?

23 Q.  Said your -- your mistrust, you -- you said earlier you did

24 not trust the FBI.  Is that correct?

25 A.  That is correct.

Fry - X - By Defendant Ryan Bundy

1  Q.  Is that in part because you had issues to resolve and yet

2  they would not resolve those issues with you?

3  A.  I -- I had a distrust of the FBI, just in general because

4  of how they acted in the past historically.

5         And, you know, this whole protest was a peaceful

6  protest, and it's the government who started the gunfight.  I

7  mean, started shooting people.  And so it's -- it's kind of odd

8  for -- for the bully to ask for a peaceful resolution.

9  Q.  And so you're saying that the killing of LaVoy Finicum was

10  not a peaceful resolution?

11         MR. KNIGHT:  I'm going to object to the question,

12  your Honor.

13         THE COURT:  The objection is sustained.

14  BY DEFENDANT RYAN BUNDY:

15  Q.  Have any of those issues been resolved as yet of today?

16         MR. KNIGHT:  Object as asked and answered.

17         THE COURT:  Objection sustained.

18         DEFENDANT RYAN BUNDY:  That's not asked and answered.

19  It's a new question.

20         THE COURT:  It's an argumentative point, sir.  Move

21  on.

22  BY DEFENDANT RYAN BUNDY:

23  Q.  Back to some details, talking about the computers.

24         You were on a computer that belonged to the facility

25  there, or those who belonged to the facility.

Fry - X - By Defendant Ryan Bundy

1              And did you ever access the hard drive to that

2    computer?

3    A.   No.   I -- I -- so -- what I -- in my past, working with

4    encrypted hard drives, if it's -- it's a protected hard drive,

5    it won't pop up on your operating system screen when you boot

6    Linux, the operating system I'm running.   And so at that point

7    it's like, oh, okay.   So that's an encrypted hard drive.   And

8    at that -- I never made any attempt to access it, or anything

9    like that.

10   Q.   So you weren't able to utilize the files or see anything on

11   it?   Hard drive's not accessed.   It's -- basically you're just

12   using the screen and the keyboard?

13   A.   That is correct, yes.

14   Q.   Did you ever access any hard drives on any other computers?

15   A.   I did not.

16   Q.   You talked about the two men who came at the end of the

17   occupation, saying they were former Navy SEALs.

18   A.   Yes.

19   Q.   Did you and others suspect them of being government agents?

20   A.   We did.   They -- they have been acting very suspicious.

21   And at one point they were up in the tower, and they -- you

22   know, they're like, "Oh, we have this radio --

23             MR. KNIGHT:   Object to hearsay, attributing these

24   statements --

25             THE COURT:   The objection is sustained, the witness's

Fry - X - By Defendant Ryan Bundy

1   answer stands with respect to his suspicion.

2          Move on, please, Mr. Bundy.

3   BY DEFENDANT RYAN BUNDY:

4   Q.  And did -- and did you detect that you and all of the other

5   remaining occupants all concluded that the men were undercover

6   agents?

7          MR. KNIGHT:  I'm going to object to speculation.

8   He's asking him to state for everyone else --

9          THE COURT:  The objection is sustained.

10         Go ahead, Mr. Bundy.

11  BY DEFENDANT RYAN BUNDY:

12  Q.  Did that contribute to them leaving, you believe?

13         MR. KNIGHT:  I'm going to object to his personal

14  knowledge of why they left.

15         THE COURT:  You need to -- yes, I agree.

16         The question, in its form, called for speculation.

17  So the objection is sustained.

18         You may rephrase in a way that does not call for the

19  witness's speculation.

20  BY DEFENDANT RYAN BUNDY:

21  Q.  Did you know -- let's see.  You said that these men left on

22  the 27th.  Is that correct?

23  A.  Sometime in the afternoon.  Correct.  On the 27th.

24  Q.  Was it your understanding, at that point, that roads were

25  blocked at that point?  Or do you know?

1    A.   Yes.  And that's -- that's strange because they said the

2    roads were going to be blocked by 4:00 a.m. on the 27th.

3              And here they had left in the afternoon and nothing

4    about these guys is known.  And -- and it's odd that they got

5    out without ever knowing who they are.

6    Q.   So as far as your knowledge goes, they were not arrested?

7    A.   No.

8    Q.   Did that lead to your suspicion that they were government

9    agents?

10   A.   It did.  And -- and -- but we also -- because we felt that

11   they were government people -- you know, everybody there made

12   it known to them that we did not really like them at all.

13   We -- we kind of shunned them a lot, and I think that

14   contributed to them kind of leaving.

15   Q.   Was that because they were being disrespectful of things

16   that we were trying to respect previously?

17   A.   Yes.  The door kicking was absolutely -- that was -- that

18   was taboo upon the people believing that this was a good cause.

19   Q.   Were there other -- without specifying, were there other

20   things besides that?

21   A.   Their comments that they had made, it -- it was not what we

22   were standing there for.  You know, they were kind of more

23   trying to provoke a fight.

24   Q.   And -- (pause) trying to formulate a question in my mind as

25   to your overall feeling of the entire event; why you came and

Fry - X - By Defendant Ryan Bundy

1    why you stayed.  Did you feel you were there for a good purpose

2    and a good reason?

3                MR. KNIGHT:  Your Honor, I'm going to object.  The

4    answer to that is encapsulated in all of the direct

5    examination.

6                THE COURT:  The objection is sustained.

7                (Pause, Defendant Ryan Bundy conferring with

8                Ms. Ludwig.)

9    BY DEFENDANT RYAN BUNDY:

10   Q.  Okay.  One more question on that.  That door that was

11   kicked.  Was the door that was kicked in, was that the exterior

12   door to the place where LaVoy was staying?

13   A.  It is.  And in one of the pictures, you'll see where he had

14   the basket with the cameras.

15               You can see that -- the door, right there, and you

16   can see how it's all splintered.  The word is splintered.  And

17   there's a little bit of wood on the floor.  That is the door,

18   yes.

19   Q.  So that's also known as --

20   A.  The -- Burnside's office.

21               (Defendant Ryan Bundy and Defendant Ammon Bundy

22               conferring.)

23   BY DEFENDANT RYAN BUNDY:

24   Q.  Was -- was that the only door that was kicked in?

25   A.  Yes.

Fry - X - By Defendant Cox

154

1  Q.  And you felt right about going there and doing what you

2  did?

3           MR. KNIGHT:  I'm going to object to the question,

4  your Honor.  It's been asked and answered.

5           THE COURT:  It's cumulative now.

6           You've asked that.  He's testified to it.  Please ask

7  something new.

8           DEFENDANT RYAN BUNDY:  I have no further questions.

9           Thanks, David.

10          THE COURT:  Other defense questions?

11          Ms. Cox?

12          Go ahead.

13                      CROSS-EXAMINATION

14  BY DEFENDANT SHAWNA COX:

15  Q.  Hi, David.  Oh, sorry.

16          When you arrived at the refuge, were you dressed for

17  cold weather?

18  A.  I -- I brought my jackets, but I didn't realize how cold it

19  was going to be.

20  Q.  That was my next question.

21          Did you know it was going to be minus 14 degrees?

22  A.  I did not.

23  Q.  Nick Bleuler stated that you were wearing camos at the fire

24  when you were holding a -- allegedly holding this gun.

25  A.  Mmmm.

Fry - X - By Defendant Cox

155

1    Q.  Have you ever worn camos while you were there?

2    A.  I did not.  And I think he might have mistaken my black --

3    it had brown, like, stripes on it.  And he probably thought

4    that was the camo pants, but it was actually just a sports

5    pants.

6    Q.  Okay.  Did we ever talk about using your hotspot to access

7    the Internet?  It was --

8    A.  Yeah, it's my -- I have a hotspot.

9            Your phone -- phones nowadays, the smartphones have

10   the option to use it as a hotspot that turns it into an

11   Internet, basically.

12   Q.  Is that what we were using to connect your laptop and mine,

13   also, when we had to access the Internet?

14   A.  That's correct.  You can share it upon -- I think it's like

15   ten people can connect to the same one.

16   Q.  You mentioned getting a text from LaVoy about recording at

17   this meeting, in John Day.

18           Do you -- do you remember that -- saying that, just a

19   little bit ago?

20   A.  I do.

21   Q.  And do you recall -- or do you know who replaced you at

22   that meeting?

23   A.  That's -- I believe that would be Victoria Sharp went

24   because I didn't go.

25   Q.  Mr. Banta testified that there was a -- a terrible odor in

Fry - X - By Mr. Schindler

1  the bunkhouse when the Navy SEALs were there.

2          Do you know what that was?

3  A.  There was this really bad odor in one of the rooms, and I

4  did not know what it was.  But I stayed out of that room

5  because it smelled really bad.

6  Q.  Did you see any of these Navy SEALs smoking in the

7  bunkhouse?

8  A.  There was.  They were.

9  Q.  Prior to January 26th, did you ever see anyone smoking in

10  any of the buildings?

11  A.  No.  No.  Smoking was absolutely forbidden within the

12  buildings.  And made sure everybody cleaned up the area.  Like

13  they were very angry if anybody threw cigarette butts even on

14  the floors outside.

15  Q.  Was there any conversations between yourself and me about

16  employees coming to work in the office where you were?

17  A.  No.  No one ever mentioned employees ever coming, or to

18  keep them from coming.

19          DEFENDANT SHAWNA COX:  No further questions.

20          Thank you, your Honor.

21          THE COURT:  Other defense questions?

22          Mr. Schindler.

23          MR. SCHINDLER:  Yes, please, your Honor.

24                    CROSS-EXAMINATION

25  BY MR. SCHINDLER:

Fry - X - By Mr. Mumford

1   Q.  Mr. Fry, did you ever meet Mr. Medenbach during the time

2   that you were at the refuge?

3   A.  I don't remember actually meeting him.

4        I just know -- I heard about him being arrested.

5   Q.  Were you aware that he had taken a government truck?

6   A.  Oh, yeah.  That was all over the news.

7   Q.  So you had no opportunity to speak directly with

8   Mr. Medenbach?

9   A.  I don't recall having a conversation with him.

10       MR. SCHINDLER:  I have no further questions, your

11  Honor.

12       THE COURT:  All right.  Mr. Mumford.

13       MR. MUMFORD:  Thank you.

14                    CROSS-EXAMINATION

15  BY MR. MUMFORD:

16  Q.  Mr. Fry, you testified that you got to the refuge

17  approximately late night January 8th, then.  Is that right?

18  A.  That's correct.

19  Q.  And how soon after that would you say you had your first

20  interaction with Mr. Ammon Bundy?

21  A.  That would be many days later.  And I never actually even

22  really spoke with him.  I met him -- you know, we made eye

23  contact, we shook hands.  And he said, you know, "Thanks for

24  being here."  And that's -- that's about it.

25  Q.  Did -- did you -- so most of your interactions, then, at

1   the refuge were with Mr. LaVoy Finicum then?  Is that right?

2   A.  LaVoy Finicum and anybody who came to the office that I was

3   working at, the -- the firehouse building.  And so I got to

4   talk to LaVoy a lot of times, when he came in.  And then I

5   talked to Shawna, when she came in there.  And then I talked to

6   various other people at the fire -- not the firehouse.  The

7   bunkhouse, over by the -- where you eat.

8   Q.  You mentioned that Mr. Finicum had referred to that area

9   that -- where you were as the media center.  Is that right?

10  A.  That's correct.

11  Q.  Did you end up helping Mr. Finicum out with the media

12  outreach, and things of that nature?

13  A.  I did.  I -- eventually, he gave me access to his YouTube

14  channel page.

15          And I would record a video of him talking about, you

16  know, the Native American artifacts that were left out in the

17  front, to be exposed to the weather.  And I would post that to

18  his YouTube channel.

19  Q.  Those were artifacts that you guys had found exposed when

20  you got there.  Is that right?

21  A.  That's correct.

22  Q.  And what did you do to take -- take better care of those?

23  A.  Well, he brought them out from, you know, sitting right

24  there in the grass area by the building.  And he brought

25  them -- I think -- it was into the -- that building he was in.

1  He put them in there.

2  Q.  And you mentioned that you were interviewed by -- by some

3  of the media.  Is that right?

4  A.  That's correct.

5  Q.  Felt like they ridiculed you?

6  A.  That's right.

7  Q.  How many times did you approach the media, looking to do an

8  interview, to try to get some of your concerns out there?

9          MR. KNIGHT:  I'm going to object to the relevance of

10  the witness speaking to the media during the occupation.

11          THE COURT:  The objection's sustained, beyond what's

12  already been established.

13          Please move on.

14          MR. MUMFORD:  Thank you.

15  BY MR. MUMFORD:

16  Q.  Mr. Fry, do you understand that outreach to the media was

17  kind of part of the mission there?

18  A.  Absolutely.  I believe that, you know, the media is

19  supposed to be -- as we all learned in school, you know, the

20  watchdogs against the government.  You know, they're supposed

21  to be protecting us.  And so we used them -- we were trying to

22  use them as a way to reach out to the world, the nation, about

23  our grievances that we have against the federal government.

24  Q.  Did -- did you -- and did you have frustrations with --

25  with that during your time there?

Fry - X - By Mr. Mumford

1  A.  Yes, I -- I soon came to realize that the media, instead of

2  being the watchdogs for the people, they had become the

3  government lap dogs, and they have become more political.  And

4  so they're more interested --

5            MR. KNIGHT:  I'm sorry.  I'm going object to the

6  narrative answer opining about his view of the media as

7  irrelevant.

8            THE COURT:  I'm going to let this part, that which

9  the jury has heard, stand with respect to its bearing, whatever

10  the jury may find, as to the witness's state of mind.  But I'm

11  now sustaining the objection to exploring that because it is

12  too attenuated to any material issue in the case.

13            Please move on, please, Mr. Mumford.

14            MR. MUMFORD:  Thank you, your Honor.

15  BY MR. MUMFORD:

16  Q.  Was there a discussion, while you were at the refuge about

17  how the -- the -- the media's misreporting of what was going on

18  was actually making it more dangerous for people there?

19  A.  Absolutely.  The media was telling people all of the power

20  was cut.  At one point they said that there was blockades set

21  up, that were never there.  They at one point even brought

22  in -- maybe -- I don't know if they brought him in.  But there

23  was these two guys that were ripping off the tarp from some of

24  the signs, angry at us.  And they were covering that, and it

25  seemed like they were trying to incite violence towards us.

Fry - X - By Mr. Mumford

1   Q.  You had mentioned -- and Ms. Cox asked you a couple of

2   questions about this -- about that day, Mr. Finicum telling you

3   he was going to meet with the sheriff.  Right?

4   A.  Okay.

5   Q.  And -- and did you have an understanding as to what was

6   significant about that meeting that Mr. Finicum was going to

7   have with the sheriff that day?

8   A.  I wasn't aware of any details of what the meeting was going

9   to be about.  I just know that from the past, you know, they --

10  the had said that the sheriff's job is to protect, you know,

11  the people.  And so they were trying to get all of the sheriffs

12  to basically uphold the Constitution, so that they could help

13  protect us against federal tyranny, basically.

14  Q.  Do you know why Mr. Finicum wanted you -- wanted -- wanted

15  you to join him at that meeting that day?

16  A.  Yeah, he -- he wanted me to record it.

17  Q.  And you -- you -- you testified that you later found out

18  about some of the circumstances of -- of -- of Mr. -- of

19  Mr. Finicum's death then.  Right?

20  A.  I later did -- was aware of the circumstances, yes.

21  Q.  And that contributed to your -- your -- your -- to some of

22  the choices you made in staying there, and that kind of thing.

23  Right?

24  A.  It was definitely a contributing factor, yes.

25  Q.  Was -- was -- was one of those details you learned that

Fry - X - By Mr. Mumford

1   Mr. Finicum was shot while his hands were in the air?

2           MR. KNIGHT:  Your Honor, I'm going to object to the

3   mischaracterization.

4           THE COURT:  The objection is sustained.

5           Mr. Mumford, you're violating the Court's rulings in

6   limine.

7   BY MR. MUMFORD:

8   Q.  Besides -- besides what you testified to, Mr. Fry, are

9   there -- are there circumstances about the shooting that you

10  learned from Mr. Finicum --

11          MR. KNIGHT:  I object.  This has been covered

12  extensively.

13          MR. MUMFORD:  Excuse me.  Excuse me.

14          THE COURT:  The objection is sustained.

15          The witness is not to talk about the circumstances of

16  Mr. Finicum's shooting beyond what has already been covered.

17          Move to another subject.

18          MR. MUMFORD:  I was going to ask if that contributed,

19  your Honor, to his decision to -- to -- to stay there.

20          THE COURT:  That has already been covered.  The

21  objection is sustained.

22          Move --

23          MR. MUMFORD:  Well --

24          THE COURT:  Mr. Mumford, you're forfeiting any more

25  examination if you press this point any further in the jurors'

Fry - X - By Mr. Mumford

1    presence.

2         MR. MUMFORD:  With respect, I'm trying to find out if

3    it has been covered, your Honor.

4         THE COURT:  And I have sustained the objection three

5    times now.  Move on.

6    BY MR. MUMFORD:

7    Q.  Mr. Fry, did you -- did you come -- come to know an

8    individual at the refuge that would sometimes visit named

9    Tucker Dunbar?

10   A.  I'm actually not aware of him.

11   Q.  Okay.  You talked about some of the circumstances of you

12   coming out and -- and -- and surrendering that day.  Right?

13        Were you on the phone with Ms. Michele Fiore?

14   A.  She was on the -- I think the third -- it was like a

15   third-party -- a three-way call.

16   Q.  Do you have an understanding as to why -- why -- why it was

17   that you were speaking with her and that contributed to your

18   decision to come out that day?

19   A.  I would say she -- she helped, you know, and then she --

20   she was also there.  She came there to witness.  And so it

21   definitely felt more safe with -- with civilian people

22   watching.

23   Q.  And you knew she was a political representative from

24   Nevada, right?

25   A.  Yes.

Fry - X - By Mr. Mumford

1    Q.  You mentioned in your testimony earlier that you -- that

2    you were not familiar with some of the federal lands issues.

3    Is there federal and public land in -- in -- in Ohio?

4    A.  It's unheard of.  I mean, most people aren't aware of

5    anything like that.

6    Q.  Do you know why there's -- there's -- there's not as much

7    federal public lands in some of those other states, as there

8    are out -- out west?

9            MR. KNIGHT:  I'm going to object to the relevance of

10   the witness's opinion about public lands.

11           THE COURT:  The objection is sustained in light of

12   the earlier foundations.  Move on, please, Mr. Mumford.

13   BY MR. MUMFORD:

14   Q.  Was -- would there -- was there -- was there -- did --

15   did -- did you meet the son of a local rancher who sometimes

16   would come in at night on his ATV, with the lights off?

17   A.  I was not aware.

18           MR. MUMFORD:  Okay.  Thank you.

19           Hold on for just a second.

20           (Pause, Mr. Mumford and Defendant Ammon Bundy

21           conferring.)

22   BY MR. MUMFORD:

23   Q.  You -- you testified about the -- the -- these Navy SEALs

24   kicking in the door after -- after -- after the shooting of --

25   of Mr. Finicum.

1          Was there -- was there a real contrast, if any,

2     between the environment at the -- at the refuge before you

3     found out what had happened to Mr. Finicum and after?

4     A.   Like a change of mood?

5     Q.   Yeah.

6     A.   Yeah, the -- before -- before the 26th, when LaVoy died, it

7     was calm.  It was -- it was a really very happy environment.

8          Then after -- well, I guess the night of the 26th,

9     it -- it became absolutely chaotic.  The women, screaming

10    hysterically, with tears running down their face because they

11    thought the daughter -- you know, they knew the daughter was in

12    the truck.  And so they thought maybe she was one of the people

13    that were shot.  Because, at that time, we didn't know who was

14    shot.

15         And so they were the first to go, and all of the

16    children went with them.  And people were just really freaking

17    out and running.

18    Q.   And so is it fair to say there was -- that contributed to

19    the loss of organization that was there, then?

20    A.   Oh, it was -- it was -- there was no more organization.

21             MR. MUMFORD:  Thank you.

22             Thank you, Mr. Fry.  Thank you, your Honor.  No more

23    questions.

24             Mrs. Maxfield, did you have any questions?

25             MS. MAXFIELD:  No.  Thank you.

Colloquy

1          THE COURT:  All right.  We're going to take the noon
2    recess before cross.  Your lunches are here.
3          So, ladies and gentlemen, we'll resume when you're
4    ready.  Please let Ms. Boyer know when that is.  We'll assume
5    about 30 minutes, but we'll go from there.
6          All right?  No talking about the case or anything it
7    involves.
8          Leave your notes here.  Let us know when you're ready
9    to resume.
10          (Jurors exit at 11:59 a.m.)
11          THE COURT:  All right.  Mr. Fry, you may step down.
12          Everyone should be seated except for Mr. Fry,
13    Mr. Bundy, and Mr. Bundy.
14          And then we'll resume on the record at 12:30 to take
15    up any issues before the jury returns.
16          Mr. Barrow, do you have material for me to work with
17    over the noon hour?
18          MR. BARROW:  I'll check immediately, on getting
19    downstairs.
20          THE COURT:  Bring it to chambers as soon as it's
21    available.
22          MR. BARROW:  I will, your Honor.
23          MR. MUMFORD:  And just so your Honor knows, by our --
24    by our count, there are 129 memos.
25          I think your Honor thought there were only 13.  There

Colloquy

1    are 13 additional individuals --

2            THE COURT:  It was made clear to me that there were

3    more than 13 memos, so I'm going do the best I can.  But I

4    can't start until I have them.

5            MR. MUMFORD:  Got it.

6            THE COURT:  Mr. Bundy needs to step on out, while

7    everyone remains seated.

8            MR. BARROW:  Your Honor, just so the parties know --

9            THE COURT:  Hold on.  We can wait.  We're in recess

10   now, Mr. Barrow.

11           MR. BARROW:  We can take it up later.  I just wanted

12   to make sure the record -- we'll take it up after.

13           THE COURT:  All right.  Everyone's in recess.  Be

14   back and ready at 12:30.

15               (Recess taken at 12:01 p.m.)

16                          -0-

17               (Court resumes at 12:42 p.m.)

18           THE COURT:  Do the parties have anything to put on

19   the record before we continue with the jury?  Mr. Mumford?

20           MR. MUMFORD:  Oh, Mr. -- Mr. Puckett, your Honor, is

21   at a computer at two o'clock.  We've tested it with the

22   assistance of the court IT.  They had a conference room where

23   they tested it.  It works.  They can bring it in through the

24   system.  It's video.

25           And I understand the Government is still objecting.

Colloquy

1    THE COURT:  Well, when you want to make the proffer,

2  we'll have the jury -- I'll tell you what, when we finish with

3  Mr. Fry, we'll take up what we can.

4    And the jurors are going to need to step out when he

5  moves back to his table.

6    If Mr. Puckett is then available, I can see what it

7  looks like outside the jury's presence.

8    If he's not, then we'll take the other witness

9  presentations that need to be done.  And then, at two o'clock,

10  we'll have the jurors step out and see if we can -- I -- I

11  can't make a ruling on this issue until I can see it myself.

12    MR. MUMFORD:  So he's here.  He's available at two

13  o'clock.  He's going to be back -- he had to go pick up his

14  daughter.  He's back in front of a computer at two o'clock.

15    THE COURT:  All right.  So we'll see what we can do.

16    And if we can't do it in the jury's presence today,

17  then we may have to do it at 2:30, outside their presence,

18  assess how it looks.  And we might have to set it up for

19  Monday.  We only have so many hours between now and when the

20  jury leaves for the day.

21    MR. MUMFORD:  When is the jury leaving for today.

22  3:00?

23    THE COURT:  2:30.

24    MR. MUMFORD:  Oh, okay.  2:30.  Okay.  It's going to

25  be really fast, so --

Colloquy

1          THE COURT:  Mr. Schindler?

2          MR. SCHINDLER:  And we're confident we're not getting

3   into a rebuttal case today?

4          THE COURT:  I don't know.

5          MR. SCHINDLER:  I don't know either.

6          THE COURT:  Well, then you know exactly as much as I

7   know.

8          MR. SCHINDLER:  Well, before we get into a rebuttal

9   case, there are some things I need to address with you.

10          THE COURT:  You've made that clear.

11          MR. SCHINDLER:  Thank you, your Honor.

12          MR. OLSON:  Your Honor, may we address Exhibit

13   No. 2616, which was the --

14          THE COURT:  Facebook post?

15          MR. OLSON:  Yes.  The comments from Mr. Fry's --

16          THE COURT:  If you wish to complete your record, go

17   ahead.

18          MR. OLSON:  Okay.  Your Honor, the purpose of

19   offering those was to establish the effect on Mr. Fry's mind.

20          These were representative samples of threatening-like

21   statements that he received, saying that he'll be raped in

22   prison, essentially.

23          They are quite explicit.  They're quite vulgar.  My

24   intention was not to have Mr. Fry read them out loud or for me

25   to read them out loud.  But, rather, just to offer it as an

Colloquy

1    exhibit, so that the jury in its consideration -- when it goes

2    back the jury room -- could have those to look at and consider.

3    They're very impactful.  And I think they are -- they go to

4    corroborate Mr. Fry's state of mind but also just to show the

5    ferocity and the vulgarity of those statements as impacting his

6    state of mind.

7              So I believe they're both relevant and being offered

8    for a nonhearsay purpose.  In fact, I don't think there's any

9    conceivable hearsay purpose that would be offered there.  It

10   goes to his state of mind.

11             THE COURT:  Mr. Knight.

12             MR. KNIGHT:  Your Honor, the Government's position is

13   they are both cumulative and prejudicial.  There's no dispute

14   that Mr. Fry was indeed affected by his belief that if he were

15   to go into custody early, he may be subjected to this sort of

16   situation.  He testified to that repeatedly, and that was

17   corroborated on the stand by his review of these posts.

18             So sending incendiary language like this as an

19   exhibit to the jury has no evidentiary purpose.  And to the

20   extent it does, it's certainly outweighed in a balancing test

21   with the incendiary nature and content of the language.

22             THE COURT:  The other point of corroboration is that

23   other witnesses have talked about Mr. Fry's fear in that

24   respect.  It's been before the jury in a variety of ways.

25             The content is highly prejudicial.  The point is

Fry - X - By Mr. Knight

1   made.  I'm not going to give the exhibit to the jury in any

2   form, under Rule 403.

3           So your objections -- the Government's objection

4   remains sustained.  Your proffer has been considered.  The

5   document's in the record and can be submitted on appeal, in the

6   event there's a conviction.

7           All right.  Are we ready for the jury now?  Are we

8   ready for the jury now?  Yes?

9           MR. KNIGHT:  Yes.

10          THE COURT:  All right.  Please bring in the jury.

11          (Jurors enter at 12:46 p.m.)

12          THE COURT:  All right.  Thank you, everyone.  Please

13  be seated.

14          All right, jurors, all ready?  Yes?

15          Okay.  Cross-examination, Mr. Knight.

16          MR. KNIGHT:  Thank you.

17                      CROSS-EXAMINATION

18  BY MR. KNIGHT:

19  Q.  Good afternoon, Mr. Fry.

20  A.  Good afternoon, Ethan.

21  Q.  Now, I'm going to go through some of the events you

22  described at the refuge, beginning at the time you left Ohio.

23  A.  Okay.

24  Q.  Now, Mr. Fry, you drove all the way from Ohio, in January,

25  to go to the refuge?

Fry - X - By Mr. Knight

1    A.   Yes.   2500 miles.

2    Q.   And your testimony was that that was a great opportunity to

3    get out of the house, to go to the refuge?

4    A.   Well, not to get out of the house but to -- it's the first

5    protest I ever been a part of and I thought this would be, you

6    know, a good one to join.

7    Q.   And you testified and described a little bit for the jury

8    about what happened when you got there.

9         So when you arrived that evening, it was dark.   Is

10   that right?

11   A.   Yes.

12   Q.   And you came in from the southeast?

13   A.   The southeast, yes.

14   Q.   And when you arrived, you were met by some folks at the

15   road who had headlamps on or headlights?   Flashlights?

16   A.   No, they just had flashlights.

17   Q.   And you couldn't tell whether or not they had guns?

18   A.   I could not.

19   Q.   And it was your testimony that you told them that you were

20   here to, quote, "help you guys"?   Is that right?

21   A.   I said it -- I came to help.   I brought some supplies.

22   Q.   And after you told them that, they moved the truck out of

23   the way and let you into the refuge?

24   A.   That's correct.

25   Q.   And you described a little bit on direct examination that

Fry - X - By Mr. Knight

1   you thought that the occupation was, quote, "an MLK-style

2   sit-in."  Is that right?

3   A.   I did.

4   Q.   And once were you there a while, you realized that it was

5   not in fact an MLK-style sit-in.  Isn't that right?

6   A.   No, actually, I still thought it was a sit-in.

7   Q.   Despite the fact that there were over 16,000 live rounds of

8   ammunition present, you still thought it was a Martin Luther

9   King-style sit-in?

10          MR. OLSON:  Objection.  Hasn't been established this

11  witness knew that at the time.

12          THE COURT:  Rephrase your question about the

13  witnesses's knowledge with respect to the ammunition and the

14  content of the question you're asking.

15  BY MR. KNIGHT:

16  Q.   Thank you.  Now, Mr. Fry, you testified a little about --

17  that you knew there were some guns there and you saw them.  Is

18  that right?

19  A.   Yes.

20  Q.   And there, at the end, you in fact had a number of guns in

21  your possession in your car and in your campsite.  Is that

22  right?

23  A.   Yes.

24  Q.   And there was also a lot of ammunition present in that west

25  encampment area where were you.  Is that right?

Fry - X - By Mr. Knight

1  A.   That's correct.

2  Q.   And you were actually at the refuge with this material for

3  40 days, or so.  Is that right?

4  A.   No, not me personally for 40 days.

5  Q.   Well, you were there -- I'm sorry, my math.  You were there

6  from January 4th until February 11th.  Is that right?

7  A.   No, January 8th to --

8  Q.   Oh, I'm sorry.  The 8th till February 11th?

9  A.   February 11th, yes.

10 Q.   And so based on the time you were there and the

11 observations you just described about the firearms, it's still

12 your opinion that this was, quote, "an MLK-style sit-in"?

13 A.   I still considered it a sit-in, yes.  But the guns were

14 brought to my attention -- was because of a fear of any kind of

15 Waco attack.  That they just had the right to protect themself.

16 Q.   Thank you.  I want to turn your attention, now, to the

17 employees you talked a little bit about.

18      You testified on direct examination that you knew

19 employees were in fact at the refuge.  Is that right?

20 A.   I'm sorry.  Could you repeat that?

21 Q.   There's some distraction because of what's popping up on

22 the monitors, your Honor.

23      THE COURT:  All right.  Hold on a moment.

24      Let's see if we can get the distraction resolved.

25      THE WITNESS:  A new scene (referring to monitor).

Fry - X - By Mr. Knight

1              (Pause.)

2              THE WITNESS:  I can answer the question.

3              MR. KNIGHT:  We can go ahead.  Thank you.

4    BY MR. KNIGHT:

5    Q.  All right, Mr. Fry.  The question was -- I'm sorry.  I'll

6    repeat it.

7              You testified that you knew employees worked at the

8    refuge.  Isn't that right?

9    A.  It was -- it was obvious that there has -- there was

10   workers there.

11   Q.  And you testified you actually believed they worked for the

12   Bureau of Land Management.  Is that right?

13   A.  I -- I assumed everything was Bureau of Land Management,

14   yes.

15   Q.  And you actually slept in an office belonging to one of

16   these employees?

17   A.  Yes.

18   Q.  And you worked at his desk?

19   A.  Yes.

20   Q.  And you talked a little bit about the computer.

21             Now, you inserted your flash drive into his computer

22   to increase your computer speed?

23   A.  No, that's not how it works.  It's basic -- a computer has

24   a hard drive.  Right?  And when you turn on the computer, the

25   computer boots up its operating system; you know, windows XP,

1  whatever it is.  And it's coming from that hard drive.

2          And so when I plug in my USB stick, my -- my

3  operating -- instead of booting from their hard drive, it boots

4  from my hard drive.  So now the computer is actually -- it

5  shows up as my computer.  And so their computer -- their hard

6  drive, and all of that stuff, isn't being accessed.

7  Q.  But you used his computer to help your technology and your

8  capabilities there at the refuge?

9  A.  I used his equipment.  Technically, a computer is defined

10 as a -- you have to use the hard drive as well.

11 Q.  All right.  So you used his equipment?

12 A.  Yes.

13 Q.  And even though you didn't, quote, breach any data, you

14 were still using somebody else's equipment.  Right?

15         MR. OLSON:  Objection, asked and answered.

16         THE COURT:  Overruled.

17         THE WITNESS:  Yes.  I mean, I was sitting in his

18 chair, too (laughing).

19 BY MR. KNIGHT:

20 Q.  Now, while you were at the refuge, you testified about

21 doing a number of IT-related activities.  Is that right?

22 A.  It became more media.  They kind of called me the IT guy.

23 But it was kind of like a generic term for anybody computer

24 related.  But it was more media stuff.

25 Q.  Or media.  So you worked with a number of people while you

Fry - X - By Mr. Knight

1   were there at the refuge?

2   A.  Not with.  I mean, they brought me videos, and stuff, to --

3   to compress.

4           I mean, they weren't with me in the building as I was

5   working.  They just kind of did their thing, and they brought

6   back some stuff.

7   Q.  So you helped a number of other people who were at the

8   refuge with -- I will describe as media or, quote/unquote, IT

9   issues then.  Is that right?

10  A.  Yeah.  That's -- actually, I did -- I fixed computers.  So

11  that would be IT stuff, yeah.

12  Q.  And so, for example, you helped Ms. Cox with some issues

13  she was having?

14  A.  Yes.

15  Q.  And you helped Mr. Finicum put together some videos?

16  A.  That's correct.

17  Q.  And these were videos to try and get the message out about

18  what the folks at the refuge thought was going on and why the

19  occupation was taking place.  Is that right?

20  A.  Yeah.  It was basically -- I did -- I did several videos

21  and nothing in there was -- it just seemed to support the

22  protest as far as, you know, bringing attention, and stuff, but

23  nothing against employees.

24  Q.  So they were protest related, we'll call them?

25  Protest-related materials?

Fry - X - By Mr. Knight

1   A.   Yeah.

2   Q.   And you -- through this process, you mentioned some other

3   folks you got to know, too.  You got to work with this

4   individual, Lee Rice, who testified?

5   A.   I worked with him for one day.

6   Q.   And you spent some time there getting to know different

7   people around the refuge.  Is that right?

8   A.   Yes.

9   Q.   And you were at the fire, for example?  You heard some

10  testimony about that?

11  A.   The fire?

12  Q.   The fire pit?

13  A.   The -- yeah, I was -- the fire pit was kind of -- like

14  everybody gathered around.

15  Q.   And so you would go there too?

16  A.   Yeah.  That's where we ate dinner, and stuff; outside

17  there.

18  Q.   And you were in the bunkhouse with people?

19  A.   Yes.

20  Q.   Now, there was some testimony about firearms and your use

21  of firearms.

22       Now, Mr. Fry, you personally own firearms, but you

23  didn't bring any to the refuge.  Is that right?

24  A.   I -- see, I don't really consider owning them.  My dad, he

25  keeps them locked in a safe.  I never used them, except for the

1  .22.

2  Q.  Okay.  So except for the .22, you haven't used those guns;

3  and you didn't bring any personally to the refuge.  Is that

4  right?

5  A.  That is correct.

6  Q.  And I think you described yourself as not much of a gun guy

7  earlier?

8  A.  Yes.

9  Q.  But you did add that bumper sticker to your car.  I think

10  it was -- some kind of gun bumper sticker?  You put that on

11  while were you there?

12  A.  Yeah.  It said the Second Amendment is to protect all of

13  your amendments.

14  Q.  Okay.  So you added that on while you were there?

15  A.  Mmmm.

16  Q.  Now, you testified in some detail about things changing on

17  January 26.  Is that right?

18  A.  That's correct.

19  Q.  And one of those things was you testified that your state

20  of mind or your view changed because of the version of events

21  you heard, related to Mr. Finicum's death.  Is that right?

22        So what you heard about what happened --

23  A.  Yeah, that --

24  Q.  -- affected you?

25  A.  It affected me.  It affected everybody.

1    Q.  Affected everybody.

2              And you described sort of -- things descending into a

3    little bit of chaos.  Is that correct?

4    A.  That's correct.

5    Q.  So in addition to Mr. Finicum's death, isn't it also true

6    that the leadership was arrested at that time?

7    A.  I would say the who people kept it organized were arrested.

8    Q.  So the people who kept it organized, they were arrested at

9    that time, too.  So that also changed the dynamic.  Right?

10   A.  It was pretty much -- yeah, it was just -- unmanaged

11   everything.  It was chaos.

12   Q.  So once the organizers were gone, the chaos started?

13   A.  That's correct.

14   Q.  Now, you -- again, you talked a little bit about not having

15   weapons.  So it's your testimony you never touched a weapon at

16   the refuge until the night of the 26th.  Is that right?

17   A.  No.  I -- I -- you know, I -- I looked at other people's

18   guns before.  Like before, you know -- like some weird-looking

19   gun, I was like, "What is that," you know.  And I have looked

20   at them, and stuff.

21   Q.  Okay.

22   A.  Touched it.

23   Q.  So I get -- and maybe I should be more specific.  So is it

24   your testimony that you never possessed or held a gun until --

25   at the refuge until the night of the 26th?

Fry - X - By Mr. Knight

1    A.   That would be -- I held one.   I mean, there was this gun I

2    touched and held before, but I wasn't possessing it.

3    Q.   Okay.   So you held it, but you weren't possessing it?

4    A.   It was -- it was more like -- I was -- I was looking at it.

5    Q.   Okay.   So -- well, then I guess I'll turn to the 26th.

6             On this night, setting aside holding that one before

7    the 26th, you actually had a gun.   Right?   A shotgun?

8    A.   That's correct.

9    Q.   And you were wearing, I guess, a bandolier of shotgun

10   shells.   Do you recall that?

11   A.   Yeah, I think -- I think you were supposed to use that as a

12   belt.

13   Q.   Okay.

14   A.   Put it on my head.

15   Q.   And you had that around -- okay.   And from that point on,

16   you decide to stay at the refuge until you were the last person

17   off.   Is that right?

18   A.   I was the last person.

19   Q.   And so you stayed, obviously?

20   A.   Mmmm.   (Nods head.)

21   Q.   And during that time, you actually had a number of

22   firearms.   Isn't that right?

23   A.   I -- I had gathered up a lot of the firearms and -- me and

24   other people because we noticed -- when we hadn't gathered the

25   firearms, when we would go back the next day to go grab some,

Fry - X - By Mr. Knight

1   you know, water, and stuff like that, they were -- they would

2   end up missing.

3           And so we didn't feel comfortable with them taking

4   all of these things.  So we just started gathering up as much

5   stuff, and brought them in one place.

6   Q.  So you and others collected all of the firearms that were

7   still left after the 26th.  Is that right?

8   A.  That is correct.

9   Q.  And then you moved them to places like your car.  Right?

10  A.  I just -- yeah, I put some in there.  There was so many to

11  put around -- I actually knocked over -- we had them all

12  sitting up, you know, and I actually knocked them over.  And I

13  was worried that there might be an accident and a misfire.  And

14  so I put all -- some -- I put a bunch of them in there.  We put

15  some inside the -- the -- the trailer, and so we put them in --

16  Q.  And these were the ones -- these were just the ones left,

17  after folks left, that you were able to find?

18  A.  Yeah.  People just left them behind, yes.

19  Q.  And so you went into different parts of the refuge to get

20  these guns.  Is that right?

21  A.  That's correct.

22  Q.  And the different offices and the bunkhouse.  Right?

23  A.  Yeah.

24  Q.  Now, you talked a little bit about your state of mind and

25  the effect the events had on you there at the end.

1    You were asked if you were grieving, and you said,

2    no, you were -- described yourself as disgruntled.  Is that

3    fair?  You were disgruntled during this period?

4    A.  Disgruntled.

5    Q.  And that's one of the reasons you stayed?

6    A.  Well, it would be like quite a mix of feelings.  I mean,

7    you -- you're scared.  You know, you're worried about

8    everybody's safety.  And -- and you're just generally upset

9    about how it ended like that.  It had to end in its own time.

10   Q.  And so that's -- there are a lot of reasons you stayed,

11   then?

12   A.  Yeah.

13   Q.  Now, the FBI, during this time, starts talking to you.  Is

14   that right?

15   A.  On the 26th, yes, they did.

16   Q.  And they have a number of conversations with you, some of

17   which the jury's heard.  Is that right?

18   A.  That's correct.

19   Q.  And you talked a little bit about the importance of this

20   being a peaceful protest.  Do you remember that?

21   A.  Yes.

22   Q.  And do you recall having any conversation with the FBI

23   about this?

24   A.  Yes, we -- we spoke -- well, they -- they -- they wanted it

25   to end in a peaceful resolution.  They --

Fry - X - By Mr. Knight

1    Q.  I'm sorry.  Go ahead.

2    A.  I mean, is that where you are going?  With peaceful --

3    Q.  Did you have discussions about that and them wanting it to

4    end peacefully?  Do you recall that?

5    A.  I did.  We all -- I told them at the end of the day, we all

6    want to go home.

7    Q.  Well, and I understand you were frustrated at the time,

8    Mr. Fry.  But didn't you tell the FBI that it's, quote, "not

9    going to end peacefully"?

10   A.  I did.  I did.  I really thought they were -- that they

11   would be the ones to come in and attack us, and so I'm assuming

12   that, you know, they're -- their wanting a peaceful resolution

13   wasn't going to end if you just didn't comply exactly as they

14   wanted.

15   Q.  That was your view of it, even though they repeatedly told

16   you "We want this to end peacefully, and we want you to come

17   out of here alive"?

18   A.  Well, it wasn't completely peaceful on their end.

19   Q.  Okay.  That's your opinion, based on what you heard.

20   Right?

21   A.  Well, I mean -- I guess so.

22   Q.  At the time.  I mean, that was -- okay.  Now, you talked

23   about a number of other things on those phone calls as well.

24         Didn't you talk a little bit about the federal

25   corruption that was still upsetting you?

1    A.   Yes.

2    Q.   And you did -- and we talked a little bit about this.   But

3    you talked about the fact at the time you may take out as many

4    FBI agents as possible, if they were to come.   Is that right?

5    A.   I did say that, yes.

6    Q.   So that's how you were feeling at the time.   You made those

7    statements.

8              You also had a number of firearms at the time.

9    Correct?

10   A.   Not on me.

11   Q.   Well, I mean, you had them where you slept.   Correct?

12   A.   I had -- I had the shotgun where I slept, and stuff.

13   Q.   And then there were a number in your car.   Right?

14   A.   Most of those I actually unloaded, but they were in there,

15   yeah.

16   Q.   And there were guns in other areas of the west encampment.

17   Right?

18   A.   That's correct.

19   Q.   And you made the statement about the FBI, on the phone with

20   the FBI.   Right?

21   A.   That's correct.

22   Q.   And you were upset about federal corruption.   Correct?

23   A.   Mmmm.   Okay.

24   Q.   But it's your testimony that at that moment, when you're

25   saying these things and you have these guns, that if a Fish &

Fry - ReD - By Mr. Olson

1   Wildlife employee walked in, you would have let them go to

2   work?

3   A.   Actually, I would have.  That's the main reason why we

4   separated ourselves from the refuge buildings and put ourselves

5   in the west encampment because we were generally wanting to

6   disassociate ourselves with that.

7              And so anybody who wanted to go in at that -- I mean,

8   if they would have asked us, absolutely.  We let the -- and we

9   would have let Andy Dunbar come and the FBI come if they would

10  have asked, yeah.

11             MR. KNIGHT:  Thank you.  No, further questions, your

12  Honor.

13             THE COURT:  All right.  Mr. Olson.

14             MR. OLSON:  Thank you, your Honor.

15             Mr. Fry, back over of here.

16                     REDIRECT EXAMINATION

17  BY MR. OLSON:

18  Q.   When you say you held a gun sometime before January 26th,

19  was that a -- a long arm or was it a small arm firearm?

20  A.   It was actually a pistol.

21  Q.   Pistol.  Okay.  And was that just kind of a momentary thing

22  or was that --

23  A.   It was momentary, yes.

24  Q.   All right.  Now, Mr. Knight asked you about this phone call

25  with Agent Ginda.

Fry - ReX - By Mr. Mumford

1    How many hours from January 26 to February 11 -- how

2  many hours on the phone did you spend talking to these agents?

3  Guesstimate.

4  A.  Six -- six times 14.

5  Q.  Whatever that --

6  A.  84 hours?

7  Q.  And was this the only time that you said anything like

8  that?

9  A.  It is.  And, again, I -- I thought I -- I thought I had

10  told them that, you know, if they came and attacked us, that

11  that was -- that was what was going to happen.

12    Because I mentioned -- I've talked to them multiple

13  times before and I said, you know, that if you guys come and

14  try to just start shooting at us, you know, that -- that I have

15  the right to defend myself.

16    MR. OLSON:  No further questions, your Honor.

17    THE COURT:  All right.  Any other redirect?

18    Yes, Mr. Mumford.

19                          RECROSS-EXAMINATION

20  BY MR. MUMFORD:

21  Q.  You were asked about your presence there at the refuge from

22  January 8th to February 11th, on -- on cross-examination.

23  Right?

24  A.  That's correct.

25  Q.  And I believe the -- Mr. -- Mr. Knight said something about

1    you were -- you were there for however many days that was, with

2    all of that stuff.  And he's referring to, I think, the guns

3    and the ammunition.  Right?

4    A.  One more time.

5    Q.  That stuff he referred to, referring to the guns and the

6    ammunition that -- that -- that was -- that he was saying was

7    there.  Right?

8    A.  Yes.

9    Q.  So do you know how much of that stuff was there?  Meaning

10   the guns and ammunition was there before January 8th?

11   A.  I do not.

12   Q.  Do you know how much of it was there even before?  You

13   know, like January -- even before January 2nd?

14   A.  I am not aware.

15   Q.  Did you become aware that -- that there -- that -- that the

16   employees that worked there before the occupation had guns and

17   ammunition that were there?

18            MR. KNIGHT:  I'm going to object to the basis of

19   knowledge and he's misstating the evidence as it's in so far.

20            MR. MUMFORD:  It's not misstating --

21            THE COURT:  Hold on.  Just a minute.  Let's not have

22   the back and forth.

23            The jurors know what the witnesses have said.  The

24   misstatement issue is for you to sort out, folks.

25            The witness has testified that he does not know.  And

1   when asked three different ways, he still says he does not

2   know.

3              So do not ask any more questions to make that same

4   point.  Go ahead and ask a new question responsive to the

5   cross.

6              MR. MUMFORD:  I'm sorry.  I think your Honor is

7   mischaracterizing my question.  My question was, Did you become

8   aware at some point.

9              THE COURT:  And his answers have been, no, he did not

10  have knowledge.  And so you need to ask a new question.  Ask a

11  new question, please.

12             MR. MUMFORD:  That was the question that got objected

13  to, and so I didn't get an answer on that one.

14             THE COURT:  And I sustained the objection.  Ask a

15  new --

16             MR. MUMFORD:  Okay.  If you sustained it, then I

17  understand.

18  BY MR. MUMFORD:

19  Q.  You were talking -- you were asked on cross-examination

20  about the chaos ensuing.  Right?  After the 26th, right?

21  A.  On the night of the 26th.

22  Q.  Okay.  And you were asked sort of what -- what -- what

23  contributed to that.

24             Did the fear contribute to that?

25  A.  To the chaos?  I would say so.  People just heard that

Fry - ReX - By Mr. Mumford

1   someone was killed and another was shot.

2   Q.  You were asked about the guns that were left behind.

3          Do you have any understanding as to why people left

4   guns behind?

5   A.  My understanding that, the FBI told people that they cannot

6   leave with their firearms.  And so people left them there.

7   Other people -- even before that message was brought out, they

8   did just leave their firearms and fled.

9   Q.  And you don't know how those guns got there.  Right?

10  A.  I -- I do not.  People, I guess, bring them.

11  Q.  And was part of that -- people leaving their guns, is

12  that -- they understood that the FBI -- they might encounter

13  the FBI, and they didn't want to be -- be seen with guns

14  because they were scared they were going to get shot?

15          MR. KNIGHT:  I'm going to object to the form of the

16  question as argumentative and also calls for speculation

17  because he's asking the witness to tell what these people

18  thought they might do.

19          THE COURT:  I'm sustaining the argumentative form

20  objection.

21          You have a basis to argue from the witness's

22  testimony reasonable inferences but don't ask the witness to

23  draw those inferences.  They're for the jury.

24          Please proceed.

25  BY MR. MUMFORD:

Fry - ReX - By Mr. Mumford

1    Q.  When you were -- when you were talking about the fear, did

2    you have a fear of what the Government would do when they saw

3    you with a gun?

4    A.  You know, I -- I was actually really kind of suicidal.  I

5    actually walked in front of them with a gun.  I was thinking,

6    if they're going to shoot me, just do it now.  And I was

7    walking in front of them, but they never did.  I gave them the

8    opportunity to kill me, but they didn't.  So --

9              MR. MUMFORD:  Thank you.  Thank you, your Honor.

10             No more questions.

11             THE COURT:  All right.  Thank you, sir.

12             MS. HARRIS:  Sir -- standing up.  Sorry.

13             Hi, Mr. Fry.

14             THE COURT:  Hold on a minute.

15             MS. HARRIS:  Oh, I'm sorry.  I thought you were

16   asking -- my problem.  My fault.

17             THE COURT:  I thought it was Ms. Cox who did the

18   direct of Mr. Fry, so --

19             MS. HARRIS:  Oh.

20             THE COURT:  It's one person per witness.  If she has

21   a redirect --

22             MS. HARRIS:  You're right.

23             THE COURT:  -- question, she may.

24             MS. HARRIS:  I forgot, during the lunch break.  I'm

25   sorry, your Honor.

Fry - ReX - By Defendant Cox

1          (Pause, Ms. Harris and Defendant Shawna Cox

2          conferring.)

3                    RECROSS-EXAMINATION

4    BY DEFENDANT SHAWNA COX:

5    Q.  If you had gotten LaVoy's text that day, would you have

6    been in that -- in the truck?

7    A.  Oh, yes.  I would have.  And it's -- it's -- it's kind of

8    scary because I had this weird feeling I was probably going to

9    die anyways.  And if I was in that truck, maybe -- I was

10   thinking, you know, at the time, you know, if I was in that

11   truck, I would have probably had that bullet that went into

12   Ryan's arm in my head, or something.

13   Q.  That was the day that people were arrested.  Right?

14   A.  It is.

15   Q.  And the whole Sharp family went along --

16             MR. KNIGHT:  This is now cumulative and outside the

17   scope --

18             THE COURT:  It is outside the scope of cross.

19             DEFENDANT SHAWNA COX:  I was laying a foundation

20   here.

21             MS. HARRIS:  I think -- I'm sorry.

22   BY DEFENDANT SHAWNA COX:

23   Q.  My question is were you an organizer?

24   A.  I was not.  I was just checking out what was going on, I

25   guess.

Fry - ReX - By Defendant Cox

1    Q.   Was Victoria Sharp an organizer?

2    A.   No.  She's a singer.

3    Q.   Did you -- did you know if a man by the name of Booda was

4    an organizer?

5    A.   I -- I had one conversation with him and --

6    Q.   So you know who he was?  I mean, you saw him.  Right?

7    A.   He was -- he was yelling at me because I was smoking some

8    cigarette stuff, and he -- he got mad.  (Laughing.)  He got

9    mad.

10   Q.   But you don't know if he was an organizer?

11   A.   No.

12            DEFENDANT SHAWNA COX:  Okay.  Okay.  That's all.

13   Thanks, your Honor.  Thank you.

14            THE COURT:  All right.  Jurors, I need you to step

15   out for just a short break while we get reorganized for our

16   next presentation.

17            Please leave your notes on the chair.  Don't talk

18   about the case.

19            I need another hour and 15 minutes of your attention.

20            Watch your step, folks.

21            (Jurors exit at 1:12 p.m.)

22            THE COURT:  All right.  Everyone please be seated,

23   except Mr. Fry.  You can step down.

24            Everyone be seated, please.

25            What's the next presentation?

Colloquy

1          Is that you, Ms. Maxfield?

2          MS. MAXFIELD:  Yes, your Honor.  I would like to get

3   Ed Snipes on and off.

4          THE COURT:  Okay.  Is he here?

5          MS. MAXFIELD:  He is.

6          THE COURT:  In person, live?  All of that?

7          MS. MAXFIELD:  In person, live.

8          THE COURT:  Please get him.

9          MS. MAXFIELD:  Emerging on Christy (phonetic).

10         THE COURT:  Sorry?

11         MS. MAXFIELD:  I said emerging on Christy.

12         THE COURT:  And did you want that stipulation raised

13   when the jury comes back, first?

14         MS. MAXFIELD:  Yes, that would be great.

15         THE COURT:  All right.  Mr. Snipes, come on up here

16   to the witness chair.  Please watch your step.

17         We're going to be bringing the jury in.  We'll all

18   stand.  And then I'll tell the jury -- everybody to be seated,

19   except you need to stay standing, at that point, because you'll

20   take the oath and then you'll take a seat, okay?

21         THE WITNESS:  Okay.

22         THE COURT:  All right.  Bring the jurors in, please.

23   Everybody stand for the jury.

24         (Jurors enter at 1:14 p.m.)

25         THE COURT:  Ladies, why don't you go ahead and step

Colloquy

1    on out.  It looks like one of your number is not ready to come

2    in.  There's no reason for you to be sitting here, feeling

3    alone.

4            And everybody else can take a seat until Ms. Boyer

5    tells us we're ready.

6            You too, sir, you can take a seat.  I thought we were

7    ready but we weren't.

8            (Jurors exiting.)

9            (Pause.)

10           THE COURT:  Sir, what's your first name?

11           THE WITNESS:  My first name is Charles.

12           (Pause, the Court and the witness conferring.)

13           THE COURT:  Thank you, sir.

14           Okay.  You'll repeat all of that in the jurors'

15    presence.  I'll ask you.  Thank you, sir.

16           (Pause.)

17           THE COURT:  All right.  Let's all stand for the

18    jurors.

19           (Jurors enter at 1:19 p.m.)

20           THE COURT:  All right.  Thank you, everyone.  Please

21    be seated.

22           Jurors, you all set?

23           All right.  The defendants' next witness is

24    Mr. Snipes.  He's in front of you.

25           Sir, would you face the jury there.  Turn around and

1   face them and the deputy to your right.  Raise your right hand,

2   sir, to be sworn.

3             (Witness sworn.)

4             THE WITNESS:  I do.

5             THE CLERK:  Please take a seat.

6             THE COURT:  Bring yourself close in to the

7   microphone, please.

8             Tell us your full name, sir, and spell all of it.

9             Tell us your full name and spell all of it, please.

10            THE WITNESS:  My name is Charles Edward Snipes.

11   Everybody calls me Ed.  That's C-H-A-R-L-E-S, E-D-W-A-R-D,

12   S-N-I-P-E-S.

13            THE COURT:  Thank you.

14            And this lawyer, right over here, is going to ask you

15   some questions.  Right there.

16            THE WITNESS:  Okay.

17            THE COURT:  Ms. Maxfield, go ahead.

18                       DIRECT EXAMINATION

19   BY MS. MAXFIELD:

20   Q.  Good afternoon, Mr. Snipes.  Can you hear me okay?

21   A.  How's that?

22   Q.  Can you hear me?

23   A.  Yes.

24   Q.  Okay.  Where do you live?

25   A.  I live about halfway between Crane and Princeton, Oregon,

Snipes - D - By Ms. Maxfield

1    which is about 35 miles east of Burns.

2    Q.    And how big is Crane?

3    A.    Oh, maybe 75 people.

4    Q.    And what was the other town you said?  Preston (phonetic)?

5    A.    How's that?

6    Q.    The second town you described.

7    A.    It's Princeton.  And there's probably about five people

8    there.  It's on the east end of Malheur Lake.

9    Q.    And how long have you lived in Harney County?

10   A.    About ten years.

11   Q.    What do you do there?

12   A.    I'm a hay farmer.

13   Q.    Did you have a career before you became a hay farmer?

14   A.    A career, yes.  In Southern Florida, I was 26 years on the

15   Orlando Fire Department.  Before that, four years on the Mobile

16   Fire Department.

17   Q.    And how did you find your way to Harney County?

18   A.    Well, I just wanted to get away from the dense populations.

19   Q.    Well, you did that.

20   A.    Yes.

21           (Laughter.)

22   BY MS. MAXFIELD:

23   Q.    Back in December and January, were you aware of a

24   controversy surrounding a rancher family called the Hammonds?

25   A.    Yes.

Snipes - D - By Ms. Maxfield

1  Q.  And on January 2nd did you go to a protest parade that

2  occurred in downtown Burns?

3  A.  Yes.

4  Q.  Sometime after that parade, did you hear about some people

5  occupying the Malheur National Wildlife Refuge?

6  A.  Yes.

7  Q.  And did you go there yourself?

8  A.  Yes.

9  Q.  How many times do you think you went?

10  A.  Several times.  I didn't keep track of how many times.  But

11  I went every time I heard there was going to be any kind of

12  news media or any kind of function going on there.

13  Q.  Okay.  So was this a protest that held your interest?

14  A.  Yes.

15  Q.  Did you actually bring a hog out to the refuge for a

16  barbecue?

17  A.  Yes.  Yes.

18  Q.  Okay.  When you were at the refuge, did you ever meet a man

19  named Neil Wampler?  This fellow back here?

20  A.  Yes.

21  Q.  And how many times do you think you had a chance to talk

22  with him?

23  A.  Well, we had one extended conversation about the Hammonds

24  and a writ of habeas corpus to try to get them freed or find

25  some way to get them out of prison.

1   Q.   Okay.   And do you remember, did that occur on or about

2   January 14th?

3   A.   Yes.

4   Q.   Where did that conversation take place?

5   A.   How's that?

6   Q.   Where at the refuge did it take place?

7   A.   It was in the kitchen area.   There's a little dayroom and a

8   kitchen, and there's a bar in between.   And we were standing

9   kind of in the hallway, in between the day room and the

10  kitchen.

11  Q.   All right.   And did you and he have a conversation about

12  the Constitution on that day?

13  A.   Somewhat.

14           MS. MAXFIELD:   Okay.   I have no further questions.

15  Thank you.

16           THE COURT:   Okay.   Any cross?

17           MR. GABRIEL:   Oh, no, cross-examination.   Thank you,

18  sir.

19           THE COURT:   All right.   You're free to go.   Thank

20  you, sir.

21           Ms. Maxfield.

22           MS. MAXFIELD:   Thank you, your Honor.

23           THE COURT:   Did you have a stipulation you wanted

24  read?

25           MS. MAXFIELD:   Yes, if you would.

Colloquy

```
 1          THE COURT:  All right.  So, jurors, the parties

 2   stipulate that Neil Wampler left the Malheur National Wildlife

 3   Refuge on January 20, 2016, and did not return.  Therefore,

 4   there isn't any need to call a witness to prove that fact.  The

 5   parties agree to it.  All right?

 6          All right.  Next witness presentation, please.

 7          MR. MUMFORD:  I think defendant -- your Honor,

 8   defendants call Duane Schrock.

 9          THE COURT:  All right.  Please ask him in, somebody.

10          MR. MUMFORD:  Here, I'll get him.

11          (Mr. Philpot exiting courtroom.)

12          (Pause.)

13          THE COURT:  Sir, would you come here, please, to the

14   witness chair.

15          Come all the way up.  There are steps against the

16   wall.  Watch your step coming on up.

17          Would you please remain standing, face the jury, and

18   the deputy there.  Raise your right hand, sir, to be sworn.

19          (Witness sworn.)

20          THE WITNESS:  As God is my witness, I will.

21          THE CLERK:  Thank you.  Please take a seat.

22          THE COURT:  All right.  Bring yourself close to the

23   microphone, please.  And tell us your name, spelling --

24          THE WITNESS:  Duane Michael Schrock.

25          THE COURT:  Would you spell it all, please.
```

Schrock - D - By Mr. Mumford

1          THE WITNESS:  D-U-A-N-E, M-I-C-H-A-E-L,

2   S-C-H-R-O-C-K.

3          THE COURT:  Thank you.

4          Mr. Mumford.

5                  DIRECT EXAMINATION

6   BY MR. MUMFORD:

7   Q.  Mr. Schrock, welcome.

8          Where do you live?

9   A.  I live in Crane, Oregon.

10  Q.  What -- what county is that?

11  A.  Harney County.

12  Q.  And how long have you -- have you lived there?

13  A.  I've reside there eight years.

14  Q.  Okay.  What do you do there?

15  A.  I ranch.

16  Q.  Were you -- were you recently approached by -- by the FBI?

17  A.  Yes, sir.

18  Q.  Who was it?

19  A.  Mr. Jones.

20  Q.  That's Agent Ben Jones?

21  A.  Ben Jones.

22  Q.  Did -- what did Mr. Ben Jones tell you?

23          MR. GABRIEL:  I'm going to object, your Honor.

24          This proffered testimony was limited to what we

25  discussed outside -- well, yesterday morning.

1    THE COURT:  Well, we also discussed this issue of the

2    witness having had contact with Agent Jones, and I indicated

3    that there could be a proffer.  And if there were bases for the

4    objections, I would hear them as we go.

5        So, for now, your objection is premature.

6        Ask your question again, please, Mr. Mumford.

7    BY MR. MUMFORD:

8    Q.  Okay.  What did Agent Jones talk to you about?

9    A.  He asked me questions about what went on at the Malheur and

10   my involvement.

11   Q.  Was this during the occupation, then?

12   A.  Yes, sir.

13   Q.  And over that -- how long did your conversation last?

14   A.  Oh, approximately 30 minutes.

15   Q.  Now, had you told -- had you told Agent Jones, prior to

16   that, you didn't want to talk to him?

17   A.  Absolutely.

18   Q.  And yet -- so this was -- this was while this trial was

19   going on, then?

20   A.  I believe it -- he come to my ranch the day after he was on

21   the stand here in Portland.

22   Q.  Okay.  And did he want to talk with you about -- he

23   understood you were going to be a witness?

24   A.  Yes, sir.

25   Q.  Did you come to understand he wanted to talk to you about

Schrock - D - By Mr. Mumford

1    what your testimony was going to be?

2    A.   Yes, sir.

3    Q.   What did he say to you about your testimony?

4    A.   What I seen when I was at the Malheur.  Different things of

5    that sort.

6    Q.   Did you get the sense he was -- he was trying to tell you

7    what your answers should be?

8    A.   Some of those.

9    Q.   Was he trying to influence your -- your -- what your

10   testimony --

11   A.   I felt intimidated.

12   Q.   And how did you feel intimidated, sir?

13   A.   He was answering the questions that he was asking.

14   Q.   Explain.

15   A.   He would ask me if there was something that I saw, and want

16   me to agree that I saw it.

17   Q.   And even after you said that you didn't?

18   A.   Yes.

19   Q.   What were some of these things he was wanting you to admit

20   that you saw, even though that you didn't?

21   A.   All the guns that were at the Malheur, which I did not see.

22   Q.   Anything else?

23   A.   Yeah, I'm thinking.

24            Whether I -- I visually saw anyone in the tower at

25   the Malheur.

Schrock - D - By Mr. Mumford

1  Q.  And what did he think -- what did he tell you that your

2  answer should be on the --

3  A.  Well, I explained to him that there had to be somebody up

4  there because Old Glory was flying from the top.

5  Q.  And -- and what did he want you to say about that?

6  A.  That there were people in the guard tower.

7  Q.  Okay.  Anything to do with Mr. Ammon Bundy?

8  A.  (Pause.)  Whether he was the leader of the occupation.  And

9  I explained to him there were many people that spoke and that I

10 listened to all of them.

11 Q.  Did he -- did he -- did he say at one point that he wanted

12 you to point your finger at -- to point the finger Mr. Ammon

13 Bundy?

14 A.  He would like me to identify Ammon as the leader.

15 Q.  And -- and did you understand that there would be -- there

16 could be repercussions against you if you didn't testify the

17 way Agent Jones wanted you to?

18 A.  Don't know about that.  I have received some of those in

19 other parts my business.

20 Q.  Explain.

21 A.  My cattle are in another state, in which the state has been

22 paying visits to them for reasons of they're from Harney County

23 and that Mr. Bundy's name was attached to them through me.

24 Q.  So -- and have -- has -- in your business of ranching, has

25 this ever happened before?

Schrock - D - By Mr. Mumford

1  A.  Never.

2  Q.  So you know -- you know Ammon Bundy though.  Right?

3  A.  I know Ammon Bundy.

4  Q.  When did you first become introduced to Mr. Bundy?

5  A.  Physically, on the 15th of December.

6  Q.  Okay.  What -- you mean physically on the 15th of December?

7  What are you referring to?

8  A.  The meeting that was held at the Harney County fairgrounds.

9  Q.  Were you nonphysically introduced to him before that time?

10 A.  Prior to that, I -- I have watched videos on the -- on the

11 Internet.

12 Q.  And how -- what was -- what's the significance of December

13 15th?

14 A.  It was a -- it was a county -- open -- open meeting to the

15 county, and it was about the Hammond family.

16 Q.  And did you -- did you participate in that then?

17 A.  I absolutely did.

18 Q.  When you say absolutely did, what do you mean?

19 A.  The Hammonds are my neighbors and friends.

20 Q.  And -- and what -- what was -- what -- did you take part,

21 then, in the meeting on December 15th, then?

22 A.  I did go to the meeting.

23 Q.  That was where -- was that where discussions took place

24 regarding a committee of safety, then?

25 A.  Absolutely.

1    Q.   Okay.  And did you continue to work with Mr. Bundy after

2    that meeting, then?

3    A.   Yes, I did.

4    Q.   How?

5    A.   I was nominated to be one of the members of the committee

6    of safety.

7    Q.   And just very briefly, what did you understand to be the

8    purpose of the committee of safety?

9    A.   Community safety.

10   Q.   Now, you said you were nominated.  You were -- were you

11   approved or --

12   A.   I was nominated by members of the community that were at

13   the meeting.

14   Q.   Okay.  And from that point, when -- when do you think your

15   next interaction with Mr. Bundy would have been?

16   A.   The next evening.

17   Q.   And how often, between then and let's say the first of

18   January, would you say you met with Mr. Bundy?

19   A.   I believe just that one time.

20   Q.   Okay.  Did you come to understand that Mr. Bundy had --

21   had -- had -- had -- had -- sorry.  Was -- was -- was at the

22   refuge at some point?

23   A.   Can you --

24   Q.   Yeah, did you understand that the -- they -- they took over

25   the refuge.  Right?

Schrock - D - By Mr. Mumford

1   A.  I wasn't in town when that happened.

2   Q.  Okay.  When did you come to understand that that happened,

3   then?

4   A.  On the evening of the 2nd of January.

5   Q.  Okay.  And how did you find out?

6   A.  A phone call.

7   Q.  Okay.  Who from?

8   A.  I don't remember.

9   Q.  Okay.  Somebody just telling you, hey --

10  A.  Somebody in the county.

11  Q.  Okay.  Did you go to the refuge at some point?

12  A.  I did go to the refuge.

13  Q.  Do you remember how soon after that?

14  A.  Within the -- I believe the first week.

15  Q.  Okay.  And did you -- did you continue to go visit the --

16  A.  I spent a lot of time at the Malheur.

17  Q.  Okay.  And spent a lot of time doing what?

18  A.  I was learning what the message was that they were

19  protesting for.

20  Q.  And very briefly, what was that?

21  A.  The Constitution and our rights.

22  Q.  Okay.  And how often -- from that point, let's say, until

23  the -- the January 26th, how often would you say you visited?

24  A.  At least three times or more a week.

25  Q.  Any particular time of day?

Schrock - D - By Mr. Mumford                     208

1    A.   No.

2    Q.   Okay.  Did you bring others to the --

3    A.   Yes.

4    Q.   -- refuge?

5    A.   Yes, I did.

6    Q.   Why?

7    A.   I wanted them to know what their rights were, that we were

8    learning by -- from Ammon.  And they were willing -- they were

9    wanting to go to learn.  And most of them were 70 years or

10   older.

11   Q.   Was this in your capacity as a citizen or in your capacity

12   as a committee of safety, or some other -- some other capacity?

13   A.   As a rancher to ranchers.

14   Q.   And was there a time of day that those meetings had to take

15   place?

16          MR. GABRIEL:   Your Honor, I'm going to object to the

17   cumulative nature of this testimony to other witnesses.

18          And if we could just get to the material that was

19   proffered.

20          THE COURT:   I think we have enough of the material

21   that is now, again, cumulative.  So let's get to the remainder

22   of what the witness has that's new, please.

23          Objection sustained.

24   BY MR. MUMFORD:

25   Q.   Could we just show you -- there's been an exhibit that's

Schrock - D - By Mr. Mumford

1   been introduced into evidence.

2        I'm just going to show you the first little bit, and

3   ask you some questions about it, if that's okay.

4   A.  Okay.

5        THE COURT:  Can you refer to the number, please, for

6   the record.

7        MR. MUMFORD:  This is -- thank you, your Honor.  This

8   is Exhibit 50.  Government Exhibit 50.

9        (Pause, video playing with sound.)

10        THE COURT:  Mr. Mumford, this was supposed to be just

11   a few seconds for voice, and no more.  You're going quite a bit

12   longer.

13        (Video stopped.)

14        MR. MUMFORD:  No, we are going right to here, your

15   Honor, is where I wanted to go.

16   BY MR. MUMFORD:

17   Q.  Mr. Schrock, do you recognize that -- that handsome guy

18   there?

19   A.  I believe that's me, from what I can see here.

20   Q.  Yeah.  You, were there at this meeting.  Right?

21   A.  That is me.

22   Q.  Yeah.  And who were you bringing to this -- this -- this --

23   this -- this -- this -- this meeting?

24   A.  Dave Thomas.

25   Q.  Why?

Schrock - D - By Mr. Mumford                    210

1  A.  He is the assistant fire chief for the Crane Rural Fire

2  Protection Association.

3  Q.  Was there a purpose that you wanted -- had Mr. Thomas met

4  Mr. Bundy before?

5  A.  Not until this time right here.

6  Q.  Okay.  Was there a purpose that you wanted him to -- to --

7  to meet at that time?

8  A.  Yes.

9           Mr. Thomas had been.

10          MR. GABRIEL:  Your Honor, I'm going to object to this

11  witness's purpose to introducing someone to Ammon Bundy.

12          THE COURT:  The objection is sustained.

13          And the point of this was for him to identify the

14  voice.  Let's move on now.

15          MR. MUMFORD:  Well, but I'm getting to the meeting,

16  your Honor.

17          THE COURT:  Then get to it, Mr. Mumford.  The

18  objection is sustained.

19          You're going all around the block.  Get to the point,

20  please.

21  BY MR. MUMFORD:

22  Q.  There was a purpose to this meeting then.  Right?

23  A.  Yes.

24  Q.  What was it?

25  A.  It was for the video that he had taken of the fire that was

Schrock - D - By Mr. Mumford                211

1  the previous year or two that was -- we thought was the Hammond

2  fire, that was on the Hammond ranch.

3  Q.   And was that -- so did Mr. Thomas discuss that fire then?

4  A.   Yes, he did.

5  Q.   Had -- and had Mr. -- was it your understanding that

6  Mr. Bundy had heard, basically, that information from the

7  horse's mouth, so to speak?

8  A.   There was video out there about the fire, yes.

9  Q.   Okay.  Gotcha.

10             And -- and what -- what time of day did this meeting

11 occur?

12 A.   It was after dark, in the evening, five, six o'clock.

13 Q.   Was there a reason why it was after dark?

14 A.   Mr. Thomas was worried about somebody seeing him in the

15 daylight because of his job.

16 Q.   And what was his job?

17 A.   He's assistant fire chief of the Crane Rural Fire

18 Protection Association.

19 Q.   So he understood there may be repercussions if people saw

20 him there, meeting with Mr. Bundy?

21 A.   Yes, sir.  Because of the equipment that they get from the

22 government for fire protection.

23 Q.   Okay.  And do you remember some discussion at that meeting

24 about the BLM employees at all?

25 A.   Other than the fires that they were setting in the videos.

Schrock - D - By Mr. Mumford

1   Q.  Okay.  How about when Ms. Cox -- I believe at one point

2   Ms. Cox refers to the -- what was going on at the BLM office.

3           Do you remember that?

4           MR. GABRIEL:  Your Honor, I'm --

5           THE WITNESS:  Yeah, that was --

6           MR. GABRIEL:  I'm going to object.  The video speaks

7   for itself.  And to have the witness describe what's in the

8   video, I think, would be inappropriate.

9           THE COURT:  Mr. Mumford, if you wish the witness to

10  talk about whether he heard any discussions among those whose

11  discussions are relevant about Fish & Wildlife workers or BLM

12  workers, ask that question.

13          The objection is sustained.

14  BY MR. MUMFORD:

15  Q.  Okay.  Do you recall hearing a discussion about BLM workers

16  during this meeting?

17  A.  Yes.  I was aware because Burns is a small community.  Of

18  the --

19  Q.  And --

20  A.  They were -- they had a shredder truck up at the BLM

21  office.

22  Q.  A shredder truck.  What's that for?

23  A.  That's for shredding documents.

24  Q.  And so this would be -- this would have been a -- a --

25  something that you -- that you had seen, or others had seen?

1   A.  No, I was told.

2   Q.  Okay.  And --

3           MR. GABRIEL:  Well, your Honor, I'm going to object.

4       I move to strike on lack of foundation.

5           THE COURT:  The reference to a shredder truck,

6   Jurors, are stricken.  It's hearsay.

7           Please get to the point about what is relevant here,

8   Mr. Mumford.

9           MR. MUMFORD:  Your Honor, this is relevant.  This is

10  the relevant point.

11          THE COURT:  No.  What this witness heard someone else

12  say about a shredder truck is hearsay.

13          The objection is sustained.  Ask another question.

14          MR. MUMFORD:  Your Honor, again, we're getting --

15          THE COURT:  Mr. Mumford, I've made a ruling.  Ask

16  another question, please.

17          MR. MUMFORD:  Your Honor wouldn't let me show the

18  entire video, so I'm having the witness describe it.  That's

19  why I'm getting into this, your Honor.  I can show the video,

20  if you want.

21          THE COURT:  Mr. Mumford, what I've sustained the

22  objection to is the witness's testimony about someone else

23  telling him about a shredder truck.  That's all.

24          Ask another question.

25  BY MR. MUMFORD:

Schrock - D - By Mr. Mumford

1   Q.  Okay.  During that meeting, did -- did Ms. Shawna Cox talk

2   about this sh -- shredder truck, then, sir?

3   A.  Yes, she did.

4   Q.  Okay.  And what -- what kind of a conversation do you

5   recall having about this shredder truck during this meeting?

6   A.  The doc -- the documents were being shredded up at the BLM

7   office.

8   Q.  Now, was there -- you remember also in this meeting there

9   was a -- a -- a question, I think -- or a comment, I think,

10  that Mr. Bundy made about heat outside.  Do you recall that?

11  A.  Yes, I do.

12  Q.  In what context did that -- did that come up?

13  A.  In the power of the media to spread the word.

14  Q.  And are those conversations that you had with -- with --

15  when you were at the refuge, about how -- what the media was

16  doing and how the occupiers could -- were trying to use the

17  media to get their message out?

18  A.  Yeah, they -- they would use the media, to spread their

19  message of the protest and the power of public persuasion.

20  Q.  Okay.  Was there -- over that -- over the course of that --

21  that -- the time they were there, did you see them -- that

22  media coverage, then?

23  A.  Absolutely.  Every day.

24  Q.  Did -- to you, did it comport with what you saw?

25  A.  Not completely.

Schrock - D - By Mr. Mumford                    215

1    Q.   Okay.  Did you try to work with the -- these individuals to

2    try to get it -- get it to more accurately portray?

3              I'm sorry.  That was -- you probably don't know what

4    I'm talking about.

5    A.   I don't know if you can convince them to change the way

6    they report what they report.

7    Q.   Okay.  Fair enough.  I want to move, if we can, to --

8    toward the end of the time the occupiers were there.

9              Were you working with Mr. Bundy in this time period?

10   A.   Yes.

11   Q.   Did you ever come to understand something called a -- a

12   nuts-and-bolts meeting?

13   A.   Nuts-and-bolts meeting?  I've heard -- I've heard that

14   term.

15   Q.   Okay.  What was -- what do you understand that that

16   nuts-and-bolts meeting was going to be?

17   A.   I was on the committee of safety -- or I still am on the

18   committee of safety.  And our job was to -- we had a mission

19   statement and goals set for taking count -- not taking but

20   managing our public lands, the federal lands, on a county -- on

21   a county -- local -- a local control issues of managing our

22   public resources.

23   Q.   Okay.  And was -- was -- was the significance -- do you

24   remember when this meeting was scheduled for?

25   A.   No, I don't.

Schrock - D - By Mr. Mumford

1    Q.   Do you remember if it was -- well, did you ever have it?

2    A.   No, I don't believe so.

3    Q.   And was that -- was that because Mr. Bundy was arrested?

4    A.   Yes, sir.

5    Q.   And so was -- did you understand one of the purposes of

6    this meeting was going to be to start to transition from the

7    occupiers to the committee of safety?

8    A.   I believe so, yes, sir.

9    Q.   How -- how -- how was that going to happen?

10   A.   That's a big question.  (Pause.)

11            The committee of safety would be in the management

12   position until it could have been turned over to the county

13   for -- for the county to manage.

14   Q.   Now, did you understand some of the -- the transition

15   concerned the --

16            MR. GABRIEL:  Your Honor, I'm going to object, even

17   before we get started.  We're leading the witness here and --

18            THE COURT:  The leading nature of the questions is

19   noted.  Objection sustained.

20            Please don't lead the witness.  Continue with your

21   direct.

22            MR. MUMFORD:  Well, I think your Honor said that

23   answers that could be answered with a yes are not leading --

24            THE COURT:  Not when you're editorializing in the

25   front end of it.

Schrock - D - By Mr. Mumford

1          MR. MUMFORD:  Okay.  So I'll --

2          THE COURT:  The objection is sustained.

3          Ask another question in a nonleading way, please.

4    BY MR. MUMFORD:

5    Q.  I'll -- you -- you recall discussions about the work that

6    the occupier was doing involved questions of tracing the -- the

7    title and the rights to the land?

8    A.  The deeds to the property and -- and the actual possession

9    and who was in possession of the property, yes, I was aware of

10   that.

11   Q.  And did you have an understanding of how that was being

12   approached?

13   A.  Yes.  I --

14   Q.  How was that?

15   A.  There was a previous case on the Malheur.  *U.S. versus*

16   *Otley*, 1949.  That was an adverse possession.

17          MR. GABRIEL:  Your Honor, I'm going to object here,

18   if we're talking about the witness's state of mind.

19          THE COURT:  That's true.  The objection is sustained.

20          His view of another case is not relevant here.  He's

21   here to talk about the so-called nuts-and-bolts meeting, and

22   the facts as they existed in anticipation thereof.

23          The witness may not offer an opinion about case law.

24          Please move on.

25   BY MR. MUMFORD:

Schrock - D - By Mr. Mumford

1    Q.  Was the nuts-and-bolts meeting -- was -- was this case

2    you're talking about have something to do with the

3    nuts-and-bolts meeting then?

4    A.  Yes, it did.  It was about the adverse possession.

5    Q.  And what was -- what was going to happen at the meeting

6    related to the adverse possession there?

7    A.  I was going to learn most of that at the meeting.

8    Q.  Okay.  Was it your understanding that the committee of

9    safety was going to step into the shoes, so to speak, of the

10   occupiers regarding --

11   A.  Yes, sir.

12           MR. MUMFORD:  -- regarding --

13           MR. GABRIEL:  I object again, as leading, your Honor.

14           THE COURT:  This is leading.  Please rephrase your

15   question.

16   BY MR. MUMFORD:

17   Q.  Okay.  Would these rights have to be recorded then?

18   A.  Yes, they would.

19   Q.  And did you try to make arrangements for that?

20   A.  Not at that time.

21   Q.  Well, did you help others make arrangements for that and

22   discussions about what the -- the plan was going to be?

23   A.  With the committee of safety members, yes.

24   Q.  Okay.  And did that -- did that involve also discussions

25   about the -- getting the rights recorded at the county

Schrock - D - By Mr. Mumford                    219

1   recorder?

2   A.   Recording the grazing rights and the rights of the ranchers

3   that -- around the Malheur Refuge.

4   Q.   Okay.  And was that going to be part of this transition,

5   nuts-and-bolts meeting there?

6   A.   Yes, sir.

7   Q.   Do you -- do you have an understanding as to -- as -- as to

8   what -- as to what strategies were -- were -- were -- were

9   being -- were going to be discussed to try to do that?

10           MR. GABRIEL:  I'm going to object again, your Honor.

11           THE COURT:  The objection is sustained.

12           MR. GABRIEL:  To his understanding.

13           THE COURT:  This is going beyond, now, the points

14   that we proffered.  And you've got your foundation from which

15   you can make argumentative inferences.  But we now need to get

16   back to what the witness knows about the time in question.

17           MR. MUMFORD:  Yeah, that's -- sorry, your Honor.  I'm

18   not --

19           THE COURT:  Ask another question.

20           MR. MUMFORD:  I'm not listening to my own words here,

21   because I thought that was what I was doing.

22           THE COURT:  Ask another question, please,

23   Mr. Mumford.

24           MR. MUMFORD:  Okay.  Right on.  Right on.

25   BY MR. MUMFORD:

Schrock - D - By Mr. Mumford

1   Q.   So, Mr. -- Mr. Schrock, do you have an understanding as to

2   what the strategies that were going to be discussed at the

3   nuts-and-bolts meeting in -- in the respect to the transfers?

4           MR. GABRIEL:   Your Honor, I'm going to object.   If it

5   goes to Mr. Bundy's state of mind, then it's an allowable

6   answer.   But if it's just his understanding from a different

7   source, then it's hearsay and irrelevant.

8           MR. MUMFORD:   It's not hearsay.

9           THE COURT:   Sir -- sir, rephrase your question to get

10  your client's state of mind, or move to something else.   The

11  objection is sustained.

12          MR. MUMFORD:   Can I have the court reporter read that

13  back?   Because I didn't ask him to -- to say anything about

14  what other people said.

15          THE COURT:   It called for a very broad response.

16  Rephrase the form of your question to call for a response about

17  your client's state of mind, which is why the witness is on the

18  stand, or move on.

19  BY MR. MUMFORD:

20  Q.   Okay.   Can you describe, if you know, what steps were

21  involved with the property disputes that you anticipated with

22  the federal government?

23          MR. GABRIEL:   Your Honor, I have the same objection.

24          THE COURT:   Mr. Bundy's state of mind is not a part

25  of that question.

Schrock - D - By Mr. Mumford

1    Rephrase the question to address the reason why the

2    witness is on the stand as to Mr. Bundy's state of mind,

3    please; not just any source of an answer to that question.

4    BY MR. MUMFORD:

5    Q.  You discussed with Mr. Bundy what the plan was going to be

6    at this meeting with respect to the -- the property disputes

7    that you anticipated with the federal government?

8    A.  The plan to change jurisdiction from federal government

9    over to local.

10   Q.  And as you understand what Mr. Bundy understood at that

11   time period, what was that?

12          MR. GABRIEL:  Again, I'll object.  He can speak to

13   what Mr. Bundy said, but he can't speculate as to what

14   Mr. Bundy believed.

15          THE COURT:  Sir, you may answer the question with

16   respect to anything Mr. Bundy told you on that subject.

17          Go ahead.

18          THE WITNESS:  Can I have the question repeated?

19          THE COURT:  Yes.

20          Mr. Mumford, please rephrase the question, calling

21   for the witness's knowledge of whatever Mr. Bundy may have told

22   him as to those issues, related to Mr. Bundy's state of mind.

23          MR. MUMFORD:  Okay.

24   BY MR. MUMFORD:

25   Q.  Mr. -- Mr. Schrock, what -- what did Mr. Bundy tell you

Schrock - D - By Mr. Mumford

1    about the steps that were involved in the property -- in

2    dealing with the property disputes they anticipated with the

3    federal government as they transitioned these -- these -- these

4    rights over?

5    A.   Adverse possession of the property.

6    Q.   Okay.

7    A.   And then local management of the property through the

8    county.

9    Q.   And tell us what -- tell us, if you know, what -- what you

10   and Mr. Bundy discussed regarding the use that was going to be

11   made of -- with the property after it was -- after the -- the

12   title was -- was transferred over.

13   A.   The beneficial use -- economic use of the timber and the

14   grazing in the county.

15   Q.   And -- and how about with respect to the mineral rights?

16   A.   And the mineral rights, yes.  I'm sorry.  I left that out.

17   Q.   Okay.  And were there -- were there -- were there plans

18   to -- that you discussed with Mr. Bundy about -- about

19   cultivating new grasslands and stuff?

20   A.   Absolutely.

21   Q.   What were those?

22   A.   The land that was not being used, in nonuse.

23   Q.   Okay.  Was -- did you have discussions with Mr. Bundy

24   about -- about the economic impact that this -- this use would

25   have on the county?

Schrock - D - By Mr. Mumford                223

1  A.   That's what part of the committee of safety was working on,

2  was the beneficial use.

3           MR. GABRIEL:   Your Honor, I'm going to object to

4  relevance on the economic impact pieces of this, and

5  cumulative.

6           THE COURT:   I would sustain the objection, but I'm

7  simply going to leave it where it is.   No more on this subject.

8  We are into cumulative material of a degree that under Rule 403

9  I'm going to stop.   But the witness's last answer may stand.

10          Move to something new, please.

11 BY MR. MUMFORD:

12 Q.   Okay.   Did you have a discussion with -- with Mr. Bundy in

13 this time period about how to handle the legal aspects or

14 the -- the -- the political aspects of -- of these -- these

15 matters in the transitionary time period?

16          MR. GABRIEL:   Your Honor, I'm going to object as

17 cumulative to other committee of safety members' testimony.

18          THE COURT:   The objection is sustained.

19          (Pause, Mr. Mumford, and Defendant Ammon Bundy

20          conferring.)

21 BY MR. MUMFORD:

22 Q.   Okay.   This meeting, this nuts-and-bolts meeting, was there

23 a discussion with Mr. Bundy, in preparation of this meeting,

24 about -- about how the committee of safety was going to deal

25 with the legal and political aspects of the transition there?

Schrock - D - By Mr. Mumford

1    A.   (Pause.)  It's hard for me to remember that.

2    Q.   Okay.

3    A.   I'm having trouble.

4    Q.   Okay.  Well, do you remember talking about having lawyers

5    help folks out?

6    A.   I believe so, yes.

7    Q.   Okay.  Did you have -- did you have discussions with -- or

8    did you -- did you have meetings with some of the Oregon

9    politicians in this -- in this -- in this time period?

10   A.   I did, with Mr. Walden.

11   Q.   Okay.  What -- what did you have a discussion with

12   Mr. Walden about?

13            MR. GABRIEL:  I'm going to object as irrelevant, your

14   Honor, and hearsay.

15            THE COURT:  The fact that the witness reached out to

16   an elected representative is not irrelevant in the context of

17   the defendants' theory of the case.

18            What the representative said to him, what happened

19   there, that is inadmissible.  But you can establish that he

20   made a contact.

21            Please move on.

22   BY MR. MUMFORD:

23   Q.   And that -- that contact, then, was in your -- your

24   official role with the committee of safety then, too?

25   A.   I did that on a personal level.

Schrock - D - By Mr. Mumford

1  Q.  Okay.  And you and Mr. Bundy had a discussion about --

2  about that afterward then?

3  A.  No, that -- this was a meeting that I had with the

4  community members of Jordan Valley.  And Mr. Bundy was

5  incarcerated at that time.

6  Q.  Okay.  So that -- that wasn't where I was going.

7  A.  Oh, I'm sorry.

8          (Pause, Mr. Mumford, and Defendant Ammon Bundy

9          conferring.)

10  Q.  At one point, was Mr. Bundy going to participate in that

11  meeting at Jordan Valley, then?

12  A.  Oh, the meeting that I was going to that day, Mr. Bundy was

13  incarcerated that day, was the meeting we were having in John

14  Day.

15  Q.  Okay.

16  A.  That was a different meeting than the one I just described.

17  Q.  And -- and did that meeting in John Day end up going --

18  going --

19  A.  No.

20  Q.  Before --

21  A.  The meeting -- there was no meeting because Mr. Bundy was

22  arrested.

23  Q.  Okay.  Sir, did -- did -- did it affect you, having --

24  having Mr. -- Mr. Bundy arrested?

25          MR. GABRIEL:  I'm going to object to the relevance of

1    that --

2              THE COURT:  The objection is sustained.

3              MR. GABRIEL:  -- question.

4    BY MR. MUMFORD:

5    Q.  Okay.  Let me ask you this.

6              Did you ever tell Mr. Bundy that you wanted him to --

7    to stay?

8    A.  Absolutely.

9    Q.  Why?

10             MR. GABRIEL:  I'm going to object to the relevance.

11             THE COURT:  The objection is sustained.

12             The witness has already demonstrated his support for

13   Mr. Bundy and his involvement in the community to try to

14   advance what he understood were Mr. Bundy's goals.

15             Move on, please.

16   BY MR. MUMFORD:

17   Q.  Were you present when others would tell Mr. Bundy to stay?

18   A.  I didn't hear that, sir.

19   Q.  Oh, I'm sorry.  Were you present when others -- other

20   ranchers told Mr. Bundy they -- they -- that they wanted him to

21   stay?

22   A.  Yes, sir.

23   Q.  Well, what did Mr. Bundy say in response?

24   A.  He was grateful that there were so many people that were

25   being awakened to the fact of the rights that they were losing,

Schrock - D - By Mr. Mumford

1    and needed to know more about it.

2    Q.  About how many -- how many times do you remember that?

3    That -- something like that happening?

4    A.  Pretty much every day I was around.  And the meeting that

5    we held at the -- at the hot springs.

6            MR. MUMFORD:  Your Honor, just a second, if I can.

7            (Pause, Mr. Mumford and Defendant Ammon Bundy

8            conferring.)

9    BY MR. MUMFORD:

10   Q.  Mr. Schrock, had -- had you ever been involved in a -- a --

11   a political movement prior to this?

12   A.  No, sir.

13   Q.  What -- what did you tell Mr. Bundy last time, that you --

14   that you saw him?

15           MR. GABRIEL:  I'm going to object to the relevance of

16   that question, your Honor.

17           THE COURT:  The objection is sustained.

18           The witness's state of mind on that point is not

19   relevant to the material issues in this case.

20   BY MR. MUMFORD:

21   Q.  When was the last time you told Mr. Bundy that you wanted

22   him to stay there longer, to help -- help folks out?

23   A.  The committee of safety had a meeting at the Malheur with

24   Mr. Bundy.  We -- our committee is six people.  We went there

25   with a letter that was asking Mr. Bundy to leave the premises.

Schrock - D - By Mr. Mumford

1   And there were six places for signatures and only three of the

2   six signed.  And the other three that abstained from signing

3   wanted Mr. Bundy to stay because of the message that he was

4   sending out to the ranchers about the rights that they felt

5   they were all losing.

6   Q.  And did you observe anything during all of this time that

7   ever caused you to question Mr. Bundy's intentions were

8   anything other than -- anything different than what he was

9   stating publicly?

10  A.  Never.

11          And I forgot half that question, your Honor.

12          THE COURT:  He was asking whether you saw anything

13  that changed your perspective of Mr. Bundy's beliefs, as

14  stated?

15          MR. MUMFORD:  Actually, can I just ask that again?

16          I might have -- I might have not state -- stated it

17  well enough.

18  BY MR. MUMFORD:

19  Q.  Did you observe anything, during all of this time, that

20  caused you to question whether Mr. Bundy's intentions were

21  anything other than what he stated publicly?

22  A.  I never observed anything other than that.  And I told him,

23  at that time -- in every meeting that I had with him, I thanked

24  him for what he was doing and for putting his life on the line

25  for us.  And I did not want to see him leave.

Schrock - X - By Defendant Ryan Bundy

1     MR. MUMFORD:  Thank you.  Thank you, Mr. Schrock.

2   Thank you, your Honor.

3          No more questions at this time.

4          THE COURT:  Any other questions?

5          Yes, Mr. Bundy.

6                    CROSS-EXAMINATION

7   BY DEFENDANT RYAN BUNDY:

8   Q.  Mr. Schrock -- Mr. Schrock, how are you today?

9   A.  I'm good.

10          THE COURT:  Your microphone, Mr. Bundy.

11          DEFENDANT RYAN BUNDY:  It's on now.

12          THE COURT:  It wasn't broadcasting.  Sorry.

13   BY DEFENDANT RYAN BUNDY:

14   Q.  How are you today?

15   A.  Good, sir.

16   Q.  Good to see you.

17          That letter that you said that was produced by the

18   committee of safety, three signed, three did not, was that ever

19   actually delivered to Ammon or the people there?

20   A.  It was delivered to the Malheur, and I delivered it

21   personally.

22   Q.  Gotcha.  Back to your cattle, what did you mean when you

23   said there was an issue about your cows in another state?

24          MR. GABRIEL:  I'm going to object to that on

25   relevance grounds, your Honor.

Schrock - X - By Defendant Ryan Bundy

1          THE COURT:  He testified to this on direct, without

2    objection, so he gets to explain what he meant.

3          Go ahead, sir.  What did you mean?

4          THE WITNESS:  My -- my cattle were moved to

5    California.  The brand office came out and inspected the cattle

6    because you have to have health certificates and brand

7    transportation slips for every cow that you move.

8          And within ten days of the delivery, they -- which is

9    probably natural -- they showed up and -- and didn't even need

10   to see the paperwork.  They just wanted to look at the cattle.

11         And then three and a half -- three to four weeks ago,

12   an inspector came from Sacramento to -- a message -- the -- the

13   brand inspector came from in the neighboring town of Susanville

14   to -- he had a request from the brand office to go and inspect

15   the cattle again.

16         And he -- while he was there, he -- the people that

17   manage the cattle for me said that somebody was already out to

18   inspect the cattle.  And he was upset because this was his

19   district, and he had no knowledge -- prior knowledge of anyone

20   being there to check the cattle.

21         And proceeding through that process of the paperwork,

22   he said that they were the most talked-about cattle in

23   Sacramento, California, because they had the Bundy name tied to

24   the owner of the cattle.  That they came from Harney County.

25   BY DEFENDANT RYAN BUNDY:

Schrock - X - By Ms. Harris                    231

1   Q.  And was that after you were named as a defense witness in

2   this case?

3   A.  Absolute -- yeah.  It was after I was subpoenaed.

4   Q.  So have you experienced -- besides that, have you

5   experienced unusual treatment or anything unusual since you

6   were named as a defense witness?

7   A.  (Pause.)  I deactivated my Facebook account.  Harassment.

8   And other than the visit from Mr. -- Mr. Jones, that paid my --

9   paid me a visit, to my ranch.

10  Q.  Are you in fear of future repercussions will come from you

11  testifying today?

12  A.  Probably.

13          DEFENDANT RYAN BUNDY:  Thank you, Mr. Schrock.  I

14  have no further questions.

15          THE COURT:  All right.  Anything else?

16          Cross?

17          MS. HARRIS:  Yes, briefly, your Honor.

18          THE COURT:  Oh, Ms. Maxfield.  Go ahead.

19          MS. MAXFIELD:  No questions, your Honor.

20          THE COURT:  I'm sorry.  Oh.  Ms. Harris.

21          MS. HARRIS:  Yes, I --

22          THE COURT:  I apologize.

23          MS. HARRIS:  It's okay.

24          THE COURT:  Go ahead.

25                      CROSS-EXAMINATION

Schrock - X - By Ms. Harris

1   BY MS. HARRIS:

2   Q.  Good afternoon, Mr. Schrock.  I have a few questions for

3   you.

4           This meeting that's -- part of it is captured in

5   Exhibit 51.

6           Ms. Cox was not the one who set this meeting up, was

7   she?

8   A.  I believe I was the one who set the meeting up, ma'am.

9   Q.  Did Ms. Cox dictate the agenda for that meeting?

10  A.  No, she did not.

11  Q.  At this meeting -- and no disrespect to the gentlemen who

12  were present at the meeting.  But would it be fair to say that

13  the gentlemen at the meeting did most of the talking?

14  A.  Absolutely.

15  Q.  You said that you went to the refuge, I think, about three

16  times a week during the course of the occupation.

17  A.  Yes, ma'am.

18  Q.  On these occasions, you saw Ms. Cox around the refuge?

19  A.  Yes, ma'am.

20  Q.  And what -- what did you see her carrying, when you saw

21  her?

22  A.  Most of the time she had a pen and a tablet.

23  Q.  And on occasions when you saw her in meetings, what

24  typically was her role?

25  A.  She was taking notes.

Schrock - X - By Mr. Schindler

1    MS. HARRIS:  I have no further questions.  Thank you.

2    THE COURT:  All right.  Cross?

3    MR. SCHINDLER:  Your Honor, I'm sorry.

4    THE COURT:  I'm sorry, Mr. Schindler.  Go ahead.

5    MR. SCHINDLER:  That's okay.  I'm way back here.

6    THE COURT:  No.  It's hard it miss you.

7    Go ahead.

8    (Laughter.)

9                    CROSS-EXAMINATION

10   BY MR. SCHINDLER:

11   Q.  Good afternoon, Mr. Schrock.

12       You talked about the intimidation you experienced

13   during the course of the conversation with FBI Agent Jones.

14   And one of the things you indicated was you felt like he was

15   trying to get you to say that there were guns on the refuge

16   that you didn't see?

17   A.  Absolutely.

18   Q.  Did you see guns on the refuge?

19   A.  I saw one long gun, and that's exactly what I told him.

20   Q.  Who was carrying it?

21   A.  I don't know who the gentleman was.

22   Q.  Was he pointing it at anyone?

23   A.  No.

24   Q.  Do you own guns?

25   A.  Yes, sir.

Schrock - X - By Mr. Schindler

1   Q.  Did you bring any with you when you went to the refuge the

2   first time?

3   A.  I travel with guns in my pickup.  I live in Harney County.

4   Q.  Well, you say that as though that's a very common thing in

5   Harney County?

6   A.  Very common.

7   Q.  And forgive me if I'm asking you a question that you

8   already answered.

9            How long have you been involved in ranching?

10  A.  My whole life.

11  Q.  Has it changed?

12           MR. GABRIEL:  I'm going to object to the relevance --

13           THE COURT:  The objection is sustained.  We've

14  covered this general nature about the community.

15           MR. SCHINDLER:  Thank you.  Thank you.

16           THE COURT:  Go on.

17  BY MR. SCHINDLER:

18  Q.  Did you hear anyone firing any guns during the time that

19  you were at the refuge?

20  A.  I never heard a gunshot.

21  Q.  Did you see anyone damaging any refuge property?

22  A.  I never saw any damage to property while I was there.

23  Q.  If you had seen someone doing something like that, what

24  would you have done?

25  A.  I would have stopped it.

1    Q.  The rights that you talked about being educated about,

2    I'm -- I'm not completely understanding that.

3           Are you saying you were never aware of these things

4    before you met Mr. Bundy?

5    A.  When I moved to Harney County eight years ago, I stuck my

6    head in the sand, and I didn't pay attention to a lot, rather

7    than what was happening in front of me and living a peaceful

8    and quiet life.

9           MR. SCHINDLER:  And -- I have no further questions,

10   your Honor.

11          THE COURT:  Okay.

12          MR. SALISBURY:  Judge, I have some questions.

13          THE COURT:  Yes, Mr. Salisbury.  Thank you.

14          MR. SALISBURY:  Thank you.

15                         CROSS-EXAMINATION

16   BY MR. SALISBURY:

17   Q.  Good afternoon, Mr. Schrock.

18          When you mentioned -- you talked about the FBI agent

19   coming and talking to you.  And the other issue was the

20   branding of your cattle?

21   A.  It was through the brand office in the state of California.

22   Q.  Is the -- is the FBI involved with the brand office in the

23   state of California?

24   A.  It's a state agency.

25   Q.  Okay.  Now, these things happened before you testified in

Schrock - X - By Mr. Salisbury                    236

this case?

A.   Yes, sir.

Q.   Why would you come in and testify anyway, in light of the possible repercussions against you?

A.   Because of repercussions against me.

Q.   Can you explain that?

A.   I don't know where they'll stop on -- on the harassment.

          MR. SALISBURY:  No further questions.

          THE COURT:  Okay.  Now, cross, Mr. Gabriel.

          MR. GABRIEL:  No cross-examination.

          THE COURT:  Okay.  Well, there you go.

          MR. GABRIEL:  Thank you, sir.

          THE COURT:  Mr. Schrock, you're free to go now.
Thank you, sir.  Go ahead and step down.

          Jurors, I'm going to ask you to step out briefly.  We have a video -- a potential video link with another witness. It will be brief.  But I need to set it up and I need to see if it's going to work before we go with that.

          So we'll give you a chance to stretch your legs one more time.  Notes on the chair.  Please do not talk about the case.  Give us just a moment to get this set up, and then I'll be right back with you.  Okay?

          Let's all stand for the jurors.

          (Jurors exit at 2:15 p.m.)

          THE COURT:  Please be seated.  Let's get this witness

Colloquy

1    set up so that I can assess the adequacy of the presentation,

2    please.

3              Is somebody setting it up?

4              MR. OLSON:  May I step out?

5              THE COURT:  All right.  But somebody needs to get

6    this witness set up by video, please.

7              (Pause.)

8              THE COURT:  Okay.  Do we have audio?  Liam?

9              Sir, good afternoon.

10             (Judge speaking to witness displayed on monitor.)

11             THE COURT:  We don't have audio.  Hold on a minute.

12   We don't have audio.

13             No, not for you; the witness, Mr. Mumford.

14             MR. MUMFORD:  Okay.  (Pause.)

15             THE COURT:  Mr. Mumford, if this is your witness, try

16   to establish contact.

17             Is this your witness?

18             MR. MUMFORD:  Yes.

19             Mr. Puckett, can you hear us?

20             THE WITNESS:  Yeah, I can.

21             MR. MUMFORD:  Okay.  So I'm going to ask you

22   questions here.

23             Can we -- is it possible that we can turn his volume

24   up at all?

25             THE COURT:  You can go ahead and be seated,

Colloquy

1    Mr. Mumford, don't get too close to your mic because it's got a

2    feedback going.

3            Now we've lost him.

4            MR. MUMFORD:  I believe that was -- okay.  Have we

5    got you now?

6            THE WITNESS:  Yeah.

7            MR. MUMFORD:  Okay.  So I'm just going to ask you a

8    few questions real quick, just to see --

9            (Pause, electronic feedback interference.)

10            MR. MUMFORD:  I'm sorry.  What that was?

11            MR. NEWBY:  13th floor was doing that.

12            MR. MUMFORD:  Can you hear us now?

13            THE COURT:  We can't hear him.

14            MR. MUMFORD:  Can you introduce yourself, please.

15            THE COURT:  We cannot hear him.

16            MR. MUMFORD:  Okay.  I'm asking him to talk.

17            MR. NEWBY:  I'm going to have to --

18            THE COURT:  Hold on a minute.  This is not working,

19    and so we're not going to be able to do this if we don't get

20    this resolved.

21            You're saying you have to turn off the microphones on

22    13.

23            MR. NEWBY:  I'm going to have to try to connect with

24    them, and do it through here.

25            THE COURT:  All right.  Well, we have exactly ten

Colloquy

```
 1    minutes to get this done or it has to be put off.
 2              MR. MUMFORD:  Okay.  Tell me when I should ask him
 3    again.  Okay?
 4              (Pause.)
 5              MR. MUMFORD:  Okay.  Mr. Puckett, can you introduce
 6    yourself, please.
 7              THE WITNESS:  Tim Puckett.
 8              MR. MUMFORD:  Okay.  So I'm just going to just
 9    keeping talking for just a little bit here, okay?
10              THE WITNESS:  Okay.
11              MR. MUMFORD:  What do you do for a living?
12              THE WITNESS:  I ranch.
13              MR. MUMFORD:  Okay.  You live -- where do you live?
14              THE WITNESS:  I live in Burns, Oregon.
15              MR. MUMFORD:  Great.
16              And, in fact, where are you -- where are you here
17    today?
18              THE WITNESS:  I'm in Burns, Oregon, right now.
19              MR. MUMFORD:  Okay.  Is this at your friend's house,
20    then?
21              THE WITNESS:  Yes, it is.
22              MR. MUMFORD:  Okay.  How is that, your -- your Honor?
23              THE COURT:  Let me ask one of the prosecutors to
24    speak with the witness, and then I'll take your arguments.
25              MR. MUMFORD:  And there's no -- just so you know,
```

Colloquy

1    Mr. Puckett, there's no jury in the room right now.  Okay?

2              THE WITNESS:  Okay.

3              MR. MUMFORD:  Go ahead.

4              MR. KNIGHT:  Hi there, Mr. Puckett.  My name's Ethan

5    Knight.  I'm one of the prosecutors.

6              Can hear me okay?

7              THE WITNESS:  Yeah, I can.

8              MR. KNIGHT:  Okay.  Thank you.

9              THE COURT:  And, Mr. Puckett, my name's Anna Brown.

10   I'm the judge presiding here.  Are you able to hear me?

11             THE WITNESS:  Yes, I am.

12             THE COURT:  Okay.  So the issue I'm going to be

13   talking about with the lawyer -- and you can just listen as we

14   go through it -- is whether you should be permitted to testify

15   in this manner, as opposed to being live.

16             Are you unavailable to be in Portland, say, on

17   Monday, in the event this --

18             THE WITNESS:  Ah, yeah.  Yes, I am.  I won't be

19   available.

20             THE COURT:  Tell me what the conflict is, please.

21             THE WITNESS:  My -- well, Tuesday would be my

22   grandma's funeral, and we're dealing with all of that right

23   now.

24             THE COURT:  I'm sorry to hear that.

25             So what you're saying is you need to stay close to

Colloquy

1    home to help address those issues?

2            THE WITNESS:  Yes.

3            THE COURT:  All right.  Is your father likewise

4    involved in these issues?

5            THE WITNESS:  Yes, ma'am.

6            THE COURT:  Okay.  And so -- just so you know, it may

7    be that the Government will try to be calling him and a similar

8    arrangement may need to be made, in the event they want to call

9    him as a witness.

10           Are you able to help him set up a connection like

11   this, if it's necessary?

12           THE WITNESS:  Yes, I can.

13           If I can get -- he's a lot more busier than me, but I

14   know he's headed to Canada after the funeral.  So --

15           THE COURT:  Okay.

16           THE WITNESS:  -- I don't know.

17           THE COURT:  And that's on Tuesday?  The funeral?

18           THE WITNESS:  Yes.

19           THE COURT:  In Burns?

20           THE WITNESS:  In Deschutes County.

21           THE COURT:  In Deschutes County.

22           Are you all expected to be in the Burns area on

23   Monday?

24           THE WITNESS:  I -- it's hard to tell if we'll all be.

25   We're just dealing with -- I mean, it's --

Colloquy

1          THE COURT:  Sure.  I understand these are hard times.

2          If the objection is that the witness -- witness's

3    demeanor, and the like, is not accessible by the jury because

4    he's appearing in a video format, I'm going to overrule that

5    objection.

6          His -- for the record, his image is clearly before

7    the screen.  His voice is hearable.  I think under the

8    circumstances, especially in light of the witness's family

9    loss, his personal presence would be an undue burden to him.

10         And for the very limited purpose and in -- under a

11   few minutes, the witness may testify about the very specific

12   issue involving the fence cutting, so that the jurors are not

13   to --

14         (Indiscernible voices over the satellite.)

15         THE COURT:  Ooh.  Is there back -- Mr. Puckett, is

16   that noise at your end?

17         THE WITNESS:  Yes, it is.  Sorry.

18         THE COURT:  Is there something we can do to be sure

19   that doesn't happen when the jurors come in?

20         THE WITNESS:  Okay.

21         THE COURT:  I need to be sure of that because we're

22   about to bring 19 people in who are going to try to listen

23   carefully, and we can't have that sort of background.  All

24   right?

25         THE WITNESS:  Okay.

Colloquy

1        THE COURT:  Do you need to talk to somebody before we

2  bring them in?

3        THE WITNESS:  It's -- it's handled.

4        THE COURT:  Okay.  So I'm going to bring the jury in.

5  And then I'll -- I'll start by explaining to the jury what

6  we're doing.

7        The clerk will then ask you to please raise your

8  right hand.  Would you do that for me now, so I can see how

9  that looks?  All right.

10        You'll be asked to raise your right hand.  The clerk

11  will give you the oath.  And then when you say, yes -- which I

12  assume you will do -- I will ask you to tell us your full name

13  and spell it.  And then Mr. Mumford will ask the very specific

14  questions he needs to get in without us delaying the jurors any

15  further.  All right?

16        THE WITNESS:  Okay.

17        THE COURT:  Okay.  Ms. Boyer, bring in the jury,

18  please.

19        We're all going to stand for the jurors, Mr. Puckett.

20        You can just stay where you are.

21        (Pause.)

22        (Jurors enter at 2:24 p.m.)

23        THE COURT:  All right.  Thank you, everyone.  Please

24  be seated.  And thank you, jurors.

25        You'll see on the screen in front of you -- at least

1    I hope you're seeing on the screen in front of you an image.

2              This is the defendant's next witness, Tim Puckett.

3              Mr. Puckett's had a death in the family and isn't

4    able to come to Portland.  He's on a video feed from Burns,

5    Oregon.

6              So, Mr. Puckett, would you please raise your right

7    hand, and the clerk will administer the oath.

8              (Witness sworn.)

9              THE WITNESS:  I do.

10             THE COURT:  Mr. Puckett, would you tell the jury,

11   please, what is your full name and spell all of it.

12             THE WITNESS:  Timothy Patrick Puckett, Jr.

13   T-I-M-O-T-H-Y, P-A-T-R-I-C-K, P-U-C-K-E-T-T.

14             THE COURT:  Jr.?

15             THE WITNESS:  Yes.

16             THE COURT:  Thank you very much.

17             All right.  Mr. Mumford.

18                        DIRECT EXAMINATION

19   BY MR. MUMFORD:

20   Q.  Yes, Mr. Puckett, this is Marcus Mumford.

21             Mr. Puckett, where do you live?

22   A.  I live in Burns -- well, Princeton, Oregon.

23   Q.  Okay.  How long have you been there?

24   A.  Going on four years.

25   Q.  What do you do for a living?

Puckett - D - By Mr. Mumford

1    A.   Rancher, farmer.

2    Q.   Does -- does your family also ranch?

3    A.   Yes.

4    Q.   How long have you been a rancher?

5    A.   Pretty much my whole entire life.

6    Q.   Okay.  Did you graduate from high school?

7    A.   Yes, sir.

8    Q.   Did you do anything in between high school and going into

9    ranching with your family?

10   A.   I left home as soon as I graduated, and got myself in some

11   trouble, and then came home.

12   Q.   That trouble that you talk about, what sort of trouble was

13   that?

14   A.   I went and I got some drug convictions and a burglary and

15   theft.

16   Q.   Okay.  And what prompted you to move back home?

17   A.   I about lost my life.  And I had pretty -- my -- my dad and

18   my family, and I about got killed.

19   Q.   Did your family give you any conditions about moving home?

20   A.   Yes, they did.  My dad -- the only conditions that I could

21   come home in is go to rehab.  And I couldn't mess up, or if I

22   failed anything on my probation, or anything, he was done.

23   Q.   Without getting too personal, have you messed up on your

24   probation or anything at all?

25   A.   Absolutely not.

Puckett - D - By Mr. Mumford

1    Q.   Where is your ranch?

2    A.   I'm off probation, and everything.  I got it all --

3    Q.   Where is your ranch located in relationship to the Malheur

4    wildlife refuge?

5    A.   It's about a quarter mile, half a mile east of the

6    headquarters.

7    Q.   Does your ranch share a fence with the refuge?

8    A.   Yes, it does.

9    Q.   Did you ever meet Mr. Ammon Bundy?

10   A.   Yes, I did.

11   Q.   About how many times?

12   A.   Quite a few times.

13   Q.   What were the circumstances, first time that you met him?

14   A.   He came down to introduce himself, and just talked and --

15   because I was a neighbor to the refuge.

16   Q.   Now, prior to this -- getting on this -- the -- a video

17   with you here today, did -- did my office send you a photo?

18   A.   Yes, sir.

19   Q.   Can you just describe what -- what's portrayed in that

20   photo?

21   A.   It was me and Ammon Bundy meeting for the first time.

22        He came down and introduced himself, and that's the

23   first time I met him.

24        MR. MUMFORD:  Okay.  And just so you know, your

25   Honor, after this -- after this, I'm going to ask to introduce

1    that into evidence.  It's Defense Exhibit 1017.

2    BY MR. MUMFORD:

3    Q.  Did you meet Mr. Ryan Bundy as well?

4    A.  Yes, I met them both.  I considered them my friend.

5    Q.  And do you know that -- you know that they were involved

6    in -- in the occupation of the -- of the wildlife refuge in --

7    earlier this year?

8    A.  Say that again?  Sorry?

9    Q.  Do you know if they were involved in the occupation of the

10   wildlife refuge earlier in this year?

11   A.  Yes, sir.

12   Q.  And that was when -- that was -- that's -- that's the

13   context of those meetings with the Bundys that we're talking

14   about.  Isn't that right?

15   A.  Yes.

16   Q.  Okay.  And, in fact, at that time, you -- you're aware that

17   the occupiers were involved in removing a portion of -- of the

18   fence between your property and the refuge?

19   A.  Yes.

20   Q.  Mr. -- Mr. Puckett, did -- did they have permission to --

21   to -- to access your property and remove the fence?

22   A.  They had permission to be on our property.  The fence -- I

23   think a hired hand, or someone, gave that.  But they had full

24   permission to be on the property for -- on our property.

25              I mean, we didn't have nothin' against them.  They

Puckett - D - By Mr. Mumford

1    didn't do nothin' to us.

2    Q.  And did you -- and you -- you said that a hired hand had

3    given them permission then.  Right?

4            MR. KNIGHT:  I'm going to object to hearsay, your

5    Honor.

6            THE WITNESS:  Yes.

7            THE COURT:  Excuse me.  The witness already testified

8    to that earlier without objection.

9            Don't repeat it, please, Mr. Mumford.  Time is of the

10   essence.

11           MR. MUMFORD:  Yes.

12   BY MR. MUMFORD:

13   Q.  And, Mr. Puckett, was this a fairly significant portion of

14   the -- the -- the fence?

15   A.  It was just a couple of posts of the fence.  I mean, a

16   couple of T posts.

17   Q.  Was the fence in good repair before the occupiers took down

18   that portion of the fence?

19   A.  Absolutely not.

20           The fence was completely tore down from the flood.

21   Q.  So did the occupiers cutting that section of the fence

22   change the function of the fence in any way?

23   A.  Absolutely not.

24           MR. MUMFORD:  Thank you very much.

25           I've got no more questions.

1          THE COURT:  All right.  Anyone else?

2          All right.  Cross.

3          MR. KNIGHT:  Thank you.

4                    CROSS-EXAMINATION

5  BY MR. KNIGHT:

6  Q.  Mr. Puckett, hi.  It's Ethan Knight again.  I know you

7  can't see me, but I just have a few questions for you.  Okay?

8          That fence you're talking about, that fence is

9  actually property of the United States Fish & Wildlife Service,

10  isn't it?

11  A.  Yes.  It's -- it's their fence to keep -- yes, they have to

12  keep us out.

13  Q.  So you couldn't give authority to cut that fence, even if

14  you wanted to, could you?

15  A.  No.

16          MR. KNIGHT:  Thank you.  No further -- no further

17  questions, your Honor.

18                    REDIRECT EXAMINATION

19  BY MR. MUMFORD:

20  Q.  Were -- Mr. Puckett, were you finished with your answer,

21  there?

22  A.  What was that?  Sorry?

23  Q.  Were you finished with your answer there?

24  A.  Well, it was -- it's the wild -- or it's the refuge fence

25  but it's also -- would be kind of, I guess, our fence too

1    because it borders us, it borders them.

2            So -- but I don't know for sure if I have the

3    authority to give permission what to do with it.  I know I have

4    authority to rebuild it when I wanted to, and -- sections of it

5    to keep my cows in.  So I don't know for sure what -- where my

6    authority stands on it, but I know I have every right to go out

7    there and fix it.

8    Q.  And were you -- was your family contacted by the -- the

9    federal government after the occupiers cut it down, and told

10   that you need to go out there and fix it?

11   A.  You would have -- they didn't contact me, but my dad --

12   there was some kind of connection there that -- they didn't

13   tell him he had to go fix it.  They were just wanting to know

14   what was going on.  So I don't know for sure what the

15   conversation was between them and my dad.

16           MR. MUMFORD:  Okay.  And thank you -- thank you very

17   much.

18           THE COURT:  All right.  Mr. Puckett, thank you, sir

19   for make yourself available, especially under these

20   circumstances.  We're going to disconnect the connection.  All

21   right?  Thank you, sir.

22           Go ahead and disconnect.

23           THE WITNESS:  Thank you.

24           THE COURT:  And so, ladies and gentlemen, with that,

25   your work this week has come to another conclusion.

Colloquy

1          I want to thank you, again, for your ongoing

2     attention.

3          I want to project tentatively a schedule for next

4     week.  And I say tentatively because things are still in flux

5     and subject to change.  But it's my expectation that the

6     evidence you've been hearing, that's going to come to an end

7     sometime next week.  And that we will be moving into the final

8     jury instructions and closing arguments, which I referenced

9     yesterday.

10         And then once that happens, the -- the remaining

11    alternate jurors will be excused to go home and the

12    deliberating 12 jurors will retire to deliberate.

13         I want to give you just a little bit of expectation

14    around that, so you know what timing is like.

15         For deliberation purposes, your work will be

16    basically during the same court day hours that you've been

17    working.  You would be here at about the same time, leave at

18    the same time unless all of the 12 deliberating jurors want to

19    work longer, in which case we will do whatever you would like

20    to do.

21         There isn't any right or wrong amount of time to

22    deliberate.  It just is required that the jurors consider all

23    of the evidence.  And do it calmly and dispassionately and

24    discuss it, and all of that.  So I can't predict for you how

25    long that will be.  It will be however long you say it is.

Colloquy

1      So once the case is in the hands of the deliberating

2  12 jurors, we will be waiting on you, instead of you waiting on

3  us.  And we will -- the basic schedule is the Court's schedule,

4  morning to afternoon, as we've been doing it.

5      Now, next week, if it happens that the case is in

6  your hands, say, by Thursday morning, just as a hypothetical --

7  and, again, I can't -- I can't tell you because I don't know.

8  But if it happens that you're deliberating by Thursday morning,

9  what I would like the 12 who are expected to be those

10  deliberating jurors to think about is whether you would like to

11  work next Friday, as opposed to having that be a day -- a dark

12  day.  Because once deliberations start, you may want to choose

13  to just continue them Friday, but that's going to be up to you.

14  The timing of your deliberations will be up to you.

15      We'll need updates from time to time what it is

16  you're planning, so we can provide lunches and ensure

17  everybody -- everything you need is available.  So give that

18  some thought.

19      Again, it's all tentative because we don't quite know

20  when the case will actually be at the point where I can tell

21  you you've now heard all of the evidence you're going to hear

22  but that will be next week.  I'm almost sure.  I just -- you

23  know.  I'm doing the best I can to predict, based on what I

24  know.  So give that some thought.

25      Remember, you're still not to talk about the case

Colloquy

1    with anyone, not allow anything about the case to come across

2    your path.

3                Once the case is in the hands of the deliberating

4    jurors, then you're -- then it is your duty to discuss it fully

5    and thoroughly and to determine for yourself what is or isn't

6    proved as a matter of fact.  So that time will come, in due

7    course.

8                And then after the case is over, after verdicts are

9    returned, those nondeliberating jurors will be contacted.

10               And then once all the jury work is complete, you'll

11   be free to speak to whomever you want about whatever you want

12   except with respect to what goes on in the jury room stays in

13   the jury room.  That's private among the deliberating 12.

14               You need to be frank with each other, and your

15   personal perspectives you can always talk about.  But other

16   jurors -- everybody needs to be free to express their views

17   fairly and impartially and to get on with the decision.

18               So there will come a time when I won't be telling you

19   not to talk about it.  It will come soon enough.

20               Just, please, you've worked this far, and -- and so

21   far no one has told me about anything that affects that, so

22   it's important we keep it that way, until the case is given to

23   you.  All right?

24               So hopefully that gives you a little bit of planning

25   information.  We'll check in with you about your desires next

Colloquy

1    week, as we know a little more about where things stand.

2            Please leave your notes here.  Travel safely home,

3    especially those of you who have long drives.

4            Have a good weekend.  See you Monday morning, ready

5    to go.

6            Okay.  Let's all stand for the jurors and thank them

7    for their work again.

8            Watch your step, folks.

9            (Jurors exit at 2:39 p.m.)

10           THE COURT:  All right.  Please be seated.

11           I want to outline what I need you to know for

12   scheduling for the rest of the afternoon.

13           At three o'clock, in this courtroom, I need to take

14   up an unrelated proceeding, and so all of you parties need to

15   be out so that those parties can have the space -- the well

16   space and address the issues they have to address.

17           At 3:30, I want to reconvene.  And I do want to go

18   through the first draft of the final jury instructions.  It's

19   clear to me, now, they probably can't get finalized today.  But

20   after the process we engage in this afternoon, I'll generate a

21   second draft of final jury instructions.  And then we'll have

22   another opportunity to review them before the case gets into

23   its final, final mode.

24           I have several items that I am carrying as still

25   pending, and we need to come to a schedule to get them finally

255
Colloquy

1    resolved.  And I just want to list them out, so that if I'm
2    missing anything, you tell me.  But, otherwise, we need a plan,
3    when we reconvene, to come to some final decision on this.  On
4    the things that are issues, some are just directions to you.
5         With respect to the Government's proffers to the
6    defendants about the planned rebuttal case -- and specifically,
7    as Mr. Schindler has been noting, for a requested opportunity
8    to address those issues -- I want filed before Monday morning
9    court, one memorandum on behalf of all defendants that sets out
10   any concerns about the scope of the discovery -- or, I'm sorry,
11   the scope of the rebuttal case.  The reason I want that is we
12   can then get right to, at eight o'clock on Monday morning, what
13   those issues are in the event we're going to get to it.
14        It would be best for me if that's actually filed, you
15   know, no later than midafternoon on Sunday.  I know Sundays are
16   maybe not good days.  But while we're in recess, I suggest all
17   the defending parties figure out who's -- who's going to be the
18   lead to collect those positions and state them for everybody.
19   Somebody needs to do it once for everybody.
20        There needs to be work done with respect to the
21   exhibits.  I raised this once a few weeks ago.  The parties
22   need to come to an agreement as to every exhibit -- well, the
23   parties need to come to an agreement as to the status of every
24   exhibit.
25        Ms. Boyer's been working.  She worked through that

Colloquy

1    with Ms. Rallis and Mr. Breton before she was gone and then

2    back.  So that needs to be updated.

3            Secondly, the parties need to ensure that there is a

4    meaningful index to the exhibits so that the jurors can find

5    that which you want them to find when they're looking, when

6    they're reviewing the evidence.

7            So you need to responsibility on one side or the

8    other so that when the case goes to the jury, we're still not

9    waiting on is an exhibit actually received or not.  And then

10   each side, as I've said before, needs to have somebody who's

11   accountable to guarantee to Ms. Boyer that that which is on the

12   list is actually physically going to the jury.

13           There is a pending issue with respect to Mr. Mumford

14   and that range of exhibits that were shown to Mr. Bundy with

15   respect to refreshing his recollection and the playing of those

16   exhibits.  I ruled at the time that they were there only for

17   purposes of assisting the witness's testimony.  And Mr. Mumford

18   wants that reviewed, and we'll do that in due course.

19           There -- I need an update on Mr. Ryan Bundy's motion

20   with respect to the safe, an update with respect to whatever

21   additional proffers he wants to make before he can rest so that

22   those get resolved.

23           We have still pending the motion to quash, which I

24   understand is being discussed with Mr. McDonald and Mr. Bundy

25   and Ms. Ludwig, as a facilitator.  And we have the motion to

Colloquy

1  compel.

2        With respect to the motion to compel, I understand

3  I'll be getting many more folders and I'll be spending the

4  weekend reviewing what I understand are 129 reports.  And

5  I'm -- it's going to take some time for me.

6        If I can reach some preliminary conclusions about

7  them, I will e-mail the parties.  If I can't, we'll just have

8  to pick up where -- where I leave off, which is we have an

9  issue on -- and on Monday morning.

10        So the Government's already been directed to make

11  some filings that are ex parte and under seal to facilitate my

12  understanding of what's there.

13        So that's the list of the issues I have that need to

14  be addressed before we could ever get to closing arguments.

15        Mr. Schindler?

16        MR. SCHINDLER:  Just a point of clarification

17  relative to the memo that the Court would like to us file.

18        THE COURT:  Um-hmm.

19        MR. SCHINDLER:  I anticipate raising, essentially, a

20  cumulative objection to some of the Government's rebuttal.

21        THE COURT:  So with respect to cumulative material,

22  you need to be specific as to who said it and how many ways

23  before.  Sort of the reverse of what --

24        MR. SCHINDLER:  Okay.  Is it appropriate for me not

25  to put any direct quotes from the rough transcript --

Colloquy

```
 1          THE COURT:  Right.  You can just say, Witness X
 2   covered this subject on date Y.
 3          MR. SCHINDLER:  Okay.  Thank you.
 4          THE COURT:  And it's cumulative.
 5          MR. SCHINDLER:  Thank you.
 6          THE COURT:  If that's the point, I can evaluate it.
 7   But, again, a general statement about cumulative is not helpful
 8   because, first of all, it taxes my memory as to six weeks of
 9   proceedings.
10          And so just, again, the subject's been covered five
11   times:  Witness X on this date, witness Y on that date.  You
12   don't need to quote.
13          MR. SCHINDLER:  But it would not be appropriate to
14   put a cite to a page of the rough transcript?
15          THE COURT:  If you want you can cite the page.  But,
16   again --
17          MR. SCHINDLER:  The rough --
18          THE COURT:  -- the rough transcript is not to be
19   quoted in any filing because it is a work product tool.
20          MR. SCHINDLER:  Understood.
21          THE COURT:  All right.  So you all figure out who's
22   going to do that, so it gets filed.  I am going to say no later
23   than three o'clock Sunday afternoon.  It's better earlier.
24          And then the Government needs to work with that
25   representative to see if issues can be narrowed.
```

Colloquy

 1          You all need to plan to be here at eight o'clock,

 2    again, Monday morning, so we can go forward.  But we'll talk

 3    about this again.

 4          I guess the one last thing I need is to know -- and

 5    when we reconvene at 3:30, I need to know what additional

 6    defense evidence is anticipated.  I think we've covered all of

 7    the witnesses that we've covered and the only real question is

 8    whether there's going to be any direction to the Government to

 9    make disclosures about these confidential human inform --

10    resources, whatever they are.  And then Mr. Bundy's proffers

11    with respect to the video and the -- that other piece of

12    evidence, I know you want to do that on Monday.

13          DEFENDANT RYAN BUNDY:  (Nods head.)

14          THE COURT:  So I want to know what else is expected,

15    so that we can get to a place where the defendants rest, the

16    Government can continue to its rebuttal case, if the court

17    concludes it is not cumulative, and then we'll move on.

18          So, for now, I need Mr. Bundy, Mr. Bundy, Mr. Fry can

19    leave.

20          Everybody else, we need to leave the courtroom

21    because I'm going to start another proceeding here in a

22    different case in just ten minutes.

23          And then we'll -- you'll be back at 3:30.  We're

24    going to work on jury instructions at 3:30.

25          Oh, and one more thing before the gentlemen leave.

Colloquy

1        Mr. Olson, I've had an opportunity to look briefly at

2   the instruction proposal you filed today, a few days late.

3   I'll just say.  Just saying --

4        MR. OLSON:  I didn't think of it until yesterday.

5        THE COURT:  I had a look at it.

6        You didn't think of it.  Okay.  Fair enough.

7        What I would like you to think about, between now and

8   when we resume, is the extent to which the conspiracy

9   instructions don't already address your point.

10       One way to address potentially your point is to admit

11  those definitions in the context of the elements, but refer

12  back to the law of conspiracy as it states.

13       So take a look there.  I just wanted to give you a

14  heads-up on that issue.

15       MR. SCHINDLER:  Judge, could we also have -- you

16  handed out paper copies of the --

17       THE COURT:  You don't have yours anymore?

18       MR. SCHINDLER:  No, I do have it, just not on me.  So

19  if we could have an e-copy, that would be very helpful.

20       THE COURT:  Well, or a -- would a paper copy be

21  better than a --

22       MR. SCHINDLER:  Whatever is easiest for the Court.

23       THE COURT:  We'll get you one before 3:30.  We'll

24  have -- how many need new copies?  One, two, three.  Three?

25  Four?  Make six, just in case.

Colloquy

1          MR. SCHINDLER:  Thank you.

2          Are we okay with leaving our stuff?

3          THE COURT:  Yes, but -- you can leave your stuff, but

4   you need to leave the well of the courtroom, all of you.  And

5   if public observers want to remain, they may, but you need to

6   make the well available to the next parties.

7          Are those the remaining --

8          MR. KNIGHT:  I don't know if they're remaining.

9   They're what Mr. Barrow gave me.

10         THE COURT:  So how many are there?

11         (Judge handed documents.)

12         THE CLERK:  There's six.

13         THE COURT:  I have seven here and three here.  So

14   that's 13.

15         (Court adjourned at 2:48 p.m.)

16         (Please see Volume 2 for continued proceedings.)

17                            -0-

18

19

20

21

22

23

24

25

262

Colloquy

1

2                                    --oOo--

3

4    I certify, by signing below, that the foregoing is a correct

5    stenographic transcript of the oral proceedings had in the

6    above-entitled matter this 8th day of February, 2018.  A

7    transcript without an original signature or conformed signature

8    is not certified.  I further certify that the transcript fees

9    and format comply with those prescribed by the Court and the

10   Judicial Conference of the United States.

11

            /S/ Amanda M. LeGore
12   _____

13        AMANDA M. LeGORE, CSR, RDR, CRR, FCRR, CE
              CSR No. 15-0433   EXP:  3-31-2018
14

15

16

17

18

19

20

21

22

23

24

25